UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

SISTRUNK SEEDS INC. D/B/A
DUNN'S OVERTOWN FARM,
CARMEN SALCEDO,
KRISTEN BROWDE, and
GREGORY VAN DEN DRIES,

     Plaintiffs,

v.

DONALD J. TRUMP, THE DONALD J.
TRUMP PRESIDENTIAL LIBRARY
FOUNDATION, INC., RON DESANTIS,
JAMES UTHMEIER, BLAISE INGOGLIA,
WILTON SIMPSON, FLORIDA BOARD OF
TRUSTEES OF THE INTERNAL
IMPROVEMENT TRUST FUND, MICHAEL
BILECA, ROBERTO ALONSO, MARCELL
FELIPE, ISMARE MONREAL, JUAN
SEGOVIA, JOSE FELIX DIAZ, DAVID J.
SMITH, DISTRICT BOARD OF TRUSTEES
OF MIAMI DADE COLLEGE, and MIAMI
DADE COLLEGE,

     Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Sistrunk Seeds Inc. d/b/a Dunn's Overtown Farm, Carmen Salcedo, Kristen

Browde, and Gregory van den Dries (collectively, "Plaintiffs") file this Complaint and seek

declaratory and injunctive relief for a violation of the Domestic Emoluments Clause of the United

States Constitution against Defendants Donald J. Trump, The Donald J. Trump Presidential

Library Foundation, Inc., Ron DeSantis, James Uthmeier, Blaise Ingoglia, Wilton Simpson, the

Florida Board of Trustees of the Internal Improvement Trust Fund, Michael Bileca, Roberto Alonso, Marcell Felipe, Ismare Monreal, Juan Segovia, Jose Felix Diaz, David J. Smith, the District Board of Trustees of Miami Dade College, and Miami Dade College (collectively, "Defendants"). In support thereof, Plaintiffs allege as follows:

## INTRODUCTION

1. To ensure that Presidents do not put their personal interests above those of the nation, and that no state gains an unfair advantage over federal policy through gifts to the chief executive, the Domestic Emoluments Clause prohibits Florida and other states from giving financial benefits to the President. The Clause provides that the President shall "receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

2. Flouting this prohibition, Florida officials have given the President a piece of state-owned property worth hundreds of millions of dollars. Through a coordinated multipart transaction, Defendants Ron DeSantis, James Uthmeier, Blaise Ingoglia, Wilton Simpson, Florida Board of Trustees of the Internal Improvement Trust Fund, Michael Bileca, Roberto Alonso, Marcell Felipe, Ismare Monreal, Juan Segovia, Jose Felix Diaz, David J. Smith, the District Board of Trustees of Miami Dade College, and Miami Dade College (collectively, the "State Defendants") executed the transfer of a piece of land in Downtown Miami (the "MDC Parcel") to Defendant Donald J. Trump through his corporation, The Donald J. Trump Presidential Library Foundation, Inc. (collectively, the "Trump Defendants").

1

3.      With its waterfront views and central location in bustling Downtown Miami, the MDC Parcel would likely sell for over $300 million on the open market, according to local real estate experts.[1]  But President Trump paid nothing for it.

4.      Instead, the State Defendants gifted the MDC Parcel to the President "free from any waiver, encumbrance, or restriction except for the requirement that the subject parcel contains components of a Presidential library, museum, and/or center within five years of conveyance or that construction has commenced for a Presidential library, museum, and/or center."[2]

5.      But President Trump, in his own words, "do[es] not believe in building libraries or museums."[3]  Instead, the building is "most likely going to be a hotel with a beautiful building underneath and a 747 Air Force One in the lobby,"[4] with significant personal financial benefits inuring to President Trump.  "They say it's the best block in Miami, and the state worked with us [to get it]," President Trump told reporters.[5]

---

[1] *See, e.g.*, Patricia Mazzei, *Florida Hands over Prime Miami Property for Trump Library*, N.Y. Times (Sept. 30, 2025) https://www.nytimes.com/2025/09/30/us/miami-property-trump-library.html [https://perma.cc/L2AU-G3K4]; Luke Mullins, *Trump May Be Getting Ready to Blow Up the Model of a Presidential Library*, Politico (Dec. 7, 2025), https://www.politico.com/news/magazine/2025/12/07/inside-the-crazy-fight-over-donald-trumps-presidential-library-00678715 [https://perma.cc/8KES-L937].

[2] Fla. Dep't of Env't Prot., Bd. of Tr. of Internal Improvement Tr. Fund, *Agenda* (Sept. 30, 2025), https://floridadep.gov/cab/cab/content/september-30-2025-board-trustees-agenda-and-attachments [https://perma.cc/CA3X-LFNW].

[3] Noopur Jambhekar, *Trump Says He 'Doesn't Believe in Libraries' Two Days After Unveiling Presidential Library Plan*, The Independent (Apr. 1, 2026), https://www.the-independent.com/tv/news/trump-library-presidential-hotel-miami-skyscraper-b2949804.html [https://perma.cc/R3WP-AG9W].

[4] *Id.*

[5] Claire Heddles & Douglas Hanks, *Trump Says His Miami Presidential Library Tower Will Probably Have a Hotel, Too*, Mia. Herald (Mar. 31, 2026), https://www.miamiherald.com/news/local/community/miami-dade/article315256318.html?giftCode=995dd51bd6beb87a7d762518e10479c619349a173ee5145a0ee0ff592e269791 [https://perma.cc/KW6Q-7TAH].

6. By virtue of that transaction, the State Defendants have given—and President Trump has received—an "Emolument" besides his salary "during the Period for which [he has] been elected," in violation of the Domestic Emoluments Clause.

7. The giveaway of the MDC Parcel to President Trump has injured Plaintiffs, including Downtown Miami residents Kristen Browde and Gregory van den Dries (the "Resident Plaintiffs"). Ms. Browde lives just two blocks away from the MDC Parcel, which she can see from her balcony and almost every window of her home. Mr. van den Dries lives approximately four blocks north of the MDC Parcel, which he can see from the balcony of his home. The planned high-rise hotel on the MDC Parcel will compromise the Resident Plaintiffs' views and materially worsen the living conditions in their neighborhood.

8. The giveaway has also injured nonprofit Sistrunk Seeds Inc. d/b/a Dunn's Overtown Farm (co-founded by civil rights leader, historian, psychology professor emeritus, author, filmmaker, and veteran Dr. Marvin Dunn), which operates an urban farm in Miami's Overtown neighborhood and seeks to use the MDC Parcel as a site for an urban farm on the Miami Dade College campus.

9. Finally, the giveaway has injured current Miami Dade College student Plaintiff Carmen Salcedo. Ms. Salcedo is a mentee of Dr. Dunn in both urban farming and nonprofit management, and she would benefit personally from an urban farm on the MDC Parcel. She also has an interest in her state-operated college making decisions that benefit her and her education, rather than decisions that line the pockets of President Trump at the expense of students.

10. To redress these injuries, Plaintiffs seek declaratory relief establishing that the State Defendants' gift of an immense monetary benefit to the sitting President of the United States violated the Domestic Emoluments Clause. Plaintiffs also seek equitable relief to enjoin this

violation and declare void the transaction through which the State Defendants gifted the MDC Parcel to President Trump.

## PARTIES

11.     Plaintiff Kristen Browde is a resident of Downtown Miami in Miami-Dade County. She lives in a condominium, which she owns, at 888 Biscayne Boulevard, Miami, FL 33132.  Her condominium directly faces the MDC Parcel, which she can see from her balcony and almost every window of her home.

12.     Plaintiff Gregory van den Dries is a resident of Downtown Miami in Miami-Dade County.  He lives in a condominium, which he owns, at 1040 Biscayne Boulevard, Miami, FL 33132.  His condominium is approximately four blocks north of the MDC Parcel, which he can see from his balcony.

13.     Plaintiff Sistrunk Seeds Inc. d/b/a Dunn's Overtown Farm ("Dunn's Farm") is a Florida nonprofit organization founded in 2022 to establish and operate an urban farm in the City of Miami.  The urban farm grows food for the community, models sustainable farming practices, and provides educational programs on gardening, nutrition, and healthy living.  It focuses on serving low-income and socioeconomically disadvantaged families across Miami, and is also a resource hub and training ground for community members, including Miami Dade College students interested in agriculture, culinary arts, sustainable farming, and the establishment and management of nonprofit organizations with social justice missions.

14.     Plaintiff Carmen Salcedo is a student at Miami Dade College who resides in Miami-Dade County, Florida.  She received her Associate of Arts degree in Anthropology from Miami Dade College in 2024, and is currently enrolling in summer classes at the College as she works toward her Bachelor of Arts degree in business.  She is a single mother who works at a fine dining

4

establishment to support her family and afford tuition at Miami Dade College.  She is the founder and Chief Executive Officer of a nonprofit, nonpartisan organization called Facts & Impacts.  She is also a mentee of Dr. Marvin Dunn, Co-Founder of Dunn's Farm.

15.     Defendant Donald J. Trump is the President of the United States of America.  He is sued in his official capacity.

16.     Defendant The Donald J. Trump Presidential Library Foundation, Inc. (the "Trump Library Foundation") is a Florida nonprofit corporation incorporated on May 23, 2025.[6]  The Trump Library Foundation received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code from the U.S. Internal Revenue Service ("IRS") in October 2025, with the Employer Identification Number (EIN) 39-2379084.[7]  The Trump Library Foundation has three trustees: (1) Eric Trump, President Trump's son; (2) Michael Boulos, President Trump's son-in-law; and (3) James D. Kiley, a New York–based attorney who has previously represented President Trump.  On information and belief, President Trump exercises control over the Trump Library Foundation's operations and objectives.

17.     Defendant Florida Board of Trustees of the Internal Improvement Trust Fund (the "Florida Board") is a state entity established by Chapter 253, Florida Statutes, which "is vested and charged with the acquisition, administration, management, control, supervision, conservation, protection, and disposition of all lands owned by, or which may hereafter inure to, the state or any of its agencies, departments, boards, or commissions."  § 253.03(1), Fla. Stat.  The Florida Board

---

[6] Donald J. Trump Presidential Libr. Found., Inc., Articles of Incorporation (May 19, 2025), *available at*, https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2025%5C0523%5C00177827.Tif&documentNumber=N25000006299 [https://perma.cc/3XBZ-8C7D] [hereinafter "Trump Libr. Found. Articles of Incorporation"].

[7] *Donald J. Trump Presidential Libr. Found. Inc.*, IRS Tax Exempt Organization Search, https://apps.irs.gov/app/eos/ (search by EIN for the search term "39-2379084").

consists of the Governor (acting as chair) and the state cabinet (acting as members), including the Attorney General, Chief Financial Officer, and the Commissioner of Agriculture.  It is a government instrumentality treated as a "state" for purposes of the Domestic Emoluments Clause.

18.     At all times relevant to this action, the Florida Board's members were Governor Ron DeSantis (Chair), Attorney General James Uthmeier, Chief Financial Officer Blaise Ingoglia, and Commissioner of Agriculture Wilton Simpson.  They are named as Defendants in this action in their official capacities as Florida Board members.

19.     Defendant Miami Dade College ("MDC") is a public post-secondary educational institution that operates eight campuses throughout Miami-Dade County, Florida, including the Wolfson Campus in Downtown Miami.  MDC is the largest institution in the Florida College System, and it is a government instrumentality treated as a "state" for purposes of the Domestic Emoluments Clause.

20.     Defendant District Board of Trustees of Miami Dade College (the "MDC Board") is the seven-member body that governs MDC, overseeing its operations, policies, budgets, and assets.  It is a government instrumentality treated as a "state" for purposes of the Domestic Emoluments Clause.  The Governor appoints, and the Florida Senate confirms, MDC Board members.  §§ 1001.60–.64, Fla. Stat.

21.     The MDC Board presently consists of members Michael Bileca (Chair), Roberto Alonso (Vice Chair), Marcell Felipe, Ismare Monreal, Juan Segovia, Jose Felix Diaz, and David J. Smith—each of whom Governor Ron DeSantis appointed and the Florida Senate confirmed. They are named as Defendants in this action in their official capacities as MDC Board members.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

23.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this district, and the property that is the subject of the action is situated in this district.

24.     Specifically, the MDC Parcel is located in Miami, Florida, within the Southern District of Florida.

**CONSTITUTIONAL BACKGROUND**

*Fears of Government Corruption at the Founding*

25.     Article I, Section 1, Clause 7 of the United States Constitution provides: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."

26.     Commonly known as the Domestic Emoluments Clause, this provision reflects the Founders' deep concern that government corruption could undermine the new republic and harm the American people.

27.     Because the Founders believed that corruption was one of the gravest threats to the new nation, they viewed anti-corruption measures as essential to preserve the separation of powers and an enduring republican form of government.  As George Mason warned his fellow delegates at the Constitutional Convention, "if we do not provide against corruption, our government will soon be at an end."[8]

---

[8] 1 *The Records of the Federal Convention of 1787*, at 392 (Max Farrand ed., 1911) [hereinafter "*Farrand's Records*"].

28.     Thus, in drafting the Constitution, the Founders sought to ensure that "corruption was more effectually guarded against, in the manner this government was constituted, than in any other that had ever been formed."[9]  Alexander Hamilton explained that "[n]othing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."[10]

29.     The Founders were especially worried that Congress or the states might exploit the President's self-interest as a means of inducing him to favor their personal or provincial concerns. This worry arose out of two key decisions made at the Constitutional Convention.

30.     *First*, unlike the Articles of Confederation, which joined the states together under a weak central government without any chief executive,[11] the new Constitution asked the states to yield much of their sovereignty to a true national government—subordinating state and regional loyalties "in Order to form a more perfect Union."[12]  Jealousies among the states and fears of intrigue thus posed a unique threat to the fledgling union.

31.     *Second*, this new and powerful national government would include a single chief executive, even though the states had only recently fought for independence from a king who sought "an absolute Tyranny" over them.  In the view of some delegates at Philadelphia, the colonists' experience under British rule had made the "temper of the people" "adverse to the very semblance of Monarchy."[13]

---

[9] 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 302 (Jonathan Elliot ed., 1836) (quote from Charles Cotesworth Pinckney) [hereinafter "*Elliot's Debates*"].

[10] *The Federalist No. 68*, at 412 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[11] Articles of Confederation of 1781, art. III; *see id.* art. II ("Each state retains its sovereignty, freedom, and independence.").

[12] U.S. Const. pmbl.

[13] 1 *Farrand's Records*, *supra* note 8, at 88.

32.     The prior experience of the American colonies, Hamilton noted, included many examples "of the intimidation or seduction of the Executive by the terrors or allurements of . . . pecuniary arrangements."[14]  In some colonies, for instance, governors lacked a fixed salary, instead relying on other sources of profit that accompanied their offices, such as awards of pensions, grants of land, use of land and public labor for personal profit, and "customary gifts" of merchandise from ships at port.  Some governors "accepted bribes" and even "engaged in illicit activities . . . and supported piracy."[15]

33.     Such rampant profiteering enabled legislators and others to influence governors' decisions by manipulating their financial rewards.  It also enabled governors to hold legislatures hostage to their personal monetary demands.  Benjamin Franklin recounted that, in Pennsylvania, the governor's veto "was constantly made use of to extort money.  No good law whatever could be passed without a private bargain with him.  An increase of his salary, or some donation, was always made a condition."[16]

**_History and Purpose of the Domestic Emoluments Clause_**

34.     The Domestic Emoluments Clause addressed this threat of presidential corruption by Congress and the states.  By stipulating that the President would receive a fixed compensation that could not be increased or diminished during his term of office,[17] the Clause prevented Congress from bribing the President or punishing him by manipulating his salary.

---

[14] _The Federalist No. 73_, _supra_ note 10, at 439–40.

[15] Alvin Rabushka, _The Colonial Roots of American Taxation, 1607-1700_ 311 (2008); Alvin Rabushka, _The Colonial Roots of American Tradition, 1607-1700_, Hoover Inst. Pol. Rev. (Aug. 1, 2002), http://www.hoover.org/research/colonial-roots-american-taxation-1607-1700 [https://perma.cc/AV7Q-77M7].

[16] 1 _Farrand's Records_, _supra_ note 8, at 99.

[17] _Id._ at 21; _see_ U.S. Const. art. II, § 1, cl. 7.

35.     The Framers realized, however, that providing a fixed compensation was not enough: Congress and the states might instead give the President other lucrative benefits or rewards, besides a compensation increase, to bend him to their will.

36.     To prevent such corruption, John Rutledge and Benjamin Franklin moved to supplement the presidential compensation provision by adding the following: "[A]nd he (the President) shall not receive . . . any other emolument from the U.S. or any of them."[18]   The Convention swiftly approved this motion, and the Domestic Emoluments Clause became part of the new Constitution.[19]

37.     In addition to preventing the corruption of sitting Presidents, the Clause addressed a concern that mixing power and profit in one office would encourage candidates to seek the presidency for personal gain instead of public service.  As Franklin had exhorted the Convention, "the love of power, and the love of money" were "two passions which have a powerful influence," and joining them together in one office would have "the most violent effects."[20]   The type of leaders "that will strive for this profitable pre-eminence" would be "the bold and the violent, the men of strong passions and indefatigable activity in their selfish pursuits."[21]

38.     During the ratification debates, several key Founders emphasized the Domestic Emoluments Clause's importance.  Hamilton, for instance, observed in *The Federalist Papers* that, if state officials could alter the President's financial circumstances, they could "tempt him by largesses" and thereby cause him "to surrender at discretion his judgment to their inclinations."[22]

---

[18] 2 *Farrand's Records*, *supra* note 8, at 626.

[19] *Id.*

[20] 1 *Farrand's Records*, *supra* note 8, at 82.

[21] *Id.*

[22] *The Federalist No. 73*, *supra* note 10, at 441.

10

39.     The Clause eliminated opportunities for such leverage over the President: under its prohibition, the states "can neither weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[23]  As James Wilson put it, the Clause ensured that the President, "elected by the different parts of the United States," would "consider himself as not particularly interested for any one of them," but would instead respect the collective interests of "the whole."[24]

***The Meaning of "Emolument"***

40.     Consistent with the goals of the Domestic Emoluments Clause, and its central role in preserving the integrity of the new federal government, the Framers used the capacious term "emolument" to describe the rewards forbidden to the President.

41.     During the eighteenth century, the word "emolument" was defined broadly to mean "profit," "advantage," and "benefit."[25]  The word was commonly used to describe financial and monetary benefits of any kind.  Founding-era statesmen like George Washington, James Madison, Thomas Jefferson, and Edmund Randolph regularly used the word in this broad sense,[26] including

---

[23] *Id.* at 442.

[24] 2 *Elliott's Debates*, *supra* note 9, at 448.

[25] *Oxford English Dictionary* 182 (2d ed. 1989) (citing eighteenth-century texts for the definition of "emolument" meaning "[a]dvantage, benefit, comfort"); Samuel Johnson, *A Dictionary of the English Language* (1785) (defining "emolument" as "[p]rofit; advantage"); *see, e.g.*, Jonathan Swift, *The Tale of a Tub* 91 (Henry Morley ed., 1889) ("And so I proceed with great content of mind upon reflecting how much emolument this whole globe of earth is like to reap by my labours."); Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* 9 (1775) ("A merchant's desire is not of glory, but of gain; not of public wealth, but of private emolument.").

[26] John Mikhail, *Emoluments and President Trump*, 53 Valparaiso Univ. L. Rev. 631, 643–48 (2019); John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html [https://perma.cc/3ESW-C89U]; *see also* John Mikhail, *The Definition of 'Emolument' in English Language and Legal Dictionaries, 1523–1806* (July 13, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693   [https://perma.cc/22B9-J4RW]

in public discourse and during the Constitution's ratification debates.[27]

42.     Thus, it has long been understood by the Executive Branch that the Domestic Emoluments Clause prohibits states "from attempting to influence the President through financial awards," including "gifts" and "payments" which could potentially "influenc[e] or corrupt[] the integrity of the recipient."[28]

### Entities and Individuals Covered by the Clause

43.     The Domestic Emoluments Clause provides that a sitting President may not receive emoluments beyond his fixed compensation "from the United States, or any of them."  By its express terms, therefore, the Clause prohibits the receipt of emoluments from either the federal government ("the United States") or the states ("or any of them").

44.     The Clause also applies to cities, counties, and other local municipal bodies.  The Supreme Court has long recognized that "a municipality is merely a political subdivision of the State from which its authority derives."[29]  These subordinate governmental bodies have never been regarded as sovereign entities independent of their respective states and so, as the Court has put it,

---

(concluding that "'emolument' was not a term of art at the Founding with a highly restricted meaning" but rather was used in a "broad variety of contexts, including private commercial transactions").

[27] Randolph observed in the Virginia ratifying convention that "[a]ll men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community." 3 *Farrand's Records*, *supra* note 8, at 327.  Washington, Jefferson, and other Virginians who formed an association to boycott British goods criticized merchants who ignored the boycott as having "preferred their own private emolument" to "the dearest rights of the people of this colony."  Va. Nonimportation Resolutions (June 22, 1770), http://founders.archives.gov/documents/Jefferson/01-01-02-0032 [https://perma.cc/JCM7-S29F].

[28] 5 Op. O.L.C. 187, 188–91 (1981); *see also* 3 Op. O.L.C. 440, 444 n.8 (1979) (describing "[t]ransfer of title" to sitting President as implicating the Domestic Emoluments Clause).

[29] *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 214–15 (1984) (quoting *City of Trenton v. New Jersey,* 262 U.S. 182, 187 (1923)).

"what would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State."[30]

45.     For similar reasons, the Domestic Emoluments Clause applies to federal, state, and local instrumentalities—that is, entities owned or controlled by those governments, such as public universities and units of the state government.[31]

46.     With respect to the receipt of unlawful emoluments, the Clause prohibits the President from receiving emoluments directly or constructively, through persons such as his immediate family members or corporate entities that he controls formally or informally.  If gifts to the President could simply be routed to those with whom the President necessarily shares interests, like a spouse or legal representative, the Clause could be easily circumvented.  As discussed above, however, the Framers wanted to ensure that the President would have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution."[32]

---

[30] *Id.*

[31] In construing the analogous Foreign Emoluments Clause, the Department of Justice's Office of Legal Counsel and the Government Accountability Office both interpret the term "foreign State" to encompass government instrumentalities, such as public universities, and local governments.  *See, e.g.,* 33 Op. O.L.C. 370, 379–80 (2009); 18 Op. O.L.C. 13, 15–19 (1994); 17 Op. O.L.C. 114, 120–23 (1993); Major James D. Dunn, B-251084, 1993 WL 426335, at *3 (Comp. Gen. Oct. 12, 1993); B-154213, 44 Comp. Gen. 130, 131 (1964).

[32] *The Federalist No. 73*, *supra* note 10, at 442.

## FACTUAL ALLEGATIONS

*Trump Family and Associates Make Plans for Trump Library Development*

47.      Shortly after the 2024 election, President Trump began discussing his plans to operate a presidential library of digitized records owned, controlled, and administered by the National Archives and Records Administration (NARA), as well as a privately owned and operated presidential center.

48.      Presidential foundations that establish public, NARA-administered facilities must pay an endowment of 60% of the overall initial cost of the facility to the federal government.  44 U.S.C. § 2112(g)(5)(B).  Thus, having a separate NARA-administered library facility reduces the total amount that the private library foundation must pay to the federal government.

49.      On December 15, 2024, as part of a settlement between ABC News and then President-elect Trump, ABC News agreed to make a $15 million donation "to a [p]residential foundation and museum to be established by or for Plaintiff [Donald J. Trump] . . . in full settlement and satisfaction of Plaintiff's . . . Claims."[33]

50.      President Trump subsequently negotiated settlements with other companies—including Meta (Facebook's and Instagram's parent company), X (formerly known as Twitter),

---

[33] Settlement & Release Agreement, Dkt. No. 58-1, *Trump v. Am. Broadcasting Cos., Inc. et al.*, No. 24-21050-CIV-ALTONAGA (S.D. Fla. Dec. 14, 2024), *available at* https://storage.courtlistener.com/recap/gov.uscourts.flsd.664183/gov.uscourts.flsd.664183.58.1.pdf [https://perma.cc/AF7X-2YEW]; *see also ABC News Agrees to Pay $15m to Settle Trump Defamation Suit*, Al Jazeera (Dec. 15, 2024), https://www.aljazeera.com/news/2024/12/15/abc-news-agrees-to-pay-15m-to-settle-trump-defamation-suit#:~:text=The%20terms%20of%20the%20settlement,lawyer%20fees%2C%20the%20documents%20said [https://perma.cc/A6ES-BTRV].

and Paramount Global—all of which agreed to donate settlement monies for the same purpose.[34] Monies from these four settlements alone total approximately $63 million.[35]

51.     On December 20, 2024, six days after the ABC News settlement, lawyer Jacob Roth incorporated the Donald J. Trump Presidential Library Fund, Inc. (the "Trump Library Fund") as a Florida nonprofit corporation.[36] The Trump Library Fund appears to be a predecessor to Defendant the Trump Library *Foundation*.

52.     Mr. Roth initially listed the Trump Library Fund's specific purpose as "preserv[ing] and steward[ing] the legacy of President Donald J. Trump and his presidency,"[37] but in February 2025, he amended the document to provide that the Fund would be serving "charitable, religious, educational, and scientific purposes under section 501(c)(3) of the Internal Revenue Code," thereby allowing the Trump Library Fund's assets to "be distributed for one or more exempt purposes within the meaning of section 501(c)(3)" in the event the Fund dissolved.[38]

---

[34] *See* Jennifer Jacobs, *Meta to Pay Trump $25 Million to Settle 2021 Lawsuit*, CBS News (Jan. 29, 2025), https://www.cbsnews.com/news/meta-trump-25-million-lawsuit-settlement/ [https://perma.cc/3HLN-F86L]; Jennifer Jacobs, *X Reaches $10 Million Settlement with Trump over Prior Suspension of his Twitter Account*, CBS News (Feb. 12, 2025), https://www.cbsnews.com/news/x-reaches-10-million-dollar-settlement-with-trump-over-prior-suspension-of-twitter-account/ [https://perma.cc/33CN-EHF9]; *Paramount, President Trump Reach $16 Million Settlement over "60 Minutes" Lawsuit*, CBS News (July 2, 2025), https://www.cbsnews.com/news/paramount-trump-60-minutes-lawsuit-settlement/ [https://perma.cc/8TB4-BRN2].

[35] Madeleine May et al., *Critics of Trump's Presidential Library Fundraising Say "There Are No Rules"*, CBS News (July 16, 2025), https://www.cbsnews.com/news/trump-presidential-library-fundraising/ [https://perma.cc/XB4Q-K8YX].

[36] Donald J. Trump Presidential Libr. Fund, Inc., Electronic Articles of Incorporation (Dec. 20, 2024), https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2024%5C1220%5C30437303.tif&document Number=N24000014743/ [https://permaa.cc/P94V-ZT4F].

[37] *Id.*

[38] Donald J. Trump Presidential Libr. Fund, Inc., Electronic Articles of Amendment (Feb. 17, 2025), https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath

53.     On May 23, 2025, President Trump's son Eric Trump and son-in-law Michael Boulos incorporated the Trump Library Foundation—a separate and distinct Florida corporation—to which the State Defendants have since gifted the MDC Parcel at issue in this action.

54.     Thereafter, the Trump Library Fund largely went dormant.

55.     On September 26, 2025, the State of Florida's Division of Corporations administratively dissolved the Trump Library Fund after it failed to submit its mandatory annual report.[39]

56.     Months later, on December 29, 2025, Mr. Roth filed articles of dissolution to officially dissolve the Trump Library Fund.[40]  No explanation has been given as to why he filed these articles of dissolution, nor has it been made clear where any of the funds in the Trump Library Fund's possession have been transferred.

57.     When the Trump Library Fund dissolved, $63 million in funds that had been earmarked for the first nonprofit entity effectively disappeared, prompting a congressional investigation.[41]  That investigation is ongoing.

---

=COR%5C2025%5C0326%5C44722828.Tif&documentNumber=N24000014743 [https://perma.cc/95W3-8XT2].

[39] *See* Dave Levinthal, *One of Trump's Library Funds Has Mysteriously Dissolved, but a Lack of Transparency Keeps the Public in the Dark*, Open Secrets (Oct. 14, 2025), https://www.opensecrets.org/news/2025/10/one-of-trumps-library-funds-has-mysteriously-dissolved-but-a-lack-of-transparency-keeps-the-public-in-the-dark/ [https://perma.cc/5BQP-HPKA].

[40] Donald J. Trump Presidential Libr. Fund, Inc., Articles of Dissolution (Dec. 29, 2025), https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2025%5C1230%5C64041991.tif&documentNumber=N24000014743 [https://perma.cc/8TFM-5PHD].

[41] Dan Diamond & Aaron Schaffer, *Democrats Ask What Happened to Millions Earmarked for Trump's Library*, Wash. Post (Mar. 11, 2026), https://www.washingtonpost.com/politics/2026/03/11/congressional-democrats-trump-library/ [https://perma.cc/U42M-ZK2W]; Levinthal, *supra* note 39.

*Florida's Legislature Clears the Way for Trump Library Development*

58.     As soon as President Trump began discussing plans for his presidential library development, he made clear that he was interested in potentially locating it in Florida.

59.     Normally, county and municipal governments in Florida have the power to regulate the construction of buildings within their jurisdictions via zoning restrictions and other ordinances that serve the public interest, such as requiring buildings to adhere to certain requirements intended to preserve sightlines for nearby residents, drivers, and pedestrians, and to protect people from fires and flooding.

60.     However, on December 19, 2024, just days after the ABC News settlement, members of the Florida Legislature introduced legislation ("SB 118") to prohibit any county or municipal government from "enact[ing] or enforc[ing] any ordinance, resolution, rule, or other measure governing the establishment, maintenance, or operation of a presidential library or impos[ing] any requirement or restriction thereon, except as otherwise authorized by federal law." Ch. 2025-170, § 1(3), Laws of Fla. (codified at § 257.51(3), Fla. Stat. (2025)).

61.     SB 118's cosponsors emphasized that the bill was intended to clear the way for President Trump to build a presidential library development in Florida, unencumbered by any local regulations that would apply to other buildings.

62.     Specifically, after introducing SB 118, cosponsor and State Senator Jason Brodeur said that President Trump "has built the most beautiful buildings and properties on planet Earth" and that it was "time for America's Phoenix to have his library done as he envisions it, without input from a county or city government."[42]  He also said that President Trump should have

---

[42] James Call, *Bill Aims to Let Donald Trump Bypass Local Rules to Build Presidential Library in Florida*, The Palm Beach Post (Dec. 22, 2024)

17

"maximum flexibility" to construct "this historic landmark" in Florida.[43]

63.     By April 29, 2025, both houses of the Florida Legislature had passed SB 118.

64.     On June 23, 2025, Governor Ron DeSantis signed SB 118 into law, which is now codified at Section 257.51, Florida Statutes.

65.     Section 257.51(3), Florida Statutes, provides that "[a] county, municipality, or another political subdivision of this state may not enact or enforce any ordinance, resolution, rule, or other measure governing the establishment, maintenance, or operation of a presidential library or impose any requirement or restriction thereon, except as otherwise authorized by federal law."

66.     Section 257.51(2) defines "presidential library" as used in the Section as "an institution administered or designated under the Presidential Libraries Act, as amended, Pub. L. No. 99-323, established for the preservation and accessibility of presidential records and related historical materials."

67.     The terms "administered" and "designated" are not defined in Section 257.51(2).[44]

---

https://www.palmbeachpost.com/story/news/trump/2024/12/22/bill-would-preempt-local-control over-donald-trumps-library-plans/77107955007 [https://perma.cc/3Q29-R2GF].

[43] Meridith McGraw et al., *Trump Wants His Presidential Library Set in Florida, Enticed by Free Land*, Wall St. J. (June 5, 2025), https://www.wsj.com/politics/policy/trump-wants-his-presidential-library-set-in-florida-enticed-by-free-land-c0f6e314 (on file) [hereinafter "*Free Land*"].

[44] *See* Claire Heddles, *How Miami Could Block Trump's Presidential Skyscraper Plans*, Mia. Herald (May 8, 2026), https://www.miamiherald.com/news/local/community/miami-dade/downtown-miami/article315673405.html [https://perma.cc/LCY6-G8YC].

*Trump Family and Associates Scout for Development Location in Florida*

68.     While the Florida government was working to pass SB 118, Trump family members and associates began scouting various sites in Florida to house Trump's presidential library development.

69.     These family members and associates included, among others, Eric Trump, President Trump's son; Michael Boulos, President Trump's son-in-law; Steve Witkoff, commercial and residential real estate developer and the United States Special Envoy to the Middle East; Meredith O'Rourke, a fundraiser for President Trump's political operations; and several state legislators.[45]

70.     According to *The Wall Street Journal*, President Trump's family members and associates "were looking for a parcel big enough to include a hotel development and near a major airport to attract the thousands of tourists who flock to presidential libraries."[46]

71.     The media reported that at least two South Florida universities—Florida Atlantic University ("FAU") and Florida International University ("FIU")—initially emerged as potential sites for the presidential library development.

---

[45] *Id.*; *see also* Meridith McGraw, *Florida Gov. DeSantis Proposes Giving Trump Miami Land for Library*, Wall St. J. (Sept. 24, 2025), https://www.wsj.com/us-news/florida-gov-desantis-proposes-giving-trump-miami-land-for-library-5d5ec448?gaa_at=eafs&gaa_n=AWEtsqfL1hrr Z6sS3cZWB95yt5_qWmEObAhL8qK-L41kbliMGk7ib4JiVC9W&gaa_ts=69cfbee9&gaa_sig =bxbHBeuvb8crA__3w9PBMcTNDv6jsntfOntORsfjOWSojCDPOZ0T-NiJYfPyuZaSmHR91T 6BjVfCCEkEjOd1NA%3D%3D (on file) [hereinafter "*Miami Land*"].

[46] McGraw, *Miami Land*, *supra* note 45.

72.     Although FAU reportedly offered to lease land to the Trump Library Foundation at virtually no cost,[47] and FIU also sought to host the library,[48] these suburban campuses would not have been desirable locations for a hotel because they are not located in areas that are considered central business or tourist hubs.

73.     In mid-2025, amid scouting for the Trump presidential library development, Trump associate Felix Lasarte informed the *Miami Herald* that Eric Trump had visited MDC's Wolfson Campus in Downtown Miami "as part of the vetting process for potential sites."[49]

74.     Notably, Lasarte is a lawyer for The Trump Organization—the business conglomerate privately owned by President Trump and consisting of his *for-profit* business ventures, including "luxury real estate, golf, hospitality, and entertainment."[50]  Eric Trump is the Executive Vice President of The Trump Organization,[51] and President Trump is its sole owner.[52]

75.     Although Lasarte "declined to get into the specifics of the kind of structure being pitched for the location," he said the building "would rise up south of the Freedom Tower," and "would accommodate a presidential plane if Trump can take it with him when he leaves office."[53]

---

[47] McGraw et al., *Free Land*, *supra* note 43.

[48] Douglas Hanks, *As FIU Fades, Push for a Trump Presidential Library Shifts to Downtown Miami*, Mia. Herald (June 6, 2025), https://www.miamiherald.com/news/local/community/miami-dade/article307998995.html [https://perma.cc/474P-DCJZ].

[49] *Id.*

[50] The Trump Organization (@Trump), X, https://x.com/Trump (last visited May 5, 2026); *see also* The Trump Organization, https://www.trump.com/ (last visited May 5, 2026).

[51] The Trump Organization, *Eric Trump*, https://www.trump.com/leadership/eric-trump-biography (last visited May 5, 2026).

[52] John Cassidy, *The Year in Trump Cashing In*, The New Yorker (Dec. 15, 2025), https://www.newyorker.com/news/the-financial-page/the-year-in-trump-cashing-in [https://perma.cc/R9FB-CPKG].

[53] Hanks, *supra* note 48.

76.     Unlike FAU's and FIU's campuses, the MDC Parcel in Downtown Miami would be an ideal location for a hotel.

***The MDC Parcel and Miami Dade College***

77.     By September 2025, reports indicated that President Trump had settled on Downtown Miami as the site for his library development.[54] Specifically, President Trump set his sights on the MDC Parcel, an approximately 2.63-acre plot of land in Downtown Miami owned by MDC and located immediately south of the historic Freedom Tower, which was once a welcoming and processing center for Cubans fleeing communism following the Cuban Revolution and has become perhaps the leading symbol of the freedom, success, and impact of Cuban Americans and other immigrant communities in South Florida.

78.     The MDC Parcel is located in a part of Downtown Miami that has grown rapidly during the past decade thanks to new investments from developers across the world, including the brand new $6 billion, 27-acre mixed-use Miami Worldcenter project just one block away.

79.     This part of Downtown Miami is a major, booming hub for hotels, given the City of Miami's ever-growing tourism sector and its location in the heart of the central business and entertainment district.

80.     In addition, the MDC Parcel is located one block away from the bridge that connects Downtown Miami to PortMiami—the world's largest passenger port—where a record 8.5 million passengers boarded cruise ships in 2025.[55] Before embarking on their voyages, these passengers routinely stay in hotels in this part of Downtown Miami.

---

[54] Matt Dixon, *Trump Settles on Downtown Miami for his Presidential Library*, NBC News (Sept. 23, 2025), https://www.nbcnews.com/politics/donald-trump/trump-downtown-miami-dade-presidential-library-freedom-tower-rcna233235 [https://perma.cc/WP5G-9MAG].

[55] Press Release, Miami-Dade Cnty., *PortMiami Announces a Banner Year for Cruise Passengers and an Increase in Cargo TEU Volume* (Dec. 2, 2025),

81.     During the past five years alone, numerous four- and five-star hotels have opened in the half-a-mile radius surrounding the MDC Parcel, including the citizenM Miami World Center, the Gale Miami Hotel, and The Elser Hotel.  In the years to come, Waldorf Astoria and the Delano will open hotels within the same radius.

82.     Before the State Defendants gave the land to the Trump Library Foundation, the MDC Parcel comprised 12 adjacent parcels of land on the same block.

83.     The MDC Parcel is listed on the Miami-Dade County Property Appraiser's website as 500 Biscayne Boulevard, Miami, FL 33132.  It is bounded by MDC's Wolfson Campus to the west, Biscayne Boulevard and Biscayne Bay to the east, and The Elser Hotel to the south.  The MDC Parcel also lies adjacent to the Kaseya Center, home to the NBA's Miami Heat basketball team and the location for many headliner entertainment events and concerts.

84.     MDC, which owned the MDC Parcel before its conveyance to the Trump Library Foundation, is a public college founded in 1960 that is part of the Florida College System.  It is owned, funded, and operated by the State of Florida.

85.     MDC operates eight campuses throughout Miami-Dade County, including the Wolfson Campus located in Downtown Miami that includes the Freedom Tower and previously included the MDC Parcel.

86.     MDC offers a variety of degrees, including associate and bachelor's degrees and vocational and technical certificates, across a range of disciplines.

---

https://www.miamidade.gov/global/release.page?Mduid_release=rel1764622080449470 [https://perma.cc/VG8S-UASM].

87.     In recent years, MDC has become well-known as an institution for nearly 50,000 students annually—including Miami-Dade County residents, first-generation Americans, and first-generation college students—to attain higher education.

88.     When MDC acquired the MDC Parcel in 2004, the college and its supporters envisioned that the land would eventually support an expansion of MDC's Wolfson Campus or, if sold, would serve as a potential funding source for MDC's endowment or student scholarships.

89.     At that time, Downtown Miami had yet to emerge as a hotspot for development and significant investment.  Accordingly, MDC used the MDC Parcel as a sorely needed surface parking lot for college faculty and students, given its rapidly expanding population.

90.     At night and during some weekends, MDC had contracted with vendors to provide paid parking for people attending games and concerts at the Kaseya Center and other events in the area.

91.     By 2016, when the mixed-use Miami Worldcenter broke ground, this part of Downtown Miami became a bustling neighborhood attracting developers from across the world—who have since purchased nearby parcels at record prices.

92.     When MDC transferred the MDC Parcel to the Florida Board, the Miami-Dade County Property Appraiser reported the land's appraised value at over $67 million.[56]

93.     However, most experts believe that the MDC Parcel—with its central location and unobstructed views of Biscayne Bay—could have fetched a far higher, nine-figure sales price based on the land's actual market value.[57]  It is easy to understand why: Just two blocks north of the MDC Parcel, the super-tall Waldorf Astoria Hotel & Residences Miami is selling

---

[56] Mazzei, *supra* note 1.

[57] *See, e.g.*, *id.*

condominiums for up to $12.8 million per unit, at a staggering $4,000 per square foot. And in December 2025, a hotel and residential developer purchased a 2.5-acre waterfront assemblage one mile south of the MDC Parcel for $520 million.[58]

94.     In fact, before MDC transferred the MDC Parcel to the Florida Board to give to President Trump, deep-pocketed developers regularly made offers to purchase the land from MDC.

95.     If MDC had sold the MDC Parcel at any point, it would have been transformative for the institution. Based on the foregoing, the land could have commanded a sales price that would have doubled MDC's $227 million endowment overnight—enabling MDC to advance the college's research needs, secure more world-class facilities and faculty, and reduce student expenses. MDC also could have sold only part of the MDC Parcel, while maintaining control of other parts to retain land for an urban farm.

***The State Defendants Gift the MDC Parcel to the Trump Defendants***

96.     On September 16, 2025, the MDC Board received a letter from the Florida Office of Cabinet Affairs requesting the MDC Parcel's conveyance to the Florida Board.[59]

97.     The MDC Board promptly complied: "there's not many options—we're appointed by the Governor," said Defendant and Vice Chair Roberto Alonso.[60]

98.     On the same day that it received the letter, the MDC Board issued a public notice of a special board meeting to be held one week later to "discuss potential real estate transactions."[61]

---

[58] Press Release, Aimco, *Aimco Closes Sale of Brickell Assemblage and Enters Agreement to Sell Two Additional Properties* (Dec. 24, 2025), https://www.aimco.com/aimco-closes-sale-of-brickell-assemblage-and-enters-agreement-to-sell-two-additional-properties/ [https://perma.cc/TLV3-36PC].

[59] Mazzei, *supra* note 1.

[60] *Id.*

[61] Press Release, Miami Dade College, *Public Notice: Notice of Special Board Meeting District Board of Trustees of Miami Dade College* (Sept. 16, 2025),

99.     Although MDC is a public institution, meaning that the State of Florida already possessed the MDC Parcel, this vote was necessary because state law requires the Florida Board to execute any land transactions involving state-owned land.  Specifically, the Florida Board "is vested and charged with the acquisition, administration, management, control, supervision, conservation, protection, and disposition of all lands owned by, or which may hereafter inure to, the state or any of its agencies, departments, boards, or commissions."  § 253.03(1), Fla. Stat.

100.    One week later, on September 23, 2025, the MDC Board held that special board meeting and voted unanimously to transfer the MDC Parcel to the Florida Board.

101.    Notably, the meeting's agenda identified a single action item—providing "authorization to convey property to the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida"—without identifying the specific property to be conveyed or the ultimate recipient, although those facts were well-known to the MDC Board.[62]

102.    In October 2025, Dr. Dunn, the co-founder of Plaintiff Dunn's Farm, brought suit in the Eleventh Judicial Circuit of Florida in and for Miami-Dade County ("State Court") against MDC, the MDC Board, and each MDC Board member, alleging that the September 23, 2025 meeting violated the Florida Sunshine Act and seeking an injunction against the MDC Parcel's conveyance to the Florida Board.  Compl. at 11, Dkt. No. 2, *Dunn v. Miami Dade College et al.*, No. 2025-019608-CA-01 (Fla. 11th Jud. Cir. Ct. Oct. 6, 2025).

---

https://news.mdc.edu/pressrelease/public-notice-notice-of-special-board-meeting-district-board-of-trustees-miami-dade-college-09302025/ [https://perma.cc/2EGR-2K5P].

[62] Miami Dade College, *Miami Dade College District Board of Trustees Special Meeting* (Sept. 23, 2025), https://www.mdc.edu/about/pdf/2025-trustee-agenda/20250923-agenda.pdf [https://perma.cc/ZT2J-6BA3].

103.    Specifically, the suit alleged that the MDC Board—a state entity subject to the Florida Sunshine Act[63]—failed to provide "reasonable notice" to the public of the nature of the planned real estate transaction that had been the subject of a vote at the September 23, 2025 MDC Board meeting.

104.    On November 3, 2025, the State Court granted a temporary injunction, finding that the MDC Board failed to provide reasonable notice of "the purpose of the [September 23] Special Meeting and the decision to be considered at that Meeting," because the corresponding public notice "did not identify which real estate would be discussed or what transaction would be considered." Order Grant. Pl.'s Emergency Mot. for Temp. Inj. at 5, Dkt. No. 73, *Dunn v. Miami Dade College et al.*, No. 2025-019608-CA-01 (Fla. 11th Jud. Cir. Ct. Nov. 3, 2025).

105.    Then, on November 25, 2025, the MDC Board issued another public notice for a special board meeting to "discuss potential real estate transactions including the authorization to convey [the MDC Parcel] to Florida's Board of Trustees of the Internal Improvement Trust Fund *for further conveyance for a Presidential Library for Donald J. Trump*."[64]

106.    On December 2, 2025, the MDC Board held the second public hearing and—despite significant public opposition—voted unanimously again to convey the MDC Parcel to the Florida Board to gift to the Trump Library Foundation.[65]

---

[63] § 286.011, Fla. Stat. (Sunshine Act covers "any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation, or political subdivision, except as otherwise provided in the Constitution").

[64] Press Release, Miami Dade College, *Public Notice: Notice of Special Board Meeting District Board of Trustees Miami Dade College* (Nov. 25, 2025) (emphasis added), https://news.mdc.edu/pressrelease/public-notice-notice-of-special-board-meeting-district-board-of-trustees-miami-dade-college-12022025/ [https://perma.cc/CW8H-NVA7].

[65] Miami Dade College, *Miami Dade College District Board of Trustees Special Meeting* (Dec. 2, 2025), https://www.mdc.edu/about/pdf/2025-trustee-agenda/20251202-agenda.pdf [https://perma.cc/C2JA-J38U].

107.     The State Court subsequently dissolved its prior injunction, concluding that the second hearing complied with the Florida Sunshine Act because the hearing notice "identifie[d], with sufficient detail the matter to be taken up" by the MDC Board.  Order Dissolving Temp. Inj. at 1, Dkt. No. 92, *Dunn v. Miami Dade College et al.*, No. 2025-019608-CA-01 (Fla. 11th Jud. Cir. Ct. Dec. 19, 2025).

108.     On September 30, 2025—*after* the MDC Board's first, improperly noticed September meeting, but *before* its second, apparently properly noticed December meeting—the Florida Board voted to approve the MDC Parcel's conveyance to the Trump Library Foundation, "free from any waiver, encumbrance, or restriction except for the requirement that the subject parcel contain components of a Presidential library, museum, and/or center within five years of conveyance or that construction has commenced for a Presidential library, museum, and/or center."[66]

109.     Importantly, the Florida Board's conveyance does not restrict President Trump or the Trump Library Foundation from developing a for-profit commercial or residential property— such as a hotel—on the MDC Parcel.

110.     Indeed, the Trump Library Foundation will be in compliance with the terms of the conveyance so long as the MDC Parcel includes "*components of* a Presidential library, museum, and/or center" within five years of the conveyance, or "construction has commenced" for such a library, museum and/or center within five years.[67]

---

[66] Fla. Dep't. of Env't Prot., Bd. of Tr. of the Internal Improvement Tr. Fund, *Agenda* (Sept. 30, 2025), https://floridadep.gov/sites/default/files/09302025_BOT%20Agenda_2.pdf [https://perma.cc/NTA4-MA4J].

[67] *Id.*

111. To date, none of the State Defendants have publicly explained the meaning of the phrase "components of a Presidential library, museum, and/or center."

***President Trump's Plans to Build a High-Rise Hotel on the MDC Parcel***

112. On September 30, 2025, just hours after the State Defendants gifted the MDC Parcel to the Trump Library Foundation, Eric Trump announced in a prepared statement that the structure built on the site will be "visible for miles into the Atlantic, a bold landmark on Miami's skyline."[68]

113. In December 2025, two Trump allies familiar with the planning disclosed more details about the President's vision for the site. One idea under discussion was apparently a 47-story tower, a nod to President Trump's tenure as the 47th President.[69]

114. On March 31, 2026, both Eric Trump[70] and President Trump[71] shared on social media a video rendering of the proposed skyscraper, created by the Florida-based architecture firm Bermello Ajamil. The skyscraper in the video dwarfs neighboring buildings and features a massive gold statue of the President raising his fist; a gold escalator; and a red, white, and blue spire with "TRUMP" in large illuminated letters.[72] People in formalwear in the video can be seen dining and milling about a massive ballroom, which appears to be a replica of the ballroom designed for the

---

[68] *Donald J. Trump Presidential Library Foundation Formally Announces Miami as Site for Presidential Library*, CBS News (Sept. 30, 2025), https://www.cbsnews.com/miami/news/donald-j-trump-presidential-library-foundation-formally-announces-miami-as-site-for-presidential-library/ [https://perma.cc/DJ7W-3L9X].

[69] Mullins, *supra* note 1.

[70] @EricTrump, X (Mar. 30, 2026), https://x.com/EricTrump/status/2038773279788331022 [https://perma.cc/YQ9Q-DN4U].

[71] @realDonaldTrump, Truth Social (Mar. 30, 2026), https://truthsocial.com/@realDonaldTrump/posts/116320833897987884 [https://perma.cc/ZSY2-A2UL].

[72] Donald Trump Presidential Libr., https://www.trumplibrary.org/ (last visited May 5, 2026).

East Wing of the White House.[73]  The multi-tiered lobby showcases multiple aircraft, including a full-size Air Force One.

 

 

---

[73] *Id.*

 

115. Notably, the "TRUMP" lettering at the top of the rendered skyscraper is identical to The Trump Organization's logo and the signage used on Trump hotel properties across the world, including the Trump International Hotel & Tower in Chicago and the Trump International Hotel in Las Vegas.

  



*Logo on the Trump hotel and library development rendering in Miami*   *Logos on The Trump Organization's hotels in Las Vegas (left) and Chicago (right)*

116.    The video rendering is not merely an idealized vision of what President Trump and his family hope the development will resemble, but rather a concrete proposal that is being used to raise money from donors and investors to fund the development's construction.[74]

117.    Later on March 31, 2026, President Trump answered questions about the video rendering and told the press, "I don't believe in building libraries or museums."  Instead, he said the building is "most likely going to be a hotel with a beautiful building underneath and a 747 Air Force One in the lobby."[75]

118.    These statements confirm what President Trump's allies and associates have consistently told reporters since the MDC Parcel's conveyance.

119.    Indeed, at least as early as September 2025, Trump allies told multiple media outlets that plans for development on the site included a high-rise hotel.[76]

120.    In December 2025, a Trump associate told *Politico*: "I could envision traditional library space [on the] first couple of full floors.  Then you go up to 10 floors: hotel.  And then you'd have office space.  And then you have, you know, probably a beautiful restaurant at the top."[77]

121.    And on March 31, 2026, Eric Trump posted on X, "Over the past six months, I have poured my heart and soul into this project with my incredible team at @Trump."[78]  The "@Trump" handle refers to The Trump Organization, which, as noted above, is the business conglomerate

---

[74] *See* Donald Trump Presidential Libr., https://www.trumplibrary.org/ (last visited May 5, 2026) (donation button immediately below video rendering).

[75] Jambhekar, *supra* note 3.

[76] Mazzei, *supra* note 1.

[77] Mullins, *supra* note 1 (second alteration in original).

[78] @EricTrump, *supra* note 70.

privately owned by President Trump and consisting of most of his *for-profit* business ventures in hospitality, golf, and real estate.

122. These statements, individually and collectively, make clear that President Trump intends to monetize this skyscraper, generating significant profit for himself and his family.

***Emoluments Given to and Received by President Trump***

123. As a result of the transaction described above, the State Defendants have given, and President Trump has received, an emolument beyond his fixed salary in violation of the Domestic Emoluments Clause.

124. Although ownership of the MDC Parcel was conveyed to the Trump Library Foundation and not to the President directly, the Trump Library Foundation is "governed exclusively" by President Trump's family members and close allies, who serve as its three trustees.[79]   Additionally, on information and belief, President Trump himself exercises control over the Trump Library Foundation through these trustees.

125. As stated above, it is also clear that the Trump Library Foundation intends to allow The Trump Organization, the business conglomerate privately owned by President Trump and consisting of his for-profit business ventures, to use its facilities to run a for-profit enterprise.

126. President Trump has not shied away from the fact that the State of Florida gave him the gift of an immensely valuable piece of property that will result in his private enrichment.  On March 31, 2026, he told reporters: "They say it's the best block in Miami, and the state worked with us [to get it]."[80]

---

[79] Trump Libr. Found. Articles of Incorporation §§ 4.01, 4.03, *supra* note 6.

[80] Heddles & Hanks, *supra* note 5.

127.    Indeed, the State Defendants have acknowledged from the start that the land could be used for the President's personal financial gain.  For instance, Defendant Wilton Simpson, the Florida Commissioner of Agriculture who voted to approve the MDC Parcel's conveyance to the Trump Library Foundation, told the press shortly thereafter: "What we voted on today was to allow that library to be put there.  If there's other amenities that go along with that, well, so be it."[81]

128.    "Other amenities" may sound modest, but as the video rendering makes clear, those planned for the site certainly are not.  One Miami urban planner and expert on Miami's zoning code reports that the property could be used for towers up to 100 stories high that could house roughly 2,500 condominium units or even more hotel rooms.[82]

129.    With its soaring waterfront views, central location in Downtown Miami, and ability to house multiple towers, any such use of the MDC Parcel would be a "cash cow" for the President, according to a local real estate consultant.[83]  That is why the property could sell for well over its appraised value on the open market—over $300 million, as previously noted.[84]

130.    These profits are enhanced, of course, by the fact that the President acquired this valuable land—the "best block in Miami"—from the State Defendants for free, and without any of the typical encumbrances that would attach to this sort of transaction, such as height limitations or parking requirements, because the Florida Legislature passed SB 118 to prevent the county or municipal government from "enact[ing] or enforc[ing]" any local measures governing the property or its operation.  *See* § 257.51(3), Fla. Stat.

---

[81] Mullins, *supra* note 1.

[82] Mazzei, *supra* note 1.

[83] *Id.*

[84] *Id.*

131.     Further, the gift of the MDC Parcel has already provided immense value to The Trump Organization and President Trump in tax savings.  Typically, a developer that acquires land to build a for-profit hotel must pay carrying costs, including *ad valorem* property taxes calculated annually by the county property appraiser on January 1 and set based on the value of the land and any improvements thereon.  §§ 192.001(1), 192.042, 193.011, Fla. Stat.

132.     In Florida, counties, municipalities, district school boards, and special districts use *ad valorem* property taxes to fund law enforcement, fire and emergency services, road and infrastructure improvement, public schools, traffic mitigation, flood control, fire protection, and other services.[85]

133.     However, if a nonprofit corporation owns land and intends to use it for predominantly exempt purposes (*e.g.*, charitable, religious, scientific, literary, or educational reasons), then the entity may qualify for a total exemption from *ad valorem* property taxes in Florida.  *See, e.g.*, § 196.196, Fla. Stat.

134.     Online records from the Miami-Dade County Property Appraiser's website indicate that the Trump Library Foundation (registered by its agents as a nonprofit corporation) qualified for an educational exemption—allowing it to avoid paying over a million dollars in potential property taxes on the MDC Parcel this year alone.  Attached as **Exhibit A** is a copy of the Property Appraiser's record for each piece of land comprising the MDC Parcel.

135.     Therefore, since the Trump Library Foundation received the MDC Parcel in 2025, President Trump and his close family members have already received this financial benefit and

---

[85] *See, e.g.*, Hai (David) Guo & Shaoming Cheng, Fiscal Structure & Revenue Resilience of Florida Municipalities, Fla. League of Cities (Dec. 2025), https://www.flcities.com/wp-content/uploads/2025/12/Fiscal-Structure-and-Revenue-Resilience-of-Florida-Municipalities.pdf [https://perma.cc/B5U6-HHZ4].

thus have been personally enriched by the State of Florida's gift.   While the Trump Library Foundation is planning and executing the development of its for-profit hotel, it has been made exempt from the considerable property taxes it would otherwise have to pay.

136.   In sum, Florida's gift of the immensely valuable MDC Parcel for lucrative private economic development benefiting the President and his close family members is an unlawful "emolument" under the Domestic Emoluments Clause.

### Consequences of Defendants' Failure to Comply with the Constitution

137.   The Domestic Emoluments Clause was adopted to ensure the President's undivided loyalty to the interests of the American nation as a whole by preventing individual states from giving the President gifts and other benefits with the hopes of obtaining favorable treatment in return.

138.   Yet as a result of Defendants' conduct, other states have been forced into an arms race in which they must either compete with Florida to lavish gifts on the President or fear being unfairly disadvantaged—the precise scenario that the Domestic Emoluments Clause was adopted to prevent.

139.   There are myriad ways in which presidential decisions may benefit or harm a state's interests and those of its residents, given President Trump's authority over the executive branch and his role in the legislative process.

140.   For instance, President Trump and the Department of the Interior have discretion to grant exemptions from federal restrictions on offshore drilling.  *See* 43 U.S.C. §§ 1331 *et seq.* Because Florida's economy depends heavily on beach and coastal tourism, state lawmakers have

expressed strong opposition to President Trump's latest offshore drilling plan,[86] which would open up certain areas of the United States coastline for oil and gas leasing.[87] The State Defendants have therefore given a valuable gift of land—indeed, land for a Trump hotel with waterfront views that itself will benefit from coastal tourism—to someone with the authority to protect Florida's tourism industry at the expense of similarly situated coastal states by removing Florida from the leasing proposal, while permitting drilling off the coasts of other states, such as California and Alaska.

141.   President Trump also has the power to give Florida preferential treatment with respect to disaster relief. Florida is one of the largest recipients of federal disaster aid due to hurricanes.[88] Federal disaster declarations and funding levels involve significant presidential discretion,[89] particularly in terms of timing, scope, and advocacy for supplemental appropriations.[90] In the wake of severe hurricane damage, the President can direct expedited and expanded disaster declarations and federal aid to Florida, including advocating for disproportionate supplemental appropriations, even where similarly situated states receive less

---

[86] Greg Allen, *Florida Republicans Push Back Against Trump's Plan to Expand Offshore Oil Drilling*, NPR (Dec. 16, 2025), https://www.npr.org/2025/12/16/nx-s1-5628976/florida-republicans-push-back-against-trumps-plan-to-expand-offshore-oil-drilling [https://perma.cc/RC9Q-NEW8].

[87] U.S. Dep't of the Interior, Bureau of Ocean Energy Mgmt., *Natural OCS Oil and Gas Leasing Program*, https://www.boem.gov/oil-gas-energy/national-program/national-ocs-oil-and-gas-leasing-program [https://perma.cc/VSR5-GSS8] (last visited May 5, 2026).

[88] Alex Fitzpatrick, *Where FEMA's Direct Relief Money Is Going*, Axios (Oct. 8, 2024), https://www.axios.com/2024/10/08/fema-direct-payments-state-recipients [https://perma.cc/PP98-CL7C].

[89] Bruce R. Lindsay, Cong. Rsch. Serv., R43784, *FEMA's Disaster Declaration Process: A Primer* (2014).

[90] Thomas A. Garrett & Russell S. Sobel, *The Political Economy of FEMA Disaster Payments*, 41 Econ. Inquiry 496 (2003).

robust support.  Such preferential treatment would benefit Florida's economy and infrastructure recovery at the expense of equitable national distribution of limited federal disaster resources.

142.    As another example, President Trump has influence over selecting the new location for NASA's headquarters.  With the building lease on NASA's current location outside Washington, D.C. expiring in 2028,[91] several states are vying to become home to the new headquarters, given the potential for high-paying employment opportunities and enhanced economic activity.[92]  Florida is one such state: Governor DeSantis and other lawmakers have heavily lobbied for NASA to move to Florida's Space Coast region.[93]  The President's administration can advocate on behalf of Florida, as opposed to other locations that serve as competing aerospace hubs, while the President is personally benefiting from the State Defendants' lucrative gift of land to him.

143.    In addition, one of Florida's largest industries is agriculture,[94] and the State's leadership has not been shy about its desire to limit regulation of gas-powered farming equipment.[95]  President Trump has discretion over how much weight to give to that provincial

---

[91] Roxana Bardan, *NASA Seeks Options for Future Headquarters Building*, NASA (Nov. 14, 2024), https://www.nasa.gov/centers-and-facilities/hq/nasa-seeks-options-for-future-headquarters-building/ [https://perma.cc/J8ZV-3L3E].

[92] Flynn Gray, *Republican-led States Angle for NASA Headquarters*, Am. Inst. of Physics (May 7, 2025), https://www.aip.org/fyi/republican-led-states-angle-for-nasa-headquarters [https://perma.cc/5QDY-LRPP].

[93] Richard Tribou, *Lawmakers Weigh Moving NASA Headquarters to Florida*, Gov't Tech. (Jul. 14, 2025), https://www.govtech.com/products/lawmakers-weigh-moving-nasa-headquarters-to-florida [https://perma.cc/2LH8-ZD89].

[94] Fla. Dep't of Agric. & Consumer Servs., *Florida Agriculture Overview and Statistics*, https://www.fdacs.gov/Agriculture-Industry/Florida-Agriculture-Overview-and-Statistics [https://perma.cc/3BTN-RMHA] (last visited May 5, 2025).

[95] Press Release, Fla. Exec. Off. of the Governor, *Gov. Ron DeSantis Signs Florida Farm Bill* (Mar. 23, 2026), https://www.flgov.com/eog/news/press/2026/governor-ron-desantis-signs-florida-farm-bill [https://perma.cc/8XNA-7PQ7].

interest—which has implications for the natural environment of the nation as a whole—as he negotiates his new farm bill.[96]

144.    Similarly, in negotiating the scope of foreign retaliatory tariffs or corresponding U.S. countermeasures, President Trump can decide whether to try to shield Florida's agricultural exports—such as citrus and specialty crops—from adverse trade impacts.  Any preferential trade positioning would advantage Florida's economy while redistributing the burdens of international trade conflicts to the rest of the nation.[97]

145.    Other examples abound.  They illustrate the variety of ways in which the President could use his discretion to bestow benefits on the State of Florida—potentially at the expense of other states—in light of the lucrative gift he has received from the State Defendants.

146.    Indeed, the Trump Defendants have already made clear that they view the MDC Parcel conveyance as a valuable gift from Florida.

147.    Eric Trump expressed his family's gratitude immediately after the conveyance: "A large thank you to @GovRonDeSantis & @AGJamesUthmeier who have been incredible partners in this endeavor.  Consistent with our families DNA [sic], this will be one of the most beautiful buildings ever built, an Icon on the Miami skyline."[98]

---

[96] Caitlyn Frolo & Jessica A. Botelho, *With Gold Tractor on WH lawn, Trump Shares New Actions to Help US Farmers Save 'Billions,'* Fox 45 Balt. (Mar. 27, 2026), https://foxbaltimore.com/news/nation-world/trump-to-announce-new-actions-to-help-americas-farmers-epa-small-business-administration-evironment-diesel-fuel-iran-war-fertilizer-fuel-costs [https://perma.cc/TU5R-DX89].

[97] Jui Shah, *The Potential Impacts of New Tariffs on Florida's Economy*, Fla. TaxWatch (July 8, 2025),  https://floridataxwatch.org/Research/Blog/the-potential-impacts-of-new-tariffs-on-floridas-economy [https://perma.cc/3YLS-6974].

[98]  @EricTrump, X (Sept. 30, 2025),  https://x.com/EricTrump/status/1973020578337415468 [https://perma.cc/J6N7-JEET].

148.    President Trump echoed that gratitude, telling reporters that "the state worked with us" to procure land on "the best block in Miami."[99]

149.    Due to the President's influence on so many aspects of federal policy, every state could stand to benefit in similar ways as Florida from securing the President's favor, and therefore, every state has an incentive to enrich the President should such private rewards be permitted.

150.    To avoid even the possibility that conflicts of interest like these would harm the American people by compromising their leaders' judgment, the Founders enshrined the prohibitions of the Domestic Emoluments Clause in our national charter.

***Plaintiffs' Injuries***

Kristen Browde

151.    Plaintiff Kristen Browde is a Downtown Miami resident who owns and resides in a condominium located approximately two blocks north of the MDC Parcel.

152.    Ms. Browde purchased the condominium to serve as a retirement home.  She has lived in it for approximately four years and intends to reside there for the foreseeable future.

153.    The MDC Parcel is visible from Ms. Browde's south-facing property.  She can see it from almost every window inside her condominium, as well as her balcony.

154.    As discussed, based on the Trump family's descriptions and publicly released renderings, the proposed development will dwarf other buildings in the area, disrupting sightlines and casting shadows.  Specifically, the development will substantially block Ms. Browde's water view of Biscayne Bay and block her sightlines of Bayfront Park and the Downtown Miami and Brickell skylines.

---

[99] Heddles & Hanks, *supra* note 5.

155.     Further, Ms. Browde walks by the MDC Parcel on a daily basis and drives past it frequently as part of her regular activities in this part of Downtown Miami.

156.     The Trump development will also injure Ms. Browde by increasing traffic in an area that already experiences heavy traffic congestion due to regular basketball games, concerts, and other events at the Kaseya Center; tourist traffic from nearby cruise ports, museums, parks, attractions, and retail sites (including Miami Worldcenter and Bayside); commuter traffic from Miami's central business district; and traffic from Greater Downtown Miami's residential population, which has swelled to over 100,000 people in recent years and is set to continue growing amid the construction of over two dozen residential towers in the vicinity.[100]

157.     Since she began residing in Downtown Miami, Ms. Browde has regularly participated in local civic and land-use proceedings.  She serves on the Board of Directors of the Downtown Neighbors Association and regularly attends meetings of the City of Miami Commission and other public bodies to testify, submit public comments, and raise concerns or questions regarding construction, development, and other issues affecting the Downtown Miami community.

158.     As discussed, the State of Florida enacted SB 118 to strip local governments of their authority over the MDC Parcel for the specific purpose of allowing the Trump family to build its proposed development without any encumbrances or restrictions.

159.     Accordingly, it is unclear whether Miami-Dade County or the City of Miami will be able to enforce zoning, land use, traffic, parking, height, density, or other related regulations,

---

[100] MiamiDDA, *Downtown Details, Data and Demographics* (Apr. 2025), https://www.miamidda.com/files/assets/miamidda/v/1/business-development/documents/data-amp-research/research-amp-reports/downtown-miami-demographic-study-findings_april-2025.pdf [https://perma.cc/6P9B-4ABS].

ordinances, requirements, or restrictions that would normally apply to any other proposed structure of this size. These regulations, ordinances, requirements, and restrictions are intended in part to protect residents of neighboring properties, like Ms. Browde, from excessive development that makes communities unsafe, overly congested, incompatible with the surrounding neighborhood, and generally less desirable places to live.

160. Without these protections in place, Ms. Browde lacks any recourse to redress harms caused by the development planned by the Trump Defendants for the MDC Parcel—including visual intrusions, extreme traffic congestion, disruptions caused by the development's security practices, and loss of neighborhood compatibility.

161. Indeed, but for SB 118's enactment, Ms. Browde—a civically engaged resident who lives just steps away from the MDC Parcel—would have availed herself of every possible means to object to the Trump development, including by appearing before and communicating with county and city commissioners, officials, and boards that would have determined whether the development complied with applicable ordinances and decided whether to approve its construction.

162. Based on well-documented security practices in areas surrounding the President's private properties in other highly dense areas (such as Trump Tower in New York City), and given the spate of threats lodged at the President, his family, and their properties, Ms. Browde has reason to believe that the Trump Defendants' planned development for the MDC Parcel will be subject to the recurring and continuing presence of armed security forces, surveillance, restricted access, street closures, and cordoned-off zones during Trump family visits.

163. These measures will make it more difficult for Ms. Browde to move about the neighborhood—potentially requiring her to walk blocks out of the way just to get to her front door—and will create heightened anxiety and tension for Ms. Browde.

164. Ms. Browde also reasonably expects that the development will transform the immediate area into an undesirable "hyper-political zone" almost overnight (as with the area surrounding the Mar-a-Lago Resort in Palm Beach), attracting persistent protests, demonstrations, and media activity. This will increase the risk of unrest in the area, directly affecting Ms. Browde's daily life, safety, and the use and enjoyment of her residence.

165. Overall, these conditions will materially alter and diminish Ms. Browde's quality of life, interfering with the quiet enjoyment of her property and diminishing her desire to continue living in Downtown Miami.

166. Ms. Browde reasonably expects that blocked sightlines, extreme traffic congestion, security disruptions, and the stigma associated with living in a militarized and hyper-political zone caused by the Trump development will detrimentally affect her condominium's marketability and value—including her ability to refinance or sell the property.

167. Thus, the State Defendants' gift of the MDC Parcel without any encumbrances or restrictions has caused and will continue to cause Ms. Browde concrete and particularized injuries.

Gregory van den Dries

168. Plaintiff Gregory van den Dries is also a Downtown Miami resident who owns and resides in a condominium located approximately four blocks north of the MDC Parcel.

169. Mr. van den Dries has lived in his condominium for approximately three years and intends to reside there for the foreseeable future.

170. He can see the MDC Parcel from the balcony of his condominium.

171.    Based on the Trump family's descriptions and publicly released renderings, the development will substantially block Mr. van den Dries's views and sightlines from his residence. Specifically, the development will substantially block Mr. van den Dries' southern water view of Biscayne Bay and his sightlines of Bayfront Park and the Downtown Miami and Brickell skylines from his balcony.

172.    Further, Mr. van den Dries walks by the MDC Parcel on a daily basis and bikes and drives past it frequently as part of his regular activities in this part of Downtown Miami.

173.    The Trump development will also injure Mr. van den Dries by increasing traffic in an area that already experiences heavy traffic congestion for the reasons described above.

174.    Since he began residing in Downtown Miami, Mr. van den Dries has regularly participated in local civic proceedings and attended condominium association meetings, where he has raised concerns and questions regarding construction, development, and other issues affecting the Downtown Miami community.

175.    As discussed, the State of Florida enacted SB 118 to strip local governments of their authority over the MDC Parcel for the specific purpose of allowing the Trump family to build its proposed development without any encumbrances or restrictions.

176.    Accordingly, it is unclear whether Miami-Dade County or the City of Miami will be able to enforce zoning, land use, traffic, parking, height, density, or other related regulations, ordinances, requirements, or restrictions that would normally apply to any other proposed structure of this size.  These regulations, ordinances, requirements, and restrictions are intended in part to protect residents of nearby properties, like Mr. van den Dries, from excessive development that makes communities unsafe, overly congested, incompatible with the surrounding neighborhood, and generally less desirable places to live.

177.    Without these protections in place, Mr. van den Dries lacks any recourse to redress harms caused by the development planned by the Trump Defendants for the MDC Parcel—including visual intrusions, extreme traffic congestion, disruptions caused by the development's security practices, and loss of neighborhood compatibility.

178.    Indeed, but for SB 118's enactment, Mr. van den Dries—a civically engaged resident who lives just blocks away from the MDC Parcel—would have availed himself of every possible means to object to the Trump development, including by appearing before and communicating with county and city commissioners, officials, and boards that would have determined whether the development complied with applicable ordinances and decided whether to approve its construction.

179.    Based on well-documented security practices in areas surrounding the President's private properties in other highly dense areas (such as Trump Tower in New York City), and given the spate of threats lodged at the President, his family, and their properties, Mr. van den Dries has reason to believe that the Trump Defendants' planned development for the MDC Parcel will be subject to the recurring and continuing presence of armed security forces, surveillance, restricted access, street closures, and cordoned-off zones during Trump family visits.

180.    These measures will make it more difficult for Mr. van den Dries to move about the neighborhood and will create heightened anxiety and tension for Mr. van den Dries.

181.    Mr. van den Dries also reasonably expects that the development will transform the immediate area into an undesirable "hyper-political zone" almost overnight (as with the area surrounding the Mar-a-Lago Resort in Palm Beach), attracting persistent protests, demonstrations, and media activity.  This will increase the risk of unrest in the area, which will directly affect Mr. van den Dries's daily life, safety, and the use and enjoyment of his residence.

182. Overall, these conditions will materially alter and diminish Mr. van den Dries's quality of life, interfering with the quiet enjoyment of his property, and diminishing his desire to continue living in Downtown Miami.

183. Mr. van den Dries reasonably expects that blocked sightlines, extreme traffic congestion, security disruptions, and the stigma associated with living in a militarized and hyper-political zone caused by the Trump development will detrimentally affect his condominium's marketability and value—including his ability to refinance or sell the property.

184. Thus, the State Defendants' gift of the MDC Parcel without any encumbrances or restrictions has caused and will continue to cause Mr. van den Dries concrete and particularized injuries.

Dunn's Farm

185. Plaintiff Dunn's Farm is a Florida nonprofit organization founded in 2022 to establish and operate an urban farm in the City of Miami. Its co-founder, Dr. Marvin Dunn, has been active in Miami urban farming efforts for over twenty years, including through leadership of various other nonprofit organizations.

186. The urban farm that Dunn's Farm currently operates is in the Overtown neighborhood of Miami, located at 937 NW 3rd Avenue. It grows food for the community, models sustainable farming practices, and provides educational programs on gardening, nutrition, and healthy living. It focuses on serving low-income and socioeconomically disadvantaged families across Miami, and is also a resource hub and training ground for community members, including MDC students interested in agriculture, culinary arts, sustainable farming, and the establishment and management of nonprofit organizations with social justice missions.

187.    Unfortunately, the Overtown Farm is operating on borrowed time at its current location.  The site was loaned to Dunn's Farm by a private developer who promised occupancy for a few years, and its ability to use that location could end at any time.

188.    Approximately three years ago, students from MDC's Miami Culinary Institute, located on the Wolfson Campus,[101] approached Dunn's Farm co-founder Dr. Dunn to ask for his help with an initiative to build an urban farm on MDC's Wolfson Campus.

189.    The idea of the proposed urban farm would be to provide a site for MDC students with an interest in urban farming, culinary arts, and nonprofit management to study under the mentorship of the leaders of Dunn's Farm, including Dr. Dunn himself as well as Chief Executive Officer and Lead Chef Christyna Salmon.

190.    Dr. Dunn was thrilled with this idea, in large part because it would provide a permanent home for an urban farm on public land in Downtown Miami, and would eliminate the current risk of being bounced from one privately owned site to another.

191.    The MDC Wolfson Campus also would provide an ideal location for community education in urban farming—a central aspect of Dunn's Farm's mission.

192.    Thus, Dr. Dunn promptly began talks with MDC officials about building an urban farm on MDC's Wolfson Campus.

193.    MDC was open to the idea.  As an initial step, MDC worked with Dr. Dunn to establish a small vegetable garden on the Wolfson Campus.  Dr. Dunn was the featured speaker at the event that launched the garden.

---

[101] Miami Culinary Institute, Miami Dade College, https://www.mdc.edu/culinary/default.aspx (last visited May 5, 2026).

46

194.    Dr. Dunn informed MDC of Dunn's Farm's desire to expand its partnership with MDC through the creation of a larger urban farm on the Wolfson Campus, located on the MDC Parcel.

195.    MDC staff expressed verbal interest in such a program expansion.

196.    Then-MDC President Dr. Eduardo Padrón told Dr. Dunn that he would help identify staff to support such a program expansion.

197.    Dunn's Farm was ready, willing, and able to make its case to the MDC Board for the installation of an urban farm on the MDC Parcel that was instead gifted to President Trump.

198.    Additionally, Dunn's Farm was ready, willing, and able to make its case to the Florida Board for the installation of an urban farm on the property that was instead gifted to President Trump.

199.    If the State Defendants had not gifted the MDC Parcel to President Trump, Dunn's Farm was ready, willing, and able to provide the funding and guidance for installation of an MDC urban farm on the parcel for the benefit of the MDC student body and local community.

200.    But for the gift of the MDC Parcel to President Trump, Dunn's Farm would have competed for the MDC Parcel.  The longstanding partnership between MDC and Dr. Dunn demonstrates that, at a minimum, MDC would have seriously considered Dunn's Farm's request for the land.

201.    If Dunn's Farm had succeeded in convincing MDC or the Florida Board to devote even just a portion of the MDC Parcel to an urban farm, MDC students would have been able to work and learn on their own farm on campus.  They also would have been able to receive credit for their on-campus work.

202. Food-insecure students, who make up a significant portion of the MDC student body, would also have been able to obtain fresh produce for free on their own campus.

203. There is no land on the MDC Wolfson Campus or in Downtown Miami other than the MDC Parcel that would be appropriate for an urban farm. This is because of the MDC Parcel's size, its proximity to the Miami Culinary Institute, and its central location on the Wolfson Campus.

204. Defendants' actions have foreclosed the prospect of an urban farm on the Wolfson Campus jointly operated by MDC and Dunn's Farm. Neither MDC nor the Florida Board owns or controls the land anymore, so it is no longer available to serve MDC's student community and Downtown Miami. Instead, the land will house a Trump hotel that brings riches to the President, in violation of the Domestic Emoluments Clause.

205. Dunn's Farm has accordingly suffered harm from the land transaction in the form of frustration of its organizational objective to create an expanded urban farming program to benefit both MDC students and the local community.

206. Dunn's Farm has also been deprived of the opportunity to obtain a permanent home on public land in Downtown Miami.

207. Dunn's Farm has also lost the resources it diverted to conversations and advocacy with MDC leadership about the on-campus urban farm objective. Those expenditures are now rendered worthless in light of the giveaway of the entirety of the MDC Parcel to the Trump Library Foundation.

208. Dunn's Farm will now have to devote resources to finding other ways to work with MDC students, educate them about sustainable urban farming, and assist with their food security. These outreach efforts will be more challenging than they would have been if there was an urban farm right on the MDC campus.

209.    Defendants directly caused this harm.  As described above, Defendants each played an indispensable role in the coordinated multipart transaction that resulted in the MDC Parcel's conveyance to the Trump Library Foundation on terms that would enrich President Trump.

210.    The declaratory and injunctive relief that Plaintiffs are seeking would redress this injury.  Voiding the conveyance by which the MDC Parcel was gifted to President Trump would result in the land reverting to the ownership of the State Defendants, restoring its availability for usage that benefits MDC students, Dunn's Farm, and the Downtown Miami community.

Carmen Salcedo

211.    Plaintiff Carmen Salcedo is a student at Miami Dade College.  She received her Associate of Arts degree in Anthropology from Miami Dade College in 2024, and is currently enrolling in summer classes at the College as she works toward her Bachelor of Arts degree in business.  She anticipates completing her bachelor's degree in the next two to three years.

212.    Ms. Salcedo lives approximately one hour away from the Wolfson Campus and commutes there by car.

213.    Ms. Salcedo has signed up to volunteer at Dunn's Farm and plans to obtain food for herself and her young daughter from Dunn's Farm.

214.    Ms. Salcedo also receives mentorship from Dr. Dunn in his capacity as a nonprofit leader.  She recently founded her own nonprofit, nonpartisan organization called Facts & Impacts, which helps Miami community members get engaged in political issues and pursue social justice. She hopes to learn skills in nonprofit management from Dr. Dunn—hands-on skills that cannot be taught in a classroom.

215.    Ms. Salcedo was excited at the prospect of working on an urban farm on the Wolfson Campus when she learned of the idea from Dr. Dunn.

49

216.    The idea of having an official MDC urban farming program through an on-campus farm appealed to Ms. Salcedo because it could allow her to earn credits and formal recognition for her work on the farm and with Dr. Dunn, which MDC does not currently acknowledge.

217.    The idea also appealed to Ms. Salcedo because it would allow her to obtain fresh food for her family from an urban farm on her college campus.  As a busy single mother taking classes, working, and running a new nonprofit organization, having easy access to healthy and fresh produce for free or at a reduced price would be invaluable to her, as well as to many food-insecure students.

218.    When the State Defendants gifted the land to the Trump Defendants in violation of the Domestic Emoluments Clause, they caused harm to Ms. Salcedo.

219.    The emolument at issue has quashed Ms. Salcedo's opportunity to learn urban farming and nonprofit management skills on campus for academic credit.

220.    Instead, Ms. Salcedo must now travel off-campus to gain these skills and experiences and obtain fresh food for her family.  Meanwhile, MDC will not acknowledge any work she does at the off-campus urban farm, given its lack of direct affiliation with the state college.

221.    Separately, MDC and the MDC Board have breached their duty to Ms. Salcedo as a tuition-paying student.  Indeed, even *selling* the land to a private developer would have been better for Ms. Salcedo than donating it to the President's hotel endeavor.  At least then, MDC and the state could have reinvested the proceeds of the sale to benefit MDC students like Ms. Salcedo.

222.    As discussed, had MDC sold the MDC Parcel at any point, the land could have commanded a sales price that would have doubled MDC's endowment overnight.  These funds

could have been used to advance the college's research needs, offer more bachelor's degree programs, secure more world-class facilities and faculty, or reduce student expenses.

223. For instance, Ms. Salcedo wishes to major in nonprofit management, but MDC does not offer a nonprofit-management bachelor's degree or concentration. As such, she is pursuing a general degree in business that is less applicable to her distinct career interests.

224. Ms. Salcedo is also a single mother raising a young daughter. She works part-time at a fine-dining establishment to support her family and earn money to pay for classes at MDC. The sale of the MDC Parcel could have yielded additional financial aid or the provision of on-campus childcare, alleviating Ms. Salcedo's burden.

225. Ms. Salcedo also fears that the noise generated by the construction of the massive hotel development planned by the Trump Defendants for the MDC Parcel will disrupt her educational experience, with no benefit to her as a student. In the past, construction noise on the Wolfson Campus has made it difficult for Ms. Salcedo to concentrate on her studies or even hear her teachers speak.

226. Ms. Salcedo worries that the congestion resulting from road closures and construction of the massive hotel development over the next several years will make her commute to the Wolfson Campus significantly more difficult. As noted, Ms. Salcedo already drives an hour to and from MDC for classes. Congestion in Downtown Miami is a significant factor in her commute time.

227. As a student who pays money to attend a state-run institution, Ms. Salcedo has an interest in MDC and its Board making decisions that benefit students and their education, rather than decisions that line the pockets of a sitting president.

228.    Put simply, by gifting this property to President Trump in violation of the Domestic Emoluments Clause instead of honoring their academic and fiduciary commitments to public college students, the State Defendants have undermined Ms. Salcedo's educational experience.

229.    The declaratory and injunctive relief that Plaintiffs are seeking would redress this injury.  Voiding the conveyance by which the MDC Parcel was gifted to President Trump would restore its availability for uses that would benefit MDC students and the community—specifically for Ms. Salcedo, who has a discrete interest in the land being used for an urban farm in partnership with Dunn's Farm.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the Domestic Emoluments Clause
### (Declaratory Relief)

230.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 229.

231.    There is an actual controversy between Plaintiffs and Defendants as to the meaning of the Domestic Emoluments Clause and its application to Defendants and their conduct.

232.    Specifically, the State Defendants have violated the Domestic Emoluments Clause by gifting land (the MDC Parcel) worth over $300 million, without any encumbrances or restrictions, to President Trump and his family for their financial benefit.

233.    Further, the Trump Defendants have violated the Domestic Emoluments Clause by accepting that gift.

234.    Defendants have indicated that they disagree with these allegations, including by touting the partnership between the Trump Defendants and the State Defendants and flaunting the fact that President Trump will monetize the land.

235.     Accordingly, Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between Plaintiffs and Defendants will aid in the resolution of legal issues in this action.  Absent this relief, Plaintiffs will continue to suffer injury.

**COUNT II**
**Violations of the Domestic Emoluments Clause**
**(Injunctive Relief)**

236.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 229.

237.     The Domestic Emoluments Clause bars the President from receiving during his time in office "any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.  This means that states may not give, and the President may not accept, any benefits or advantages to the President beyond his fixed compensation—including those that enrich him personally.

238.     As discussed, the State Defendants have given President Trump an "Emolument" in the form of the gift of valuable land without any encumbrances or restrictions, as described herein, thereby violating the Domestic Emoluments Clause.

239.     Further, President Trump—by and through his affiliation with the Trump Library Foundation—has received an "Emolument" from the State Defendants in the form of the gift of valuable land described herein in violation of the Domestic Emoluments Clause.

240.     By violating the Domestic Emoluments Clause through the land transaction described herein, Defendants have injured and are continuing to injure Plaintiffs as described more fully in paragraphs 151–229.

241.     Plaintiffs are entitled to injunctive relief to stop these injuries, and this Court has the power to grant such relief pursuant to its inherent ability to grant equitable relief and pursuant to 28 U.S.C. § 1331.  Such relief would order Defendants to stop violating the Domestic

Emoluments Clause by declaring null and void the land transaction that harmed Plaintiffs and violated the Clause, or through such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in Plaintiffs' favor and against Defendants, consisting of:

(a)     A declaratory judgment stating that:

    (1)     the Domestic Emoluments Clause prohibits the President of the United States from receiving any benefits of value from any state during the President's term of office, and prohibits states from giving any such benefits of value to the President during that period;

    (2)     Defendant Donald J. Trump may not elude the proscriptions of the Domestic Emoluments Clause by receiving gifts through a corporate entity or immediate family members.  Thus, the Domestic Emoluments Clause applies both to emoluments he receives directly and to those he receives constructively through the Trump Library Foundation, which he controls;

    (3)     by receiving an emolument from the State Defendants in the form of the valuable gift of land described herein, the Trump Defendants have violated and are violating the Domestic Emoluments Clause; *and*

    (4)     by giving an emolument to the Trump Defendants in the form of the valuable gift of land described herein, the State Defendants have violated and are violating the Domestic Emoluments Clause.

(b)     Injunctive relief:

54

(1)    enjoining Defendants from violating the Domestic Emoluments Clause with respect to the MDC Parcel described herein;

(2)    declaring null and void the land transaction that resulted in the Domestic Emoluments Clause violations and Plaintiffs' harms described herein; *and*

(3)    enjoining Defendants from treating the conveyance of the MDC Parcel as valid.

(c)    Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on any issues so triable.

Dated: May 13, 2026

Respectfully Submitted,

/s/ Gerald E. Greenberg
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
DANIEL S. GELBER
Florida Bar No. 512877
dan@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com

ELIZABETH B. WYDRA *
elizabeth@theusconstitution.org
BRIANNE J. GOROD *
brianne@theusconstitution.org
BRIAN R. FRAZELLE *
brian@theusconstitution.org
SMITA GHOSH *
smita@theusconstitution.org
MIRIAM BECKER-COHEN *
miriam@theusconstitution.org
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Avenue NW, Suite 1200
Washington, D.C. 20036
Telephone: (202) 296-6889

* *Pro hac vice* applications forthcoming

*Counsel for Plaintiffs*