**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| SISTRUNK SEEDS, INC. D/B/A DUNN'S OVERTOWN FARM, et al. | Case No. 1:26-CV-23365 |
| *Plaintiffs*, | Honorable Rodolfo A. Ruiz II |
| v. | |
| DONALD J. TRUMP, et al., | |
| *Defendants*. | |

## <u>MEMORDANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

I.      Transfer of the MDC Parcel..................................................................................2

II.     Plaintiffs and Plaintiffs' Alleged Injuries ...........................................................2

        A.      Sistrunk Seeds, Inc. (d/b/a Dunn's Overtown Farm) ...............................2

        B.      Carmen Salcedo .......................................................................................3

        C.      Nearby Residents .....................................................................................3

III.    Plaintiffs' Claims .................................................................................................4

LEGAL STANDARD........................................................................................................4

ARGUMENT ....................................................................................................................5

I.      PLAINTIFFS LACK STANDING TO SUE .........................................................5

        A.      No Plaintiff has Alleged an Injury-in-Fact...............................................5

                1.      Dunn's Farm ..................................................................................6

                2.      Carmen Salcedo .............................................................................7

                3.      Kristen Browde and Gregory van den Dries .................................8

        B.      Plaintiffs Do Not Allege Any Injury Traceable to the President or
                Redressable Through Relief Against Him. ...............................................10

II.     PLAINTIFFS' LACK A CAUSE OF ACTION AND, IN ANY CASE, THEIR
        ASSERTED INJURIES DO NOT FALL WITHIN THE ZONE OF INTERESTS
        OF THE DOMESTIC EMOLUMENTS CLAUSE .............................................12

III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE DOMESTIC
        EMOLUMENTS CLAUSE .................................................................................13

        A.      The Text, History, and Purpose of the Domestic Emoluments Clause
                Indicate that Any Private Commercial Benefit Attendant to the Land
                Transfer is not an "Emolument." ..............................................................14

        B.      Plaintiffs have not pleaded facts sufficient to establish that the President
                "received" an "Emolument."......................................................................18

IV.     THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL........19

CONCLUSION ............................................................................................................................20

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*,
    498 U.S. 517 (1991)................................................................................................................13

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009).............................................................................................9

*Am. Legion v. Am. Humanist Ass'n*,
    588 U.S. 29 (2019)..................................................................................................................9

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902)................................................................................................................12

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)..............................................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................................5

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
    397 U.S. 150 (1970)........................................................................................................13, 14

*Banks v. Sec'y, Dep't of Health & Hum. Servs.*,
    38 F.4th 86 (11th Cir. 2022)............................................................................................11, 12

*Bost v. Ill. State Bd. of Elections*,
    607 U.S. 71 (2026)..................................................................................................................7

*Boston Stock Exch. v. State Tax Comm'n*,
    429 U.S. 318 (1977)..............................................................................................................13

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
    115 F.4th 1266 (11th Cir. 2024), *cert. denied*, 146 S.Ct. 607 (2025)...........................8

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022)..................................................................................................................1

*City of S. Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023)................................................................................................7

*Clapper v. v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)............................................................................................................6, 8

*Clinic Mgmt. LLC v. Berry*,
    912 F.3d 1330 (11th Cir. 2019)..............................................................................................6

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003)............................................................................................................19

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022)........................................................................................................5, 10

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983)............................................................................................................19

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024).................................................................................................7, 10, 11

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008)............................................................................................9

*31 Foster Child. v. Bush*,
  329 F.3d 1255 (11th Cir. 2003)............................................................................................9

*Franklin v. Massachusetts. See*,
  505 U.S. 788 (1992)............................................................................................................20

*G.P. v. United States Env't Prot. Agency*,
  172 F.4th 1042 (9th Cir. 2026)............................................................................................11

*Ganz v. Grifols Therapeutics LLC*,
  688 F. Supp. 3d 1209 (S.D. Fla. 2023) ...............................................................................19

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)............................................................................................................12

*Hafer v. Melo*,
  502 U.S. 21 (1991)..............................................................................................................10

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)..............................................................................................................7

*Hoyt v. United States*,
  51 U.S. 109 (1850)..............................................................................................................15

*Kondrat'yev v. City of Pensacola*,
  949 F.3d 1319 (11th Cir. 2020)............................................................................................9

*Lewis v. Clarke*,
  581 U.S. 155 (2017)............................................................................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..............................................................................................................6

*Mack v. USAA Cas. Ins. Co.*,
   994 F.3d 1353 (11th Cir. 2021)...........................................................................................7

*Michigan Corr. Org. v. Michigan Dep't of Corr.*,
   774 F.3d 895 (6th Cir. 2014).............................................................................................12

*Mississippi v. Johnson*,
   71 U.S. 475 (1867)............................................................................................................20

*Murthy v. Missouri*,
   603 U.S. 43 (2024)..............................................................................................................5

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ........................................................................................20

*President Reagan's Ability to Receive Retirement Benefits from the State of California*,
   5 Op. O.L.C. 187, 192 (1981) ........................................................................................... 17

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .......................................................................................................5, 6

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ..........................................................................................20

*The Honorable George J. Mitchell U.S. Senate*, B-207467,
   1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ...................................................................17

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)............................................................................................................5

*Trichell v. Midland Credit Mgmt., Inc.*,
   964 F.3d 990 (11th Cir. 2020).........................................................................................4, 5

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)..........................................................................................................12

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982)..........................................................................................................13

*Virginia Office for Prot. & Advocacy v. Stewart*,
   563 U.S. 247 (2011)..........................................................................................................12

*Walters v. Fast AC, LLC*,
   60 F.4th 642 (11th Cir. 2023)............................................................................................10

*Warth v. Seldin*,
   422 U.S. 490 (1975)..........................................................................................................13

*Williams v. Reckitt Benckiser LLC*,
65 F.4th 1243 (11th Cir. 2023)...........................................................................................5


## **Constitution**

U.S. Const. art. II, § 1, cl. 7 ................................................................................... 1, 14

## **Other Authorities**

1 Fletcher Cyc. Corp. § 31 (rev. ed. 1999)...........................................................................19

2 Fletcher Cyc. Corp. § 505 ................................................................................................19

Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*,
102 Minn. L. Rev. 639, 650 (2017) ................................................................... 16

Donald J. Trump Presidential Libr. Found., Inc., Articles of Incorporation (May 19, 2025), § 3.04(d),
https://tinyurl.com/392v699n............................................................................ 19

James Barclay, *A Complete and Universal English Dictionary on a New Plan* (1774)

James Cleith Phillips, Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760-1799*,
59 S. Tex. L. Rev. 181 (2017).........................................................................................15

James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America*,
(Gaillard Hunt & James Brown Scott eds., 1920)........................................................ 16

John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* (1766) .................................................... 14

Oxford University Press, *Emolument*, OED Online,
http://www.oed.com/view/Entry/61242..................................................................... 15

Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*,
52 Ga. L. Rev. 1 (2017) ..........................................................................................15, 16, 17

Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem Tillman*,
40 Harv. J.L. & Pub. Pol'y...........................................................................................17

vi

The                       American                      Presidency                      Project,
     https://www.presidency.ucsb.edu/sites/default/files/documents_with_attached_files/372038/164
     008-1.pdf ........................................................................................................................... 18

*The Barnhart Concise Dictionary of Etymology* 240 (1995) ........................................................... 15

*The Federalist* No. 73,
     (Jacob E. Cooke ed., 1961) ......................................................................................................... 16

*The Foreign Emoluments Clause and the Chief Executive*,
     102 Minn. L. Rev. 639 (2017) ......................................................................................................16

*The President and Vice President's 2015 Financial Disclosure Forms*, President Barack Obama
White House (May 16, 2016),
     https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-presidents-2015-
     financial-disclosure-forms ......................................................................................................... 18

Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) .................... 15

**INTRODUCTION**

Plaintiffs come to this Court seeking the extraordinary: equitable relief against a sitting President. One would imagine, given such an ask, that Plaintiffs would be armed with an airtight case. Instead, Plaintiffs flunk bedrock standing requirements and put forward a constitutional theory that, if true, means George Washington openly violated the Constitution only a few years after presiding over its drafting. And not only Washington, but also Jefferson, Madison, Reagan, and other presidents. Because courts should "adhere to the teachings of history, experience, and precedent," *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022), rather than newfangled theories meant for this President alone, this Court should dismiss this case.

The Domestic Emoluments Clause provides that the President shall receive "for his Services" a fixed "Compensation" during his tenure and not "any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. As is evident from the text of the Clause itself, it was designed to prohibit the President from engaging in a *quid pro quo* with the states through the exchange of "Emoluments" for official acts. Plaintiffs fail to allege any such engagement. Instead, Plaintiffs take issue with a transfer of land from the State of Florida to the Trump Library Foundation. But private commercial interests themselves are not an "Emolument" in its constitutional sense, and Plaintiffs fail to identify a single official act for which these "benefits" were transferred. Moreover, Plaintiffs fail to plausibly allege that this transfer will provide commercial benefits to President Trump while in office.

Beyond these clear deficiencies on the merits, no Plaintiff adequately alleges standing to sue. Plaintiffs instead allege an array of speculative, generalized, and non-concrete harms that variously cannot support an Article III case, were not caused by the President in his official capacity, or would not be remedied by the requested relief against the President in his official capacity. And beyond that, Plaintiffs lack a cause of action and do not allege any injury falling within the zone of interests

1

that the Domestic Emoluments Clause protects. Finally, the injunctive and declaratory relief that Plaintiffs seek against the President is unconstitutional.

No court has ever issued relief against a President regarding any claim arising from the Domestic Emoluments Clause. This Court should not be the first. Dismissal is required.

## BACKGROUND

### I.  Transfer of the MDC Parcel

In May 2025, the President's son, Eric Trump, and his son-in-law, Michael Boulos, incorporated the Trump Library Foundation. Compl. ¶ 53, ECF No. 1. Eric Trump, along with others, also began to search for property in Florida on which a future presidential library could be located. *Id.* ¶¶ 68-76. Although several state colleges were vying for the opportunity to host President Trump's presidential library, a parcel of land owned by Miami-Dade College and operated as a paid parking lot was selected ("the MDC Parcel"). *Id.* ¶¶ 71, 77, 84, 90. On September 16, 2025, the Florida Office of Cabinet Affairs directed the Board of Miami-Dade College ("the MDC Board") to convey the MDC Parcel to the Florida Board of Trustees of the Internal Improvement Trust Fund ("the Florida Board"). *Id.* ¶ 96. After public hearings, the Board of Miami-Dade College ("the MDC Board") voted unanimously in favor of the conveyance. *Id.* ¶¶ 99, 106. The Florida Board conveyed the state-owned MDC Parcel to the Trump Library Foundation. *Id.* ¶¶ 108-09.

### II.  Plaintiffs and Plaintiffs' Alleged Injuries

#### A.  Sistrunk Seeds, Inc. (d/b/a Dunn's Overtown Farm)

Plaintiff Sistrunk Seeds Inc., doing business as Dunn's Overtown Farm (hereinafter "Dunn's Farm"), is a nonprofit organization that operates an urban farm serving low-income and disadvantaged families in Miami. *Id.* ¶¶ 185-86. Dunn's Farm alleges that it has operated a "small vegetable garden" at MDC and had informed MDC of its "desire" to expand its partnership to include the installation of an urban farm on the MDC Parcel. *Id.* ¶¶ 188-94. Dunn's Farm alleges

2

that "MDC staff expressed verbal interest in such a program expansion" and that Dunn's Farm was prepared to procure funding and provide guidance for installation of an urban farm on the MDC Parcel. *Id.* ¶¶ 195, 199. Dunn's Farm claims that MDC would have "seriously considered" its proposal for the land had the intervening conveyance of land to the Trump Library Foundation not occurred. *Id.* ¶¶ 196-200. Dunn's Farm therefore alleges that it has suffered harm in the form of frustration of its organizational objective to expand its urban farming program. *Id.* ¶ 205. Dunn's Farm also alleges harm in the form of now-sunk costs related to its advocacy before MDC leadership and diversion of resources to find other ways to work with MDC students. *Id.* ¶¶ 207-08. Dunn's Farm alleges that no alternative plot of land suitable for an urban farm exists in Downtown Miami, and thus it has been deprived of an opportunity to obtain a permanent home there. *Id.* ¶¶ 203, 206.

### B. Carmen Salcedo

Plaintiff Carmen Salcedo is a current student at MDC who alleges that she intended to volunteer at, and obtain produce from, the proposed urban farm on the MDC Parcel. *Id.* ¶¶ 213-217. Plaintiff Salcedo alleges that conveyance of the MDC Parcel to the Trump Library Foundation has eliminated her opportunity to volunteer at an urban farm on campus and she will now be forced to go elsewhere to learn urban farming and obtain fresh produce for her family. *Id.* ¶ 220. Ms. Salcedo also alleges that off-campus experience would not be an adequate substitute for the experience she would have gained at Dunn's Farm because MDC will not provide academic credit for such experience. *Id.* ¶ 216. And Ms. Salcedo alleges that, if MDC had sold the MDC Parcel rather than gifted it, her educational experience would have improved due to the sales proceeds. *Id.* ¶¶ 221-24. Finally, Ms. Salcedo claims that construction on the MDC Parcel will disrupt her studies and make her commute to the campus more difficult. *Id.* ¶¶ 221-26.

### C. Nearby Residents

Plaintiffs Kristen Browde and Gregory van den Dries reside in condominiums near the MDC

3

Parcel with direct sightlines to the property. *Id.* ¶¶ 151, 153, 168-70. These Plaintiffs allege injuries in the form of potentially disrupted sightlines in the event a building is erected on the sight, potentially increased traffic congestion in an area that already experiences heavy traffic, potential disruptions related to security measures at and around the development, and concerns about the finished structure's compatibility with the surrounding neighborhood. *Id.* ¶¶ 154-56, 162-66, 170-81. Plaintiffs also allege concern that any potential building could impair the marketability and value of their condominiums. *Id.* ¶¶ 166, 182-183.

### III.    Plaintiffs' Claims

Plaintiffs allege that transfer of the MDC Parcel to the Trump Library Foundation has resulted in a violation of the Domestic Emoluments Clause because it has caused the President to "receive[]an emolument beyond his fixed salary." *Id.* ¶ 123. Although acknowledging that the "MDC Parcel was conveyed to the Trump Library Foundation and not to the President directly," Plaintiffs allege that the Foundation is controlled by President Trump, *id.* ¶ 124, and that the conveyance of the MDC Parcel—which can be developed into a highly profitable residential or commercial property—has provided a financial benefit to the President along with others, *see id.* ¶¶ 127-36. Plaintiffs allege that the conveyance of the MDC Parcel by the State of Florida to the Trump Library Foundation has forced all other states into an "arms race" that requires them to "lavish gifts on the President or fear being unfairly disadvantaged[,]" which is "the precise scenario that the Domestic Emoluments Clause was adopted to prevent." *Id.* ¶ 138. Plaintiffs list several hypothetical examples as to how the President might favor Florida over other states in the exercise of his authorities, *see id.* ¶¶ 139-45, although they do not allege that such scenarios have occurred.

**LEGAL STANDARD**

To withstand a motion to dismiss under Rule 12(b)(1), plaintiffs must allege "facts that plausibly establish their standing." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th

4

Cir. 2020) (citation omitted). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Mere "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement" are not sufficient. *Id.* (citation omitted). Rather, a court should disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679.

**ARGUMENT**

**I.      PLAINTIFFS LACK STANDING TO SUE**

To have standing, a plaintiff "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (citation omitted). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified). Because "standing is not dispensed in gross," a plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted). Thus, "for every defendant, there must be at least one plaintiff with standing." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). And when seeking forward-looking relief, at least one plaintiff must plausibly allege a "real and immediate" threat of injury posed by a defendant. *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1253 (11th Cir. 2023) (citation omitted). Conjecture, hypotheticals, and past injuries will not do. *See id.*; *Mack v. USAA Cas. Ins. Co.*, 994. F.3d 1353, 1358 (11th Cir. 2021). Plaintiffs fail to allege facts demonstrating any of the three elements.

**A.  No Plaintiff has Alleged an Injury-in-Fact.**

To begin, none of the Plaintiffs allege an injury-in-fact sufficient to support Article III

5

jurisdiction. "To establish injury in fact, a plaintiff must show that he or she [has] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Specifically, the injury must affect the plaintiff in "a personal and individual way" and must be "real" not "abstract." *Id*. at 339–40.

### 1. Dunn's Farm

Dunn's Farm contends that it has been injured by the President's alleged constitutional violation because the conveyance of the MDC Parcel has foreclosed its opportunity to develop an urban farm on the MDC Parcel. Compl. ¶¶ 204-206. But this theory rests on a "speculative chain of possibilities," not any "certainly impending" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  Dunn's Farm alleges that "[b]ut for the gift of the MDC Parcel to President Trump, Dunn's Farm would have *competed* for the MDC Parcel." Compl. ¶ 200 (emphasis added). It states that MDC was "open to the idea" of an urban farm on the MDC Parcel, that MDC "expressed verbal interest in [urban farming] program expansion," and that Dunn's Farm was "ready, willing, and able to make its case" to the MDC and Florida boards for the installation of an urban farm on the MDC Parcel. *Id*. ¶¶ 193-98. None of these allegations, though, make it plausible that any such opportunity actually existed. *See Spokeo*, 578 U.S. at 340 ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist." (citation omitted)). Dunn's Farm's most concrete allegation merely claims that MDC would have "seriously considered Dunn's Farm's request for the land[,]" Compl. ¶ 200. But this allegation is based on speculation, not fact, and thus is insufficient. *See Clapper*, 568 U.S. at 411-14.  And even if this Court concluded that such an opportunity is plausibly alleged, any injury remains speculative because Dunn's Farm offers "no facts suggesting that the [urban farm] was imminent or that [Dunn's Farm] had any concrete plan in place for bringing its [farm] into operation." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337 (11th Cir. 2019).

Dunn's Farm's other theories are equally insufficient. Because a "plaintiff must show 'far more than simply a setback to the organization's abstract social interests'" to have standing, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), the alleged "frustration of [Dunn's Farm's] organizational objective to create an expanding urban farming program" does not suffice, Compl. ¶ 205. And Dunn's Farm's allegation, Compl. ¶ 207, that it has expended resources in the past to advocate for an urban farm on the MDC Parcel fails because backward-looking harm is not enough to seek forward-looking relief, *see Mack*, 994 F.3d at 1358, as well as the fact that plaintiffs "cannot 'manufacture standing by voluntarily' incurring costs," *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 82 (2026) (citation omitted).

Finally, Dunn's Farm claims injury because, without an urban farm on MDC's campus, it will "have to devote resources to finding other ways to work with MDC students[.]" Compl. ¶ 208. To sustain such a theory, an organizational plaintiff must show that a defendant's "actions directly affected and interfered with [the organization's] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. Or, as the Eleventh Circuit has put it, an organization must show both a diversion and an "injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *City of S. Miami v. Governor*, 65 F.4th 631, 638-39 (11th Cir. 2023). But here, Dunn's Farm merely offers an assumption that, absent the land transfer, Dunn's Farm would have secured usage of the MDC Parcel and furthered its "outreach efforts" to students. Compl. ¶ 208. This assumption finds no support in any of Dunn's Farm's allegations, and it is insufficient for purposes of standing.

### 2. Carmen Salcedo

Plaintiff Carmen Salcedo alleges injuries stemming from loss of the opportunity to work at an urban farm located on the MDC Parcel (Ms. Salcedo currently works at Dunn's Farm's current

location in downtown Miami), benefits associated therewith, and generalized harms from construction, noise, and traffic. *Id*. ¶¶ 213-26. None of these injuries suffice. First, Ms. Salcedo alleges no facts making it plausible that an opportunity to work at an urban farm on campus was forthcoming and thus fails to show an injury that is "certainly impending." *Clapper*, 568 U.S. at 402. Ms. Salcedo's other alleged injuries suffer from the flaw. Ms. Salcedo claims that if MDC had sold the MDC parcel, the financial return could have improved her student experience by, for example, yielding additional financial aid and/or degrees. Compl. ¶¶ 221-24. Ms. Salcedo also claims that future construction will disrupt her educational experience and lengthen her commute. *Id*. ¶ 226. Like her farm-related harms, these too are "conjectural" and "hypothetical," and therefore do not suffice for standing purposes. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1281 (11th Cir. 2024) (citation omitted), *cert. denied*, 146 S. Ct. 607 (2025).

### 3.   Kristen Browde and Gregory van den Dries

Plaintiffs Kristen Browde and Gregory van den Dries ("the Resident Plaintiffs") own homes near the MDC Parcel and allege injuries associated with the construction of a presidential library—allegedly in the form of a large tower—on the MDC Parcel. In support of their alleged injuries, they cite public statements and social media posts by the President, the President's children, and unnamed allies suggesting that the development on the MDC Parcel will consist of a multi-story tower housing a presidential library and also other commercial or residential property. Compl. ¶¶ 112-20. If such a tower is constructed, the Resident Plaintiffs allege that it will cause excessive noise, generate traffic problems, obstruct sightlines from their respective properties, and generally alter the character of their neighborhood. *See generally id*. ¶¶ 151-184.

Like the other Plaintiffs, the Residential Plaintiffs fail to clearly allege concrete and imminent harm. To find injury-in-fact, this Court would have to conclude, on the basis of a number of vague public statements and preliminary renderings of what the development *might* look like,

that there is a substantial risk that Defendants' future development on the MDC Parcel will so vastly transform the area around the property that it will imminently affect the Residential Plaintiffs' "daily life, safety, and the use and enjoyment" of their property, Compl. ¶ 164, "materially alter and diminish" [their] quality of life," *id.* ¶¶ 165, 182, "create heightened anxiety and tension" due to an overwhelming presidential security presence, *id.* ¶¶ 163, 179-80, decrease their properties' value, *id.* ¶¶ 166, 183, and generally transform the surrounding area into a "hyper-political zone" overnight, *id.* ¶¶ 166, 181. And the Court must reach these conclusions even though Residential Plaintiffs have failed to allege anything to say *when* these outcomes might occur.

Such conclusions, based on Residential Plaintiffs' allegations, are impossible. The Residential Plaintiffs' claim to imminent harm is based on speculation, not surety. Even if it is "possible" that these harms may accrue at "'some time' in the future," that is not good enough. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1267 (11th Cir. 2003). Only when a plaintiff alleges that he "would be injured within a fixed period of time in the future" is the imminency requirement met. *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194 (11th Cir. 2009) (internal quotation omitted). Here, there is no such allegation, and therefore there is no basis for federal jurisdiction. The bedrock standing principles discussed above prove as much. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (no standing when "plaintiffs failed to allege when, where, and how" (citation omitted)).

Also weighing against standing is the fact that Residential Plaintiffs are offended observers. To the extent Residential Plaintiffs are understood to claim harm because they live near the alleged development and will not like how it looks, *see* Compl. ¶¶ 153-55,169-72, this is not a cognizable harm under Article III, *see Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 83 (2019) (Gorsuch, J., concurring in the judgment); *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1337 (11th Cir. 2020) (Newsom, J., concurring).

9

**B. Plaintiffs Do Not Allege Any Injury Traceable to the President or Redressable Through Relief Against Him.**

Even if this Court concludes that one or more Plaintiffs has plausibly alleged a cognizable injury, Plaintiffs still must demonstrate that their injuries were *caused by* the President in his official capacity and would likely be remedied by relief *against* the President in his official capacity. *See Cruz*, 596 U.S. at 296. No Plaintiff meets their burden.

All of Plaintiffs' injuries stem from the transfer of the MDC Parcel to the Foundation and the Foundation's alleged plans for development. Compl. ¶¶ 167, 184, 209, 218. But Plaintiffs do not allege with any specificity how the President was involved in this transaction in his *official capacity*. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017) ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." (citation omitted)). In other words, even though Plaintiffs allege that "President Trump himself exercises control over the Trump Library Foundation through [three] trustees," Compl. ¶ 124, Plaintiffs allege no facts to support the conclusion that the President's involvement is attributable to any federal "policy or custom." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law."). Nor do Plaintiffs claim that this is a suit against the Presidency itself. *Cf. Lewis*, 581 U.S. at 162. As a result, Plaintiffs fail to show "*factual* causation between [their] injuries" and President Trump's conduct in his official capacity. *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023). And for that same reason, redressability is lacking too. *See All. for Hippocratic Med.*, 602 U.S. at 380 (explaining that causation and redressability "are often the flip sides of the same coin" (quotation omitted)).

Plaintiffs' problems do not end there. Article III's causation requirement precludes both speculative links—"that is, where it is not sufficiently predictable how third parties would react to

10

government action or cause downstream injury to plaintiffs"—and attenuated links—"that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id*. (citations omitted). And Article III's redressability requirement "must not turn on guesswork." *G.B. by & through G.P. v. United States Env't Prot. Agency*, 172 F.4th 1042, 1064 (9th Cir. 2026) (observing that plaintiffs' challenge to government action that "may or may not [occur] in the future to set in motion a lengthy chain of events that will allegedly result in their downstream harm" failed to satisfy the redressability prong because a "declaratory-judgment remedy . . . is unlikely to mitigate the only asserted injuries at issue.").

Plaintiffs' theories suffer from all the above. For example, to conclude that Dunn's Farm's lost opportunity is traceable to the transfer to the Foundation, the Court would have to conclude that Dunn's Farm had such an opportunity in the first place. But Dunn's Farm has failed to plausibly allege that they were engaged in a process to secure the parcel. Thus, any injury in this regard is far too attenuated. And the alleged downstream harms from Dunn's Farm's failure to secure the MDC Parcel—both Dunn's Farm's alleged diversion of resources and Ms. Salcedo's lost opportunity to work on an urban farm on the Wolfson Campus—rest on the highly speculative proposition that, without the transfer, the Florida Board would transfer the MDC Parcel back to MDC, who would then allow Dunn's Farm to build an urban farm on it. Similarly, Ms. Salcedo's claimed academic injuries rely on the unfounded assumption that MDC would again take control of the MDC Parcel, decide to sell it, and then put the resulting funds to a use that would benefit Ms. Salcedo while she is still enrolled. Such guesswork is not the stuff of which standing is made.

Similarly, Ms. Salcedo's and the Resident Plaintiffs' alleged future injuries with respect to future construction on the MDC Parcel share only attenuated and speculative links with the transfer. In between the transfer and any alleged injuries are scores of independent decisions by "third

parties" as to the character of the development, as well as decisions by members of the public as to how to receive the development. *All. for Hippocratic Med.*, 602 U.S. at 383. Even if Plaintiffs' speculation about these decisions turns out true, "far too many steps lay between" the transfer of the MDC parcel and these alleged harms. *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 97 (11th Cir. 2022) (citation omitted).

## II.   PLAINTIFFS' LACK A CAUSE OF ACTION AND, IN ANY CASE, THEIR ASSERTED INJURIES DO NOT FALL WITHIN THE ZONE OF INTERESTS OF THE DOMESTIC EMOLUMENTS CLAUSE

Plaintiffs also lack a cause of action to seek relief against President Trump under the Domestic Emoluments Clause. While the Supreme Court has indicated that an equitable cause of action can lie in some circumstances, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015), this is not an appropriate case to infer the existence of such an action, nor is there any basis to recognize an implied cause of action under the Emoluments Clauses. Implied equitable suits against government officers have historically involved claims that "permit potential defendants in legal actions to raise in equity a defense available at law," *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014); *see Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring), or claims involving a direct governmental infringement of the plaintiff's own property or liberty interests, *see American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110-11 (1902). But Plaintiffs are not asserting their own individual rights under the Domestic Emoluments Clause nor are they preemptively asserting a defense to a potential enforcement action against them by the Government, and nothing warrants recognizing an equitable cause of action in these circumstances. Indeed, "[t]o accord a type of relief that has never been available before" is Congress's job, not the court's. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

Even if an individualized right to enforce the Clauses could ever be judicially recognized without an express cause of action enacted by Congress, Plaintiffs' asserted injuries do not fall within the zone of interests of the Domestic Emoluments Clause. The zone of interests test principally asks "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  Thus, even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the [law] whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523-524 (1991) (citations omitted).

Although most typically applied to statutory causes of action, the Supreme Court has long applied the zone-of-interests test to implied constitutional causes of action too. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 469, 475 (1982); *Boston Stock Exch.* v. *State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977); *Ass'n of Data Processing Serv. Orgs*., *Inc. v. Camp*, 397 U.S. 150, 153 (1970). And here, Plaintiffs fail to meet it. The Domestic Emoluments Clause was intended to guard against corruption and to ensure the independence of the President. *See infra* at 16-17. The text and history of Domestic Emoluments Clause show that its prohibitions arose from the Framers' concern with protecting the new government from corruption and undue influence, not any concern to protect homeowners from environmental nuisances, students' educational opportunities, or organizations' agricultural and educational endeavors, particularly in the absence of any alleged official conduct by the President. Plaintiffs therefore fail the zone-of-interests test.

### III. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE DOMESTIC EMOLUMENTS CLAUSE

In order to survive a motion to dismiss, Plaintiffs must plead facts that, taken as true, establish that the President has received an emolument from the federal government or a U.S. state in violation of the Domestic Emoluments Clause. They fail to do so.

The Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be [i]ncreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const., art. II, § 1, cl. 7. The text of the Clause reveals three essential elements. A violation inures only if the President (1) during "the Period for which he shall have been elected" (2) "receive[s] for his Services" (3) an "Emolument from the United States, or any of them" beyond his fixed "Compensation." *Id.* Plaintiffs plausibly allege none of the three.

### A. The Text, History, and Purpose of the Domestic Emoluments Clause Indicate that Any Private Commercial Benefit Attendant to the Land Transfer is not an "Emolument."

Plaintiffs' theory fails for the basic reason that alleged benefits accruing to the President's *private* commercial interests—unrelated to any official act—are not "Emoluments" within the meaning of the Domestic Emoluments Clause. Text, context, and history prove as much.

Start with the text. The term "Compensation" in the Domestic Emoluments Clause is qualified by "for his Services" as President. *Id.* That qualification must also apply to "any other Emolument." Indeed, the Clause's usage of "other" between "for his Services" and "Emolument" confirms that "Compensation" and "Emolument" are intended to be read in parallel. *See id.* Given this context, the term is most naturally read to refer to the receipt of value for one's services rendered in an official position or in an employment relationship.

This understanding is consistent with contemporaneous dictionary definitions. One source from 1766 explained that "[e]molument relates to commissions and employments; intimating, not

14

only the salaries, but, all other perquisites."[1] Another source from 1774 defined the term to mean "profit arising from an office or employ."[2] The Oxford English Dictionary ("OED"), citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[3] Indeed, the definition is closely related to the etymology of emolument, which is profit from labor, or more specifically, from grinding corn."[4] And this definition accords with the Supreme Court's observation that "the term *emoluments*" embraces "every species of compensation or pecuniary profit derived from a discharge of the duties of the office." *Hoyt v. United States*, 51 U.S. 109, 135 (1850).

To be sure, dictionaries also offer broader definitions of the term. For example, the OED's second definition of "emolument" is "advantage, benefit, comfort."[5] But history and context confirm that the narrower meaning is the one the Constitution employs. For example, one corpus linguistics analysis of Founding-era sources resulted in the conclusion that the Domestic Emoluments Clause "would have *most likely* been understood to contain a narrow, office or public-employment sense of 'emolument.'" James Cleith Phillips, Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760-1799*, 59 S. Tex. L. Rev. 181, 233 (2017). And another survey of Founding-era sources is in accord, at least as

---

[1] John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* at 154–55 (1766) (emphasis omitted).

[2] James Barclay, *A Complete and Universal English Dictionary on a New Plan* (1774).

[3] Oxford University Press, *Emolument*, OED Online, http://www.oed.com/view/Entry/61242 (last visited August 10, 2026).

[4] Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Concise Dictionary of Etymology* 240 (1995) (emolument: "*n.* 1435, borrowed through middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn[.]")

[5] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.

relevant here. *See* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 Ga. L. Rev. 1, 55 (2017) ("[T]he word 'emolument(s)' in the Constitution meant compensation with financial value, received by reason of public office."); *see also* Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 650 (2017).

During the Constitutional Convention, Benjamin Franklin advocated that the President should not receive any "salary, stipend[,] fee or reward whatsoever" for his services. *See* James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America*, 43–46 (Gaillard Hunt & James Brown Scott eds., 1920). The delegates decided instead that the President would receive a fixed compensation during his tenure. *Id.* at 103, 294, 326. Franklin and John Rutledge then proposed that the President not receive "any other emolument" from the federal government or any of the States. *Id.* at 571. Alexander Hamilton wrote in *The Federalist* that the Clause's purpose was to ensure that the President can have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961). Under the Clause, he explained, "[n]either the Union, nor any of its members, will be at liberty to give, nor will [the President] be at liberty to receive, any other emolument than that which may have been determined by the first act." *Id.* at 493–94. This prohibition would prevent any attempt to "corrupt [the President's] integrity by appealing to his avarice." *Id.* at 493. In other words, the evils sought to be prevented by the Domestic Emoluments Clause are inducements in the forms of pecuniary compensation and other benefits for the President's services *as President*, as such benefits would pose the greatest danger of undermining the President's independence. *See* Natelson, *Original Meaning*, 52 Ga. L. Rev. at 54 ("The discussion of emoluments in the constitutional debates focused on those received by reason of public office.").

16

This history is devoid of any concern about private commercial business arrangements, even though our first Presidents were an industrious group. Washington "did business with the Federal Government on more than one occasion while he was president," including by purchasing land in the new federal capital in 1793. Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759, 761 (2017). If Plaintiffs are right, this transaction—which involved the President's receipt of "piece[s] of property," Compl. ¶ 126—transgressed the Domestic Emoluments Clause. But there is no record of any argument that these parcels of land constituted an "Emolument from the United States." *See* Tillman, 40 Harv. J.L. & Pub. Pol'y at 763.

As another example, Jefferson and Madison were "tobacco growers." Natelson, *Original Meaning*, 52 Ga. L. Rev. at 49. At the time, Virginia "required each tobacco grower to deliver his product to a state warehouse for inspection and storage[,]" and, in exchange, "officials issued a warehouse receipt known as a 'tobacco note," which was "negotiable as currency" and "commonly used as cash." *Id.* at 48. Despite this private commercial "benefit," no one thought that a tobacco grower elected president had to "to sell or fallow his land before serving[.]" *Id.* at 49. Indeed, "when Thomas Jefferson and James Madison entered the presidency, there was no outcry to the effect that they were receiving unconstitutional emoluments from tobacco notes." *Id.* at 49 n.218.

Published opinions of the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC") are in accord with this history. For example, both components determined that President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "Emoluments" from a State. *See The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (stating that it is "evident" the Domestic Emoluments Clause "was intended to prevent the

President from being subject to influence in carrying-out his duties. . . by rewards given for additional services performed as President"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981)). Contrary to these opinions, Plaintiffs overly broad reading of the Domestic Emoluments Clause would prohibit a President from holding United States Treasury bonds while in office because the accrued interest would be benefits "from the United States" under the Domestic Emoluments Clause.[6]

Thus, properly construed, an "Emolument" under the Domestic Emoluments Clause must arise from the President's service as President. And under the correct interpretation, it becomes clear that Plaintiffs fail to state a claim. Plaintiffs have not pleaded that the State Defendants transferred the MDC Parcel to the President as renumeration for an act he performed as President. Instead, Plaintiffs merely offer up examples of how the President "*could* use his discretion to bestow benefits on the State of Florida." Compl. ¶ 145 (emphasis added). Plaintiffs have therefore failed to establish the payment of any "Emolument" that would violate the Domestic Emoluments Clause.

**B. Plaintiffs have not pleaded facts sufficient to establish that the President "received" an "Emolument."**

Even if Plaintiffs' understanding of "emolument" is correct, they fail to plausibly allege that the President received one when the Trump Library Foundation received the MDC Parcel. Plaintiffs provide no factual allegations that, if accepted as true, would allow the Court to conclude that the

---

[6] President Obama and President Biden, for example, owned U.S. Treasury notes and bills during their tenure. *The President and Vice President's 2015 Financial Disclosure Forms*, President Barack Obama White House (May 16, 2016), https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-presidents-2015-financial-disclosure-forms (last visited August 11, 2026) (containing links to President Obama's financial disclosure reports from 2010 to 2015); *White House Press Release - The President and Vice President Release Their Financial Disclosure Reports Disclosing Their Personal Financial Interests*; The American Presidency Project, https://www.presidency.ucsb.edu/sites/default/files/documents_with_attached_files/372038/16400 8-1.pdf (last visited August 11, 2026) (containing a link to President Biden's 2023 financial disclosure report).

transfer of the MDC Parcel to the Trump Library Foundation has inured to or can inure to the benefit of the President during his term of office.

Indeed, Plaintiffs admit that President Trump is not a trustee. Compl. ¶ 16. But even if he was, the Foundations' Articles of Incorporation prohibit any of its "net earnings or assets to inure to the benefit of any private shareholder, Trustee, officer, director, or individual" and prohibit the Foundation from "engag[ing] in any transactions resulting in private benefit or private inurement[.]" Donald J. Trump Presidential Libr. Found., Inc., Articles of Incorporation (May 19, 2025), § 3.04(d), https://tinyurl.com/392v699n.[7] As long as this provision of the Articles of Incorporation governs, any earnings or net assets—including the MDC Parcel—may only inure to the benefit of the Trump Library Foundation. More fundamentally, the establishment of corporations as distinct and independent entities is a basic tenet of American corporate law. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation.'" (citation omitted)). As such, an individual shareholder, trustee, or corporate director does not own a corporation's assets, let alone an individual who has no legal relationship with the corporate entity. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) (citing 1 Fletcher Cyc. Corp. § 31 (rev. ed. 1999)); *see also* 2 Fletcher Cyc. Corp. § 505. Against the weight of the fact that the President is not a trustee of the Trump Library Foundation, the clear restrictions in the Trump Library Foundation's charter on the use of the Foundation's assets, and the foundational legal principle of corporate separateness, Plaintiffs muster only the bare accusation that "President Trump will monetize the land." Compl. ¶ 234. Such mere speculation does not meet Plaintiffs' burden at this stage.

---

[7] This document is published by the Florida Department of State's Division of Corporations. The Court may take judicial notice of this document in considering this motion to dismiss. *See Ganz v. Grifols Therapeutics LLC*, 688 F. Supp. 3d 1209, 1218 (S.D. Fla. 2023) ("Courts may also take judicial notice of public records . . . when ruling on a 12(b)(6) motion . . . ." (citing cases)).

## IV.   THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL

Finally, as a threshold matter, the injunctive and declaratory relief Plaintiffs seek as to the President in his official capacity are illogical because there is no official-capacity conduct to enjoin or declare violates the Domestic Emoluments Clause. The President has not taken any action, even in his personal capacity. Conceivably, a broad injunction prohibiting the President from violating the Domestic Emoluments Clause would leave him with no other course of action than to resign. Nevertheless, if the Court *did* issue such remedies against the President, they would be patently unconstitutional. In *Mississippi v. Johnson*, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." 71 U.S. 475, 500–01 (1867). A majority of justices later reiterated that principle in *Franklin v. Massachusetts*. *See* 505 U.S. 788, 802–03 (1992) (plurality op.) ("In general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Mississippi*, 71 U.S. at 501); *see also id.* at 827-28 (Scalia, J., concurring in part and concurring in the judgment) (opining that courts may issue neither injunctive nor declaratory relief against the President and noting that such principle is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history" (citation omitted)). The lower courts have often applied this settled principle. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[w]ith regard to the President, courts do not have jurisdiction to enjoin him"). Therefore, even if this Court were to find that Article III jurisdiction had been established and Plaintiffs had stated a claim, the Court should dismiss the President because the relief Plaintiffs seek against the President would be unconstitutional.

**CONCLUSION**

20

For the foregoing reasons, Defendant respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction and for failure to state a claim.

Dated: August 11, 2026                          Respectfully Submitted,

                                                BRETT A. SHUMATE
                                                Assistant Attorney General

                                                ALEXANDER K. HAAS
                                                Branch Director

                                                JAMES R. POWERS
                                                Chief Litigation Counsel

                                                */s/ Ryan M. Underwood*
                                                RYAN M. UNDERWOOD
                                                (D.C. Bar No. 156505)
                                                Trial Attorney
                                                United States Department of Justice
                                                Civil Division
                                                Federal Programs Branch
                                                1100 L Street NW
                                                Washington, DC 20009
                                                (202) 305-1952
                                                Ryan.m.underwood2@usdoj.gov

                                                *Counsel for Official-Capacity Defendant*

21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on August 11, 2026, to all counsel of record.

/s/ *Ryan M. Underwood*
Ryan M. Underwood

22