**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

SISTRUNK SEEDS INC. *d/b/a* DUNN'S
OVERTOWN FARM, *et al.*,

        *Plaintiffs*,

   v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

No. 1:26-cv-23365-RAR

**STATE DEFENDANTS' AND**
**THE DONALD J. TRUMP PRESIDENTIAL LIBRARY FOUNDATION'S**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

LEGAL STANDARD........................................................................................................3

ARGUMENT ...................................................................................................................4

I.      Plaintiffs lack standing.........................................................................................4

        A.      Plaintiffs lack a cognizable injury.                                           5

                1.      The Student and Resident Plaintiffs' injuries are speculative and unripe. .......................................................................................6

                2.      Sistrunk Seeds' injuries are speculative or otherwise insufficient..............8

        B.      Plaintiffs' injuries are not fairly traceable to a perceived violation of the Domestic Emoluments Clause.                                        12

II.     Plaintiffs' Domestic Emoluments Clause claim presents a nonjusticiable political question. ....................................................................................................13

III.    Plaintiffs lack a cause of action to enforce the Domestic Emoluments Clause .................15

IV.     The State Defendants are entitled to Eleventh Amendment immunity..............................16

V.      Plaintiffs fail to state a claim under the Domestic Emoluments Clause. ..........................19

        A.      Plaintiffs fail to state a claim against the MDC, the MDC Trustees, and the DBOT, because by Plaintiffs' own allegations none of these entities was involved in the transfer of land from the Trust Fund to the Foundation that Plaintiffs claim violated the Emoluments Clause.                    19

        B.      A land transfer from a state entity to a private nonprofit organization does not constitute an "emolument" for the President under the Domestic Emoluments Clause.                                                    20

CONCLUSION...............................................................................................................24

CERTIFICATE OF SERVICE ...........................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*, 329 F.3d 1255 (11th Cir. 2003) ........................................................ 6, 11

*Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330 (11th Cir. 2019) ................................... 13

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) .................... 7

*Aerojet-Gen. Corp. v. Askew*, 453 F.2d 819 (5th Cir. 1971) ....................................................... 17

*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) ............................................................ 14

*Alabama v. Pugh*, 438 U.S. 781 (1978) ....................................................................................... 16

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ............................................................................ 9

*Armstrong v. Exceptional Child Ctr.*, Inc., 575 U.S. 320 (2015) .......................................... 15, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 4, 8, 23

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970) ................................ 15

*Baker v. Carr*, 369 U.S. 186 (1962) ...................................................................................... 14, 15

*Baker v. Univ. Med. Serv. Ass'n, Inc.*, No. 8:16-CV-2978, 2016 WL 7385811
(M.D. Fla. Dec. 21, 2016) ...................................................................................................... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 4

*Betterson v. Town of Cutler Bay*, No. 25-11638, 2026 WL 322952 (11th Cir. Feb.
6, 2026) ..................................................................................................................................... 3

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc)...................................... 17

*Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318 (1977) ................................................. 15

*Bruckner v. Biden*, 666 F. Supp. 3d 1237 (M.D. Fla. 2023)......................................................... 9

*Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*, No. 07-CV-20192,
2008 WL 1848389 (S.D. Fla. Apr. 22, 2008) .......................................................................... 6

*California v. Deep Sea Rsch., Inc.*, 523 U.S. 491 (1998) ............................................................ 18

*Carney v. Adams*, 592 U.S. 53 (2020) ...................................................................................... 8, 9

*Castro v. New Hampshire Sec'y of State*, 701 F. Supp. 3d 176 (D.N.H 2023) ........................... 13

ii

*Citizens for Resp. & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174
    (S.D.N.Y. 2017) ........................................................................................................ 5

*City of South Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023).................................... 11

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................... 4, 6, 12

*Cohens v. State of Virginia*, 19 U.S. 264 (1821)................................................................ 5

*Corbett v. TSA*, 930 F.3d 1225 (11th Cir. 2019)............................................................. 11

*Cotto v. Campbell*, 126 F.4th 761 (1st Cir. 2025), *cert. denied*, 146 S. Ct. 1491
    (2026)...................................................................................................................... 18

*Cuevas v. Miami Dade College*, No. 18-20731, 2018 WL 11472730 (S.D. Fla.
    Dec. 17, 2018)........................................................................................................... 3

*Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321 (2025) ........................... 24

*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ................................ 12

*Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006) ............................................... 6, 12, 13

*Ex parte Levitt*, 302 U.S. 633 (1937) ............................................................................... 5

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ....................... 4, 10, 11, 12, 13

*Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227
    (11th Cir. 1999).................................................................................................... 8, 9

*Fleischman v. Polk Cnty. Sch. Bd.*, No. 8:25-cv-02479, 2026 WL 962167 (M.D.
    Fla. Apr. 9, 2026)..................................................................................................... 3

*Gagliardi v. City of Boca Raton*, No. 16-CV-80195, 2017 WL 5239570 (S.D. Fla.
    Mar. 28, 2017).......................................................................................................... 6, 7

*Georgia. v. City of Chattanooga*, 264 U.S. 472 (1924) ................................................. 19

*Green v. Mansour*, 474 U.S. 64 (1985)..................................................................... 16, 18

*Griffin v. United States*, 935 F. Supp. 1 (D.D.C. 1995).................................................. 23

*Hampton v. State Bd. of Educ.*, 105 So. 323 (1925) ...................................................... 17

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................. 11

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013) ......................... 7

*Hoyt v. United States*, 51 U.S. (1 How.) 109 (1850) ...................................................... 23

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) (en banc) ............................................................................................... 4

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997) .................................... 18, 19

*In re Trump*, 958 F.3d 274 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. Dist. of Columbia*, 141 S. Ct. 1262 (2021) .................................... 14, 23

*Irwin v. Miami-Dade Cnty. Pub. Sch.*, No. 06-23029-CIV, 2008 WL 2741157 (S.D. Fla. July 11, 2008) ......................................................................................... 3

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974)....................................................... 19

*Johnson v. Mayor, City of Jacksonville*, No. 23-11937, 2026 WL 1676195 (11th Cir. June 10, 2026)................................................................................................ 7

*Kerchner v. Obama*, 669 F. Supp. 2d 477 (D.N.J. 2009) .............................................. 14

*Kirk v. Kennedy*, 231 So. 2d 246 (Fla. 2d DCA 1970) .................................................. 17

*LaPierre v. Trump*, No. 2:25-CV-451, 2026 WL 370930 (D. Idaho Feb. 10, 2026)...................... 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (1914) ............................. 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 4, 6

*Marbury v. Madison*, 5 U.S. 137 (1803)......................................................................... 14

*Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322 (11th Cir. 2025) ......................................... 18

*Mich. Corr. Org. v. Mich. Dep't of Corrs.*, 774 F.3d 895 (6th Cir. 2014) ................................... 16

*Murthy v. Missouri*, 603 U.S. 43 (2024) ......................................................................... 4

*Nicholl v. Att'y Gen. Georgia*, 769 F. App'x 813 (11th Cir. 2019)................................... 17

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ..................................................................... 6

*Papasan v. Allain*, 478 U.S. 265 (1986) .................................................................. 16

*Parfitt v. Fla. Gulf Coast Univ.*, No. 219-cv-727-FtM-38NPM, 2020 WL 1873585 (M.D. Fla. Apr. 15, 2020) ......................................................................... 3

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)............................... 17

*Robinson v. Bowen*, 567 F. Supp. 2d 1144 (N.D. Cal. 2008) ....................................... 14

*S.J. Groves & Sons Co. v. Fulton Cnty.*, 920 F.2d 752 (11th Cir. 1991)................................ 8, 9

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038 (10th Cir. 2011)...................................................... 7

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)........................................ 5

*Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020)............................. 11

*Sierra Club v. Robertson*, 28 F.3d 753 (8th Cir. 1994) .................................................... 6

*Souto v. Fla. Int'l Univ. Found., Inc.*, 446 F. Supp. 3d 983 (S.D. Fla. 2020)................................ 3

*Stuart v. Miami Dade College*, No. 26-20067, 2026 WL 1857183 (S.D. Fla. June
    5, 2026) ........................................................................................................ 3

*Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999) ................................... 16, 17

*Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990) ................................................................ 18

*United States v. Hill*, 123 U.S. 681 (1887) .................................................................. 23

*United States v. Richardson*, 418 U.S. 166 (1974) .......................................................... 5

*United States v. Rivera*, 613 F.3d 1046 (11th Cir. 2010).................................................... 7

*Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc.*, 861 F.3d 1234 (11th Cir. 2017)........................... 17

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................... 8, 9

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................. 6

*Wilderness Soc. v. Alcock*, 83 F.3d 386 (11th Cir. 1996) ................................................... 6

*Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190 (11th Cir.
    2005) ............................................................................................................ 17

**Statutes**

Fla. Stat. § 1001.63 ......................................................................................... 3

Fla. Stat. § 1001.64 ......................................................................................... 3

Fla. Stat. §§ 553.70–553.8991 .............................................................................. 7

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 7 ............................................................... 1, 17, 19, 20, 24

**Rules**

Fed. R. Civ. P. 12(b)(1)..................................................................................... 4

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 4

Fed. R. Evid. 201 ........................................................................................................... 8, 9

**Regulations**

14 C.F.R. §§ 77.1–77.35 .................................................................................................. 7

**Other Sources**

1 Annals of Cong. 661 (1789)......................................................................................... 14

3 Elliot's Debates 486..................................................................................................... 14

A Complete and Universal English Dictionary on a New Plan (1774) ......................... 20

Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*,
102 Minn. L. Rev. 639 (2017) .......................................................... 20, 21, 23

American Dictionary of the English Language (1828).................................................. 20

*Applicability of 18 U.S.C. s 219 to Retired Foreign Serv. Officers*, 11 Op. O.L.C.
67 (1987).................................................................................................. 22

*Comp. of Emps. Detailed to Assist Foreign Gov'ts*, 40 Op. Att'y Gen. 513 (1947).................... 22

Douglas R. Hume, *Between "The Rock" and A Hard Case: Application of the
Emoluments Clauses for a New Political Era*, 2018 Pepp. L. Rev. 68 (2018)....................... 22

Dr. Eduardo J. Padrón, *Achieving the Dream* (last accessed Aug. 11, 2026),
https://perma.cc/46HH-7ARQ ......................................................................... 9

John R. Breihan, *William Pitt and the Commission on Fees, 1785-1801*, 27 Hist.
J. 59 (1984) .............................................................................................. 21

Josh Blackman & Seth Barrett Tillman, *The Domestic Emoluments Clause*, in The
Heritage Guide to the Constitution (Josh Blackman & John G. Malcolm eds.,
3d ed. 2025) .................................................................................................. 22

*President Reagan's Ability to Receive Ret. Benefits from the State of California*, 5
Op. O.L.C. 187 (1981)........................................................................................ 22

Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*,
52 U. Ga. L. Rev. 1(2017) ........................................................................ 20, 21

Seth Barrett Tillman, *Business Transactions and President Trump's
"Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759 (2017)......................... 22

*The Federalist* No. 73 (George W. Carey & James McClellan eds., 2001) ................. 20

**INTRODUCTION**

The United States currently has 16 officially registered presidential libraries.  President by President, each library does the hard work of preserving the history of the United States.  While they vary in form and function, these libraries are almost uniformly organized, built, and operated by 501(c)(3) nonprofit entities.  Long before a President leaves office, family, friends, and supporters create those nonprofit entities and begin accepting substantial donations.

Consider the George W. Bush Presidential Library Foundation.  It received 501(c)(3) status in early 2006, and was led by Marvin Bush, the President's younger brother.  Before President Bush left office in 2008, the Foundation had accrued more than $3 million in net assets.  During that same period, it scouted locations and institutions looking to host what would become the George W. Bush Presidential Center at Southern Methodist University.  Many other presidential libraries were created in a similar fashion, and President Trump seeks to follow that well-trodden path in creating his own library.

Plaintiffs seem to think they have now discovered, late in the day, that this traditional practice violates the Domestic Emoluments Clause.[1]  They are wrong.  That Clause merely prohibits the President from receiving compensation—other than his congressionally approved salary—from the United States, or any single state, for performing official actions.  It does not foreclose the states from donating lands to private foundations to create presidential libraries, nor does it create what amounts to a private property right to force the undoing of such donations just because a particular plaintiff would prefer that the donated property be used for a different purpose.

---

[1] "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.

1

Plaintiffs also seem to believe that, for more than 250 years, the Domestic Emoluments Clause has concealed a secret way for any citizen to sue and enjoin not only the President but also the state entities involved in a transaction they seek to set aside under the Clause.

To advance these novel claims, Plaintiffs concoct faulty theories of standing and piece together a revisionist history of the Domestic Emoluments Clause.  For the reasons expressed below, Plaintiffs are in for a disappointment.  Whether because Plaintiffs lack standing, because Plaintiffs lack a cause of action, because Defendants are immune, or because Plaintiffs' Domestic Emoluments Clause claim fails resoundingly on the merits, the Court should dismiss Plaintiffs' complaint.

## STATEMENT OF FACTS

In May 2025, President Trump's son, Eric Trump, and son-in-law, Michael Boulos, incorporated the Donald J. Trump Presidential Library Foundation Inc. (Foundation), a nonprofit 501(c)(3) organization.  The Foundation then began looking for institutions and locations interested in hosting President Trump's future library.  The District Board of Trustees of Miami Dade College, Florida ("DBOT") considered the request to convey the land to the Board of Trustees of the Internal Improvement Trust Fund ("Trust Fund"), a sister state entity.  After focused deliberation, two public hearings, and hours of public debate, DBOT decided to convey a parcel of land presently used as a parking lot ("Lot") to the Trust Fund.  The Trust Fund then conveyed that land to the Foundation.  That conveyance reverts to the Trust Fund unless the Lot "contain[s] components of a Presidential library, museum, and/or center within five years of conveyance or that construction has commenced for a Presidential library, museum, and/or center."  Compl. ¶ 108.

Plaintiffs disagree with that decision.  Kristen Browde and Gregory van den Dries ("Resident Plaintiffs") live in Miami and reside at least two city blocks north of the Lot.  Compl. ¶ 7.  Carmen Salcedo ("Student Plaintiff") is a Miami Dade College student with an interest in urban

2

farming.  Compl. ¶ 9.  Sistrunk Seeds is a nonprofit organization that operates an urban farm in

Miami's Overtown neighborhood.  Compl. ¶ 8.  Together, Plaintiffs sued President Trump and the

Foundation.  They also listed the following State Defendants: Governor Ron DeSantis, Attorney

General James Uthmeier, CFO Blaise Ingoglia, Commissioner of Agriculture Wilton Simpson, the

Trust Fund, Miami Dade College (MDC),[2] the DBOT, and Trustees Michael Bileca, Roberto

Alonso, Jose Felix Diaz, Marcell Felipe, Ismare Monreal, Juan Segovia, and David J. Smith

("MDC Trustees").[3]  Plaintiffs seek declaratory and injunctive relief against all defendants for an

alleged violation of the Domestic Emoluments Clause.

## LEGAL STANDARD

A plaintiff bears the burden of proving Article III standing, and "must show that she has

suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly

---

[2] "Miami Dade College" is not a legal entity with the capacity to sue or be sued and therefore should be dismissed.  *See, e.g., Stuart v. Miami Dade College*, No. 26-20067, 2026 WL 1857183, at *2 (S.D. Fla. June 5, 2026) ("By naming 'Miami Dade College,' the Plaintiff has sued an entity that, for purposes of suit, does not exist."); *Cuevas v. Miami Dade College*, No. 18-20731, 2018 WL 11472730, at *2 (S.D. Fla. Dec. 17, 2018) (dismissing case against "Miami Dade College"); *Souto v. Fla. Int'l Univ. Found., Inc.*, 446 F. Supp. 3d 983, 998 (S.D. Fla. 2020) (FIU is not a proper defendant).  Under Florida law, the only proper party to sue is "The District Board of Trustees of Miami Dade College, Florida" (DBOT).  *See, e.g.,* Fla. Stat. §§ 1001.63, 1001.64 (2025); *Stuart*, 2026 WL 1857183, at *2; *Cuevas,* 2018 WL 11472730, at *2; *Parfitt v. Fla. Gulf Coast Univ.,* No. 219-cv-727-FtM-38NPM, 2020 WL 1873585, at *2 (M.D. Fla. Apr. 15, 2020).

[3] The MDC Trustees should likewise be dismissed, with prejudice.  The Complaint alleges no conduct by any individual trustee that led to Plaintiffs' alleged injuries and appears to seek no relief from them.  Rather, each of the MDC Trustees is named solely in his or her official capacity as a member of DBOT.  *See* Compl. ¶ 21.  Plaintiffs' claims against the MDC Trustees should be dismissed because they are redundant and duplicative of their claims against DBOT.  *See Betterson v. Town of Cutler Bay*, No. 25-11638, 2026 WL 322952, at *5 (11th Cir. Feb. 6, 2026) (affirming dismissal of official-capacity claims as duplicative); *Fleischman v. Polk Cnty. Sch. Bd.*, No. 8:25-cv-02479, 2026 WL 962167, at *3 (M.D. Fla. Apr. 9, 2026) (dismissing official-capacity claim against superintendent as duplicative); *Irwin v. Miami-Dade Cnty. Pub. Sch.*, No. 06-23029-CIV, 2008 WL 2741157, at *2 (S.D. Fla. July 11, 2008) ("It is redundant to name in a lawsuit a governmental entity and an individual employee of that entity in his or her official capacity" and dismissal with prejudice is appropriate).

3

traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see* Fed. R. Civ. P. 12(b)(1).  At "the motion-to-dismiss stage, a plaintiff must allege facts that, taken as true, plausibly state that the elements of standing are met." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1241 (11th Cir. 2022) (en banc) (quotation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

### I.   Plaintiffs lack standing.

Standing doctrine exists to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("*AHM*").  That describes the Plaintiffs here.  The Resident Plaintiffs assert stigmatic, aesthetic, traffic, noise, and neighborhood disruption injuries.  The Student Plaintiff asserts loss of scholarship and academic opportunities, but also complains of the traffic, noise, and neighborhood disruption raised by the Resident Plaintiffs.  Sistrunk Seeds asserts lost opportunity, diversion of resources, and frustration of purpose.

At bottom, Plaintiffs are challenging "a regulation (or lack of regulation) of someone else." *AHM*, 602 U.S. at 382 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  They effectively challenge an alleged underenforcement of the Domestic Emoluments Clause against President Trump.  As a result, standing is "substantially more difficult to establish." *Id.*  Plaintiffs cannot meet that high bar here.

4

### A.      Plaintiffs lack a cognizable injury.

Though Plaintiffs purport to suffer individualized injuries, they really "seek to have the Judicial Branch compel the Executive Branch to act in conformity with the [Domestic Emoluments Clause], an interest shared by all citizens." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974).  Of course, the Executive Branch is already acting in conformity with the Constitution, but even if it were not, such a "generalized interest" could not support standing.  *Id.* at 227.  As with the Constitution's other structural provisions, a plaintiff cannot sue to enforce the Domestic Emoluments Clause on behalf of the public.  *See id.* at 226–27 (Incompatibility Clause); *United States v. Richardson*, 418 U.S. 166, 177 (1974) (Statement and Accounts Clause); *Ex parte Levitt*, 302 U.S. 633, 636–67 (1937) (Ineligibility Clause); *Cohens v. State of Virginia*, 19 U.S. 264, 405 (1821) (Marshall, C.J.) (Article III "does not extend the judicial power to every violation of the constitution which may possibly take place").

Generalized interests in forcing the government to comply with the Constitution's structural guarantees are "too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Schlesinger*, 418 U.S. at 227.  To possess standing, then, Plaintiffs must identify some injury *personal* to them—meaning one not shared by all citizens.  *See id.*  Plaintiffs are not the first to unsuccessfully reframe their generalized Domestic Emoluments Clause grievances as cognizable injuries.  *See LaPierre v. Trump*, No. 2:25-CV-451, 2026 WL 370930, at *3 (D. Idaho Feb. 10, 2026); *Citizens for Resp. & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 184–193 (S.D.N.Y. 2017).[4]  Plaintiffs' standing theories accordingly fail.

---

[4] A Second Circuit panel reversed the district court.  *See* 939 F.3d 131 (2d Cir. 2019), *vacated and remanded*, 953 F.3d 178 (2d Cir. 2019), *as amended* (Mar. 20, 2020).  A subsequent denial from rehearing en banc drew dissents from Judges Cabranes, Menashi, Livingston, and Sullivan.  971 F.3d 102 (2d Cir. 2020).  The Supreme Court then granted certiorari and vacated the panel decision.  *See Trump v. Citizens for Resp. & Ethics in Washington*, 141 S. Ct. 1262 (2021).

### 1.     The Student and Resident Plaintiffs' injuries are speculative and un-ripe.

The Student and Resident Plaintiffs' injuries are "entirely speculative." *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006).  The Student Plaintiff alleges future injuries—noise, traffic, neighborhood disruption, loss of funding for scholarships, and loss of scholastic opportunities—based on highly speculative downstream consequences of the Library's construction.  Compl. ¶¶ 224–27.  None is remotely certain ever to materialize.

Similarly, the Resident Plaintiffs' alleged future injuries—aesthetic, stigmatic, and other disruptions—are hypothetical harms based on "the Trump family's descriptions and publicly released renderings." Compl. ¶¶ 154, 171.  But those preliminary building plans are not "concrete." *Lujan*, 504 U.S. at 564; *see, e.g.*, *Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996); *Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994).  Without ongoing construction, blueprints, or even demolition of the MDC Lot, the Court "can only speculate" as to the actual impacts of the Library's construction.  *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974).  Such "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 158 (1990)).  Courts have routinely found a lack of standing in similar circumstances.  *See Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*, No. 07-CV-20192, 2008 WL 1848389, at *5 (S.D. Fla. Apr. 22, 2008) (traffic, noise, disruption, aesthetic and other concerns relating to new high-rise construction were "speculative or conjectural"); *Gagliardi v. City of Boca Raton*, No. 16-CV-80195, 2017 WL 5239570, at *6 (S.D. Fla. Mar. 28, 2017) (similar).

And while a future injury need not occur within weeks or days to be imminent, "one cannot merely allege that an injury will be suffered at 'some time' in the future." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1267 (11th Cir. 2003).  Indeed, an alleged future injury must be "reasonably

6

fixed and specific in time and not too far off." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1339 (11th Cir. 2013) (quoting *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1193–94 (11th Cir. 2009)).  Plaintiffs fail to allege a "reasonably fixed" time "not too far off" where these injuries will materialize—a telltale sign that the injuries are neither actual nor imminent, but instead speculative. *Id.*

Many of the Student and Resident Plaintiffs' injuries are also non-justiciable generalized grievances.  Just like "[d]isagreement with the names of public thoroughfares," complaining about noise, traffic, stigma, aesthetics, and neighborhood disruption associated with construction "is the very definition of an insufficiently personal, generalized grievance." *Johnson v. Mayor, City of Jacksonville*, No. 23-11937, 2026 WL 1676195, at *5 (11th Cir. June 10, 2026); *see Gagliardi*, 2017 WL 5239570, at *6 (construction-related concerns were "not the particularized and concrete injuries necessary to confer standing").

The Student and Resident Plaintiffs also have a ripeness problem.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010) (quotation omitted).  Construction hasn't begun, FAA authorization hasn't been secured, and Plaintiffs are relying on preliminary mock-ups for a building that is likely years away from completion.[5]  The Foundation may still choose to "revise" or "modify" its plans for the Library. *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1047 (10th Cir. 2011).  Indeed, the Foundation could simply choose another location for the Library and the Lot would eventually revert to Trust Fund ownership.  In

---

[5] Plaintiffs assume away the Federal Aviation Administration's role in approving the construction of buildings in downtown Miami. *See* 14 C.F.R. §§ 77.1–77.35 (outlining required FAA notice, review, and regulation of buildings near airports).  Plaintiffs do the same with state officials' role in enforcing, among other state laws, Florida's Building Code. *See, e.g.*, Fla. Stat. §§ 553.70–553.8991.

7

sum, there is a world in which Plaintiffs' prized parking lot remains a parking lot.  Accordingly, any claim that rests on the impact of the Library or its construction is not ripe.

> **2.      Sistrunk Seeds' injuries are speculative or otherwise insufficient.**

Sistrunk Seeds claims standing based on a loss of opportunity to place an urban farm on the Lot, diversion of resources, and frustration of purpose.  None of those theories is viable.[6]

*Loss of opportunity*.  Standing based on a loss of opportunity requires the plaintiff to show that it is "able and ready" to seize that opportunity.  *Carney v. Adams*, 592 U.S. 53, 60 (2020).  A "few words of general intent" do not suffice.  *Id.* at 64.  When it comes to challenging loss of opportunity based on government decisions, courts regularly reject standing theories where plaintiffs have not formally participated in the process before filing suit.  *See id.* at 62–63 (no standing for plaintiff who "fail[ed] to apply for available judgeships"); *Warth v. Seldin*, 422 U.S. 490, 516 (1975) ("There is no averment that any member has applied . . . for a building permit or a variance with respect to any current project."); *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1231 (11th Cir. 1999) ("[I]t is unclear how this chain of events . . . would have contributed to the possible loss by [plaintiff] of any prospective bid, assuming one was submitted by all the plaintiffs in the first place."); *S.J. Groves & Sons Co. v. Fulton Cnty.*, 920 F.2d 752, 758 (11th Cir. 1991) (plaintiff never "alleged it has ever bid for a single contract that was subject to the resolution"); *see also Bruckner v. Biden*, 666 F. Supp. 3d 1237, 1244–46 (M.D. Fla.

---

[6] As a threshold matter, Sistrunk Seeds's injuries all hinge on the allegation "that there is no land . . . in downtown Miami," other than the Lot, "that would be appropriate for an urban farm." Compl. ¶ 203.  That is an implausible allegation.  There are several adjacent, near-identical parking lots, as well as parks and green areas, *see* https://perma.cc/Y34M-EWX3, which provide "obvious alternative[s]" for Sistrunk Seeds' proposed urban farm. *Iqbal*, 556 U.S. at 682; *see* Fed. R. Evid. 201.  Without that allegation, Sistrunk Seeds has no standing.

2023) (similar). A plaintiff must do more than allege that a "competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).

Despite Sistrunk Seeds' alleged interest in placing an urban farm on the Lot, it never tendered a formal proposal to MDC, filed a zoning variance application, or took any formal steps to begin farming at the Lot. Its interest in the Lot appears to have resurfaced after years of dormancy just in time to bring this lawsuit. That precludes standing here. *See, e.g.*, *Warth*, 422 U.S. at 516. Instead of factual allegations that would show Sistrunk Seeds' standing, the complaint is filled with Plaintiffs' legal views on the Domestic Emoluments Clause. Compl. ¶¶ 25–46. That reveals Sistrunk Seeds' injuries as nothing more than a non-cognizable "generalized grievance"—a "desire to vindicate [its] view of the law"—rather than an Article III injury. *Carney*, 592 U.S. at 63–64. True, Sistrunk Seeds once helped with a "small vegetable garden," and some MDC staff later expressed vague "verbal interest" when Sistrunk Seeds floated the idea of a partnership, but such inchoate steps toward preparation do not show that Sistrunk Seeds was "able and ready." *See Warth*, 422 U.S. at 516; *Apfel*, 194 F.3d at 1231; *S.J. Groves*, 920 F.2d at 758; *Bruckner*, 666 F. Supp. 3d at 1244–46.[7] Likewise, Sistrunk Seeds' statements of "general intent" to put an urban farm on the Lot prove nothing. *Carney*, 592 U.S. at 64. After years of inaction from Sistrunk Seeds, and silence from MDC officials, it is pure speculation whether Sistrunk Seeds would (or could) convert a government-owned parking lot into an urban farm. If this injury is sufficient to sustain Article III standing, we are going to need more federal judges.

---

[7] Sistrunk Seeds notes that a former president of MDC, Dr. Eduardo Padrón, stated that he "would help identify staff to support" a potential opportunity to work with Sistrunk. Dr. Padrón, however, has not been MDC's president since 2019. *See* Dr. Eduardo J. Padrón, *Achieving the Dream* (last accessed Aug. 11, 2026), https://perma.cc/46HH-7ARQ; Fed. R. Evid. 201. And other than what appears to be directing Sistrunk Seeds to other MDC staff, nothing came from Dr. Padrón's diplomatic statement. Sistrunk Seeds does not allege that it received any "support" from MDC staff other than vague "verbal support." Compl. ¶¶ 195–96.

*Diversion of resources.* Sistrunk Seeds alleges that it will now have to "devote resources to finding other ways to work with MDC students" that would pose more difficulties than "if there was an urban farm right on the MDC campus." Compl. ¶ 208. Of course, this standing theory fails at the threshold because, as just explained, Sistrunk Seeds' likelihood of ever farming the parking lot relies entirely on credulity-straining guesswork. But even assuming Sistrunk Seeds could have done so, this diversion of resources doesn't confer standing. For one, Sistrunk Seeds does not allege that it is diverting any resources away from its mission. It will still work with MDC students to promote urban farming, and it cannot divert resources from an urban farm that never existed. An abstract and marginal increase in the difficulty of urban farming outreach is also not a cognizable Article III injury. But even if it were, the Supreme Court has foreclosed Sistrunk Seeds' "make it easier" theory. In *AHM*, doctors challenging the approval of the drug mifepristone based their standing on "diverting resources and time from other patients to treat patients with mifepristone complications." 602 U.S. at 390. In other words, the doctors argued that it would be easier to care for other patients if mifepristone were banned. *See id.* at 390–91. That, the Court reasoned, was "too speculative." *Id.* at 390. The same is true here. Sistrunk Seeds cannot prove standing because it would be easier to perform outreach to MDC students if the land transfer to the Foundation was voided. Even if it were, several more dominoes would have to fall before Sistrunk Seeds could operate an urban farm on the Lot.[8] Basing standing on such a theory is "flatly inconsistent with Article III." *Id.* at 392.

---

[8] Even if the Trust Fund's transfer to the Foundation were voided, Sistrunk Seeds would not become open for business on the Lot. The land would then belong to the Trust Fund, which would decide what to do with it. And even if the land then reverted to the DBOT, there's no guarantee—or even remote suggestion—that the DBOT would allow Sistrunk Seeds to engage in urban farming on the Lot.

10

Sistrunk Seeds also alleges that it "lost the resources it diverted to conversations and advocacy with MDC leadership about the on-campus farming objective." Compl. ¶ 207. That is not enough. Sistrunk Seeds must prove "that it has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *City of South Miami v. Governor*, 65 F.4th 631, 638–39 (11th Cir. 2023) (emphasis in original).

Sistrunk Seeds' theory fails because a thwarted desire to inform others about urban farming is not a "cognizable Article III injury." *Id.* Moreover, Plaintiffs only seek prospective injunctive and declaratory relief. "When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury." *Corbett v. TSA*, 930 F.3d 1225, 1233 (11th Cir. 2019) (quoting *31 Foster Children*, 329 F.3d at 1265). Sistrunk Seeds' mission is to promote urban farming—it "did not divert resources from its mission to prepare for litigation in this case." *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020).

*Frustration of purpose*. To have standing, an organization "must show 'far more than simply a setback to [its] abstract social interests.'" *AHM*, 602 U.S. at 394 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Here, Sistrunk Seeds merely alleges "frustration of its organizational objective to create an expanded urban farming program to benefit both MDC students and the local community." Compl. ¶ 205. But frustration of an "organizational objective" alone, without an underlying cognizable injury, cannot support standing. *See AHM*, 602 U.S. at 394. Because Sistrunk Seeds has no underlying injury here, it lacks standing.

11

**B.     Plaintiffs' injuries are not fairly traceable to a perceived violation of the Domestic Emoluments Clause.**

As for traceability, Plaintiffs' lines of causation are either "too speculative or too attenuated." *AHM*, 602 U.S. at 383 (citing *Clapper*, 568 U.S. at 410–11).  Each line of causation—from the alleged violation of the Domestic Emoluments Clause to the alleged injury—relies on countless "unfettered choices made by independent actors not before the courts." *Id.* (quotation omitted). "The causation requirement precludes speculative links." *Id.*  Here, Plaintiffs cannot show that the numerous actors enveloped by their standing theories "will likely react in predictable ways" to cause their injuries. *Id.* (quotation omitted).  And even if each link in the chain was predictable, the alleged government action here is too "far removed from its distant (even if predictable) ripple effects" to establish standing. *Id.*

For example, the Student and Resident Plaintiffs' traffic, noise, disruption, and aesthetic injuries are based on the Library's dimensions and urban planning impact, two things which independently require countless decisions of unnamed architects, engineers, and government officials to resolve in myriad ways.  Even if those causal chains were not speculative, each injury is logically distant from an alleged failure of the President to decline a purported emolument.  Such speculative and attenuated chains of causation are far afield from those that the Supreme Court has permitted. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 120 (2025) (fuel emission regulations will predictably cause economic injury to fuel producers).

The same goes for the Resident Plaintiffs' fears of stigma over living in a "militarized and hyper-political zone."  Compl. ¶¶ 166, 183.  Standing cannot be based on hypothetical protests against the President and the hypothetical responses by unnamed law enforcement officials that may result. *See Elend*, 471 F.3d at 1206–07 (general plans to protest President Bush's speeches could not confer standing).  Future stigmatic injuries must be precise and certain. *See Aaron Priv.*

*Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019) ("Because Aaron has not been subjected to discriminatory treatment, . . . Aaron's vague assertions of stigma and discrimination cannot establish its direct standing.").

The same is true for the Student Plaintiff's alleged scholarship and academic opportunity injuries. Plaintiffs cannot simply assume that MDC officials would decide to sell the Lot (as opposed to keeping its parking lot intact), that the resulting funds would be used for scholarships (as opposed to anything else), and that the Student Plaintiff would qualify for this hypothetical scholarship and still be enrolled at MDC by the time this all occurs. Similarly, the Student Plaintiff's loss of hypothetical academic credit is based on her prediction that she will work on a new hypothetical urban farm that MDC will decide that it needs in addition to its already existing urban farm.[9]

Sistrunk Seeds' theories fare no better. An increased difficulty in informing others about urban farming, a lost (but never actual) opportunity, and resources spent failing to influence MDC are "distant (even if predictable) ripple effects that . . . cannot establish Article III standing." *AHM*, 602 U.S. at 383. These textbook causation defects preclude standing.

## II. Plaintiffs' Domestic Emoluments Clause claim presents a nonjusticiable political question.

Like the decision of whether an individual meets the constitutional qualifications to hold the Presidency, deciding whether a President complies with the Domestic Emoluments Clause is a nonjusticiable political question.[10] The Supreme Court has "identified six hallmarks of political

---

[9] Alternatively, the Student Plaintiff could be understood as trying to assert an injury on behalf of the MDC endowment. Of course, this would be barred under the third-party standing doctrine. *See Elend*, 471 F.3d at 1206 ("a plaintiff cannot raise the claims of third parties").

[10] *See Castro v. New Hampshire Sec'y of State*, 701 F. Supp. 3d 176, 185 (D.N.H 2023) (deciding whether then-candidate Trump was barred under the Insurrection or Rebellion Clause was a nonjusticiable political question); *Kerchner v. Obama*, 669 F. Supp. 2d 477, 483 n.5 (D.N.J.

questions, any one of which may carry a controversy beyond justiciable bounds." *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Nearly every hallmark applies here.[11]

"The text, structure, and history of the Constitution make plain that it is Congress and the people, not the federal courts, that are best positioned to address a President's alleged violations of the Clauses [referring to both the Foreign and the Domestic Emoluments Clauses]." *In re Trump*, 958 F.3d 274, 303 (4th Cir. 2020) (Wilkinson, J., dissenting, joined by Niemeyer, Agee, Richardson, Quattlebaum, and Rushing, JJ.), *cert. granted, judgment vacated sub nom. Trump v. Dist. of Columbia*, 141 S. Ct. 1262 (2021). To decide this case in the courts would thus show a profound "lack of respect for the political branches of government." *Aktepe*, 105 F.3d at 1404. As the Framers recognized, "if the President is 'discovered' to have received forbidden emoluments, 'he may be impeached.'" *In re Trump*, 958 F.3d at 305 (Wilkinson, J., dissenting) (quoting 3 Elliot's Debates 486); *see also* 1 Annals of Cong. 661 (1789) (remarks of Rep. Stone) (identifying impeachment as Domestic Emoluments Clause remedy). Indeed, Chief Justice Marshall noted that the President has some constitutional duties for which he "is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

---

2009) (deciding whether President Obama complied with the Natural Born Citizen Clause was a nonjusticiable political question); *Robinson v. Bowen*, 567 F. Supp. 2d 1144, 1147 (N.D. Cal. 2008) (deciding whether Senator McCain complied with the Natural Born Citizen Clause was a nonjusticiable political question).

[11] These hallmarks are "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Aktepe*, 105 F.3d at 1402–03 (quotation omitted).

Compliance with an obligation to refrain from accepting emoluments is one such duty.  For this Court to inject itself into whether the President has committed what the Framers considered an impeachable offense could foreseeably result in the President, the Court, and the Congress producing conflicting "pronouncements . . . on one question."  *Baker*, 369 U.S. at 217.  Accordingly, the Court should decline Plaintiffs' invitation to enter this political thicket.

**III.     Plaintiffs lack a cause of action to enforce the Domestic Emoluments Clause**

Plaintiffs also lack a cause of action against any of the State Defendants or the MDC Defendants under the Domestic Emoluments Clause.  That Clause is a structural constraint, designed to curb undue influence on the President's performance of his federal duties.  Congress has not seen fit to create any cause of action regarding enforcement of the Clause, and the Clause is not the "source of any federal rights" that might justify the implication of a private cause of action. *See Armstrong v. Exceptional Child Ctr.*, Inc., 575 U.S. 320, 324–25 (2015).  Even if the Clause did somehow imply a cause of action, Plaintiffs would not be within the "zone of interests" of the Clause, such that they would be among those authorized to bring such a suit.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–29 (2014) (explaining that the "zone of interests" test defines the class of parties who are entitled bring a particular cause of action); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (confirming that plaintiff stock exchanges were "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question" (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).  The Domestic Emoluments Clause does not exist to protect Plaintiffs' putative interest in preserving the possibility that a particular tract of land will become available to them for urban farming.

While "federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law," such relief is available only in "a

15

proper case"—i.e., "to *prevent* an injurious act by a public officer." *Armstrong*, 575 U.S. at 327 (emphasis added). That is not what Plaintiffs seek in this case. They seek to set aside an already-completed land transfer. Plaintiffs thus are not preemptively asserting the Domestic Emoluments Clause as a shield against an enforcement action threatened against them by the State or the MDC Defendants, which is the paradigmatic circumstance in which the *Ex parte Young*[12] cause of action is available to an individual plaintiff. *See Armstrong*, 575 U.S. at 326 ("[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."). Plaintiffs instead are seeking to weaponize the Domestic Emoluments Clause and use it as sword to set aside an already-completed land transfer. *See Mich. Corr. Org. v. Mich. Dep't of Corrs.*, 774 F.3d 895, 906 (6th Cir. 2014) ("Private parties who act in compliance with federal law may use *Ex parte Young* as a shield against the enforcement of contrary (and thus preempted) state laws . . . . But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating sword.") (citations omitted)). That is not a proper use of *Ex parte Young*.

**IV.     The State Defendants are entitled to Eleventh Amendment immunity.**

"[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies." *Alabama v. Pugh*, 438 U.S. 781, 781 (1978). Under *Ex parte Young*, a limited exception exists for plaintiffs to seek prospective relief, but any action that seeks retrospective relief remains barred by the Eleventh Amendment. *See Green v. Mansour*, 474 U.S. 64, 73 (1985); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999). When deciding whether requested relief is retrospective, courts "look to the substance rather than to the form of the relief sought." *Papasan v. Allain*, 478 U.S. 265, 279 (1986).

---

[12] 209 U.S. 123 (1908).

All State Defendants, save one,[13] are entities entitled to Eleventh Amendment immunity.[14] And here, while Plaintiffs couch their requested relief in prospective terms, the substance is clearly retrospective. Plaintiffs seek a retrospective injunction to void a land transfer that has already been completed, and declaratory relief advising others that Defendants violated the Domestic Emoluments Clause when they made that transfer. *See* Compl. at 54–55 (requested relief). In other words, Plaintiffs want the Court to ignore *Young*'s retrospective bar "to adjudicate the legality of past conduct." *Summit Med.*, 180 F.3d at 1337. Plaintiffs try to frame their allegations as a "continuing" violation of the Domestic Emoluments Clause, but that makes no sense. The Clause is concerned with one temporally distinct act: the President's receipt of an "Emolument[]." U.S. Const. art. II, § 1, cl. 7. An emolument, like any other piece of property, can only be given or received at one point in time. That the Lot remains in the control of the Foundation "does not transform a one-time past event into a continuing violation." *Nicholl v. Att'y Gen. Georgia*, 769 F. App'x 813, 816 (11th Cir. 2019). In that sense an alleged Domestic Emoluments Clause violation is like "a completed constitutional tort," something the *Ex parte Young* fiction does not reach.

---

[13] By overreading a 1925 Florida Supreme Court decision, the pre-split Fifth Circuit determined that the Trust Fund was not a part of the State of Florida for Eleventh Amendment immunity purposes. *See Aerojet-Gen. Corp. v. Askew*, 453 F.2d 819, 830 (5th Cir. 1971) (citing *Hampton v. State Bd. of Educ.*, 105 So. 323, 327 (1925)). As a matter of Florida law, *Aerojet* was wrong the day it was decided. *See Kirk v. Kennedy*, 231 So. 2d 246, 247 (Fla. 2d DCA 1970) ("There is no dispute as to a suit against the Trustees of the Internal Improvement Fund being a suit against the State of Florida and therefore . . . within the law of 'sovereign immunity.'"). State Defendants acknowledge, however, that this Court is bound by *Aerojet*. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1208 (11th Cir. 1981) (en banc).

[14] Florida community colleges, like MDC, as well as their boards of trustees, are entitled to Eleventh Amendment immunity. *See Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc.*, 861 F.3d 1234, 1237 (11th Cir. 2017); *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1195 (11th Cir. 2005); *Baker v. Univ. Med. Serv. Ass'n, Inc.*, No. 8:16-CV-2978, 2016 WL 7385811, at *2 (M.D. Fla. Dec. 21, 2016) (collecting cases). And because Plaintiffs sue the Governor, Attorney General, Commissioner of Agriculture, and the Florida CFO in their official capacities, *see* Compl. ¶ 18, those defendants are also entitled to Eleventh Amendment immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

17

*Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1334 (11th Cir. 2025).  Thus, when it comes to reversing or voiding property transfers, courts recognize that the Eleventh Amendment bars such retrospective relief.  *See Cotto v. Campbell*, 126 F.4th 761, 765 (1st Cir. 2025), *cert. denied*, 146 S. Ct. 1491 (2026) ("the Eleventh Amendment bars all the relief sought by plaintiffs [because their] attempt to recover their forfeited property focuses on a past alleged wrong"); *Ulaleo v. Paty*, 902 F.2d 1395, 1400–01 (9th Cir. 1990) ("land exchange" from Hawaii to a private estate was a past harm and plaintiffs' request for Hawaii to reverse that exchange was an impermissible "retro-active remedy").  Likewise, Plaintiffs' request for declaratory relief is the same "notice relief" that the Supreme Court has foreclosed in *Young* actions.  *Green*, 474 U.S. at 71.

Alternatively, the State Defendants have Eleventh Amendment immunity because Plain-tiffs' suit "is the functional equivalent of a quiet title action which implicates special sovereignty interests."  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997); *see California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 506 (1998) ("the Eleventh Amendment bars federal jurisdic-tion over general title disputes relating to state property interests").  Indeed, Plaintiffs ask the court to void two separate land transfers and "enjoin[] Defendants from treating the conveyance of the MDC Parcel as valid."  Compl. at 55.  They effectively request this Court to quiet title to the Lot.

Such relief would constitute an even more egregious invasion of sovereignty than in *Coeur d'Alene Tribe*.  There, a tribal government sued Idaho, seeking declaratory and injunctive relief to establish that it was the rightful owner of certain lakeside land.  *Coeur d'Alene Tribe*, 521 U.S. at 265.  The Supreme Court held that Idaho was entitled to Eleventh Amendment immunity because, if the declaratory and injunctive relief were granted, "Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury."  *Id.* at 287.  Here, Plaintiffs go further and ask the Court to force

18

Florida to void its own land transfers and claw back property from a private nonprofit. Such an injunction would effectively operate as an exercise of eminent domain authority, a core "attribute of sovereignty." *Georgia. v. City of Chattanooga*, 264 U.S. 472, 480 (1924); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) (eminent domain "is traditionally associated with sovereignty"); *Coeur d'Alene Tribe*, 521 U.S. at 287 (Eleventh Amendment immunity is warranted when injunctive or declaratory relief implicates a state's "funds in its Treasury").

## V.     Plaintiffs fail to state a claim under the Domestic Emoluments Clause.

Independent of all that, the Complaint is due to be dismissed because, in two ways, it fails to state an Emoluments Clause violation.

### A.     Plaintiffs fail to state a claim against the MDC, the MDC Trustees, and the DBOT, because by Plaintiffs' own allegations none of these entities was involved in the transfer of land from the Trust Fund to the Foundation that Plaintiffs claim violated the Emoluments Clause.

At its core, Plaintiffs' Complaint arises from their belief that the transfer of the Lot from the Trust Fund to the Foundation violated the Domestic Emoluments Clause. Compl. ¶ 10. However, as the Plaintiffs acknowledge in their complaint, the MDC, the MDC Trustees, and the DBOT were not involved in that transfer. *Id.* ¶ 92 ("When MDC transferred the MDC Parcel to the Florida Board"); *id.* ¶ 94 ("MDC transferred the MDC Parcel to the Florida Board"). DBOT merely transferred the disputed land to another state entity: the Trust Fund. *Id.* ¶¶ 99–100. A transfer from one state entity to another state entity cannot possibly constitute a violation of the Domestic Emoluments Clause. U.S. Const. art. II, § 1, cl. 7. This is another reason to dismiss MDC, the MDC Trustees and the DBOT with prejudice.

19

**B.** **A land transfer from a state entity to a private nonprofit organization does not constitute an "emolument" for the President under the Domestic Emoluments Clause.**

Text, history, and precedent tell us that the original meaning of "emolument," as used in the Domestic Emoluments Clause, means a form of compensation for exercising government authority. The text of the Clause begins by discussing the President's "Compensation" and then states that during his term, "he shall not receive . . . any other Emolument." U.S. Const. art. II, § 1, cl. 7. The phrase "any other Emolument" refers back to "Compensation," meaning that the Framers understood an emolument as a form of compensation. *Id.*

Period dictionaries support this reading. A 1774 Dictionary entitled "A Complete and Universal English Dictionary on a New Plan" defined an emolument as "profit arising from an office or employ." The 1828 American Dictionary of the English Language defined an emolument as "profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office, as salary, fees and perquisites."

Records from the Continental Congress and state ratification conventions confirm that the Framers preferred to use the term "emolument" to refer to compensation for performing official duties in public office. *See* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 U. Ga. L. Rev. 1, 13–16 & nn. 31–55 (2017). In *The Federalist* No. 73, Alexander Hamilton used "emolument" to refer to the President's compensation that would be set by Congress. *The Federalist* No. 73, at 380 (George W. Carey & James McClellan eds., 2001) (the President will not "be at liberty to receive[] any other emolument than that which may have been determined by the first act"). Though there are some outliers, the majority of "ratification-related statements . . . assume an office-related definition" of "emolument." Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 650 & n.47 (2017) (surveying ratification sources); *see* Natelson, 52 U. Ga. L. Rev. at 13–16 & nn. 31–55 (same).

History reinforces that an emolument is "compensation one receives for the personal performance of services, whether as an officer or employee." Grewal, 102 Minn. L. Rev. at 641–42. The Framers were born into a British political context where "[f]ees and other non-salary payments were familiar forms of official emolument." John R. Breihan, *William Pitt and the Commission on Fees, 1785–1801*, 27 Hist. J. 59 (1984). As a result, government employees were not typically paid salaries for much of the United States' early history. Grewal, 102 Minn. L. Rev. at 647. Instead, they received a variety of emoluments to compensate them for their services such as bounties, charged fees, or even "servants and forage for [their] horses." *Id.* at 647 & n.35. In addition to public emoluments, officials were sometimes paid with so-called "private emoluments" that came from the people that public officials were charged with regulating. *See* Natelson, 52 U. Ga. L. Rev. at 17–25. In other words, almost anything could become an emolument, but it only does so when it is used to compensate another for services performed.

Understandably, the prospect that public officials would make a living from emoluments raised concerns that they would be subject to regulatory capture. This led to civil service reforms in Britain and Revolutionary America barring public officials from receiving "emoluments" from sources other than their immediate public employers. *Id*. at 23–29. Rhode Island "forbade the state's congressional delegates from holding or receiving 'any emolument' from federal office." *Id.* at 25. Pennsylvania banned officials responsible for operating its jails from receiving "private emoluments." *Id.* Massachusetts, Delaware, North Carolina, South Carolina, and Virginia all crafted new state constitutions that required officials to be compensated with "adequate salaries" rather than emoluments. *See id.* at 25 nn. 104–05. This history demonstrates that the Founding Generation thought of emoluments as payments linked to the performance of official duties by those in the public's employ.

Two centuries of presidential history confirm that understanding.  From the early days of the Republic, Presidents have received payments from their personal business while in office.[15] President Washington purchased several parcels of land from the federal government at auction, and no constitutional concerns were raised that the land might have been an "emolument."  *See* Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759, 761 (2017).  President Lyndon B. Johnson, a part-owner of several Texas radio and television stations, also did not face any Domestic Emolument Clause criticisms when the FCC renewed his broadcast licenses while in Office.  *See* Josh Blackman & Seth Barrett Tillman, *The Domestic Emoluments Clause*, in The Heritage Guide to the Constitution 365 (Josh Blackman & John G. Malcolm eds., 3d ed. 2025).  And the Office of Legal Counsel determined that President Reagan did not violate the Domestic Emolument Clause when he accepted pension payouts from his service as California's Governor because he "no longer ha[d] to perform any services" to California to receive it.  *President Reagan's Ability to Receive Ret. Benefits from the State of California*, 5 Op. O.L.C. 187, 190 (1981).[16]  Recent litigation concerning President Trump notwithstanding, 200 years of presidential practice have liquidated the meaning of "Emolument." It cannot have the broad meaning Plaintiffs propose.

Courts have also understood that an emolument is a species of compensation for official duties.  Historically, the Supreme Court has used the term "emolument" in reference to

---

[15] Presidents Washington, Jefferson, Madison, and Monroe all operated mills or plantations, and in Jefferson's case a nail factory, during their time in the Oval Office.  Douglas R. Hume, *Between "The Rock" and A Hard Case: Application of the Emoluments Clauses for a New Political Era*, 2018 Pepp. L. Rev. 68, 75 & nn. 37–39 (2018).

[16] *See also Applicability of 18 U.S.C. s 219 to Retired Foreign Serv. Officers*, 11 Op. O.L.C. 67, 67 n.2 (1987) ("The term 'emolument' has been interpreted to include compensation for employment.") (citing *Comp. of Emps. Detailed to Assist Foreign Gov'ts*, 40 Op. Att'y Gen. 513 (1947)).

compensation for public employment.[17]  More recent cases show that emoluments cannot be stretched to simply mean any benefit that ultimately reaches the President.  For example, in one of the cases concerning ownership of President Nixon's papers, the court held that President Nixon could proceed with a takings claim against the United States for seizing his papers without violating the Domestic Emoluments Clause.  *Griffin v. United States*, 935 F. Supp. 1, 6 (D.D.C. 1995).  The court reasoned that while President Nixon had accrued his papers in office, "they were not transferred to him by the government as compensation for his service in office."  *Id.*  Indeed, "no court has ever enforced [the Domestic Emoluments Clause] against a President, despite the fact that prior Presidents have owned property while in office, producing income that could be attributed in part to domestic or foreign governments and officials."  *In re Trump*, 958 F.3d at 309 (Niemeyer, J., dissenting, joined by Wilkinson, Agee, Quattlebaum, Rushing, JJ.).

In other words, to state a claim under the Emoluments Clause, Plaintiffs must plausibly allege some compensatory arrangement between Florida and President Trump for the performance of some official duty.  Plaintiffs list "ways in which presidential decisions may benefit or harm" Florida's interests, but allege no presidential actions performed because of the parking lot conveyance.  Compl. ¶ 139.  Plaintiffs may contend that an emolument should include these other kinds of indirect "profit," "advantage, or "benefit," Compl. ¶ 41 (cleaned up), but that legal conclusion receives no deference, *see Iqbal*, 556 U.S. at 678.

---

[17] *See, e.g.*, *United States v. Hill*, 123 U.S. 681, 686 (1887) ("The clerk of a court of the United States collects . . . fees and emoluments of his office, with an obligation on his part to account to the United States for all he gets over a certain sum which is fixed by law."); *Hoyt v. United States*, 51 U.S. (1 How.) 109, 135 (1850) ("The compensation of the collector was derived from three sources;—1, fees allowed for the services already referred to; 2, commissions on the duties received; and 3, a share of the fines, penalties, and forfeitures. The emoluments of the office were dependent upon the receipts from these sources; and the officer was entitled to apply to his own use the whole amount derived from them."); Grewal, 102 Minn. L. Rev. at 647 n.35 (collecting cases).

Making matters even worse, Plaintiffs offer little as to why this land transfer to the Foundation—and not President Trump—would nonetheless qualify as an emolument. Plaintiffs do not allege that President Trump himself is part of the Foundation. *See* Compl. ¶ 124. But the plain text of the Domestic Emoluments Clause states that "*he* [the President] shall not receive within that Period any other Emolument from the United States[.]" U.S. Const. art. II, § 1, cl. 7 (emphasis added). The Clause focuses on the President specifically, not the "family members and close allies" whom the Foundation actually comprises. Compl. ¶ 124. Plaintiffs' oversimplification also fails to wrestle with the basic reality that "[i]t is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 327 (2025). Put simply, the Foundation is distinct from the President. Plaintiffs' failure to meaningfully address this fact is also fatal to their claims.

## CONCLUSION

By any measure, Plaintiffs request truly extraordinary relief: to enjoin the President of the United States and multiple State actors on an ill-conceived, novel constitutional theory and void an unquestionably valid land transfer. Plaintiffs request much but offer little by way of justification for that request. They lack standing, the core of the case is a non-justiciable political question, and their claims run headlong into government immunity. And even if Plaintiffs were able to run this gauntlet of threshold obstacles, their theory of the Domestic Emoluments Clause bears no relation to the original understanding of that provision.

This case is a distraction and a burden for the President, the State of Florida, and this Court. It should proceed no further. Plaintiffs' complaint should be dismissed.

24

August 11, 2026

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

/s/ *David M.S. Dewhirst*
DAVID M.S. DEWHIRST
  *Solicitor General*

JEFFREY PAUL DESOUSA
JASON J. MUEHLHOFF
NATHAN A. FORRESTER
  *Chief Deputies Solicitor General*
CHRISTINE K. PRATT
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
*david.dewhirst@myfloridalegal.com*
*jason.muehlhoff@myfloridalegal.com*

*Counsel for Governor DeSantis, Attorney General Uthmeier, Commissioner Simpson, CFO Ingoglia, and the Board of Trustees of the Internal Improvement Trust Fund*

JAVIER A. LEY-SOTO
  *General Counsel*
Miami Dade College
Office of Legal Affairs
300 NE 2nd Avenue
Room 1453
Miami, FL 33132
Phone: (305) 237-3694

JESUS M. SUAREZ
Continental PLLC
245 Alcazar Avenue
Coral Gables, FL 33134
Phone: (305) 677-2707

*Counsel for Miami Dade College, the District Board of Trustees of Miami Dade College, and the Trustees*

ALEJANDRO BRITO

25

IAN M. CORP
Brito PLLC
2121 Ponce de Leon Boulevard, Suite 650
Coral Gables, Florida 33131
Phone: (305) 614-4071
abrito@britopllc.com

*Counsel for the Donald J. Trump Presidential Library
Foundation, Inc.*

FRANCIS A. CARBONE II
  *General Counsel*
Florida Department of Financial Services
400 S Monroe St. # PL11
Tallahassee, FL 32399
Phone: (850) 413-5939
*francis.carbone@myfloridacfo.com*

*Counsel for CFO Ingoglia*

26

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on August 11, 2026, to all counsel of record.

/s/ *David M.S. Dewhirst*
Solicitor General