**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CIVIL ACTION NO. 1:26-cv-23365-RAR-LFL**

SISTRUNK SEEDS INC., *et al*.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity, *et al*.,

Defendants.

_______________________________________/

# BRIEF OF PROFESSOR SETH BARRETT TILLMAN AND LANDMARK LEGAL FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

Michael J. O'Neill*
*Counsel for Amicus Curiae Landmark Legal Foundation*
19415 Deerfield Ave.
Suite 312
Leesburg, VA 20176
(703) 554-6100
mike@landmarklegal.org

Robert W. Ray*
*Counsel for Amicus Curiae Professor Seth Barrett Tillman*
55 McDermott Way
Englewood Cliffs, NJ 07632
(732) 687-1380
rayrobwil@verizon.net

Michael A. Sasso
*Counsel of Record*
Sasso & Sasso, P.A.
630 South Maitland Avenue
Maitland, FL 32751
(407) 644-7161
masasso@sasso-law.com

**Pro Hac vice forthcoming*

# TABLE OF CONTENTS


| | Page |
|---|---|
| TABLE OF CONTENTS | ii |
| TABLE OF AUTHORITIES | iii |
| CORPORATE DISCLOSURE STATEMENT | 1 |
| INTEREST OF *AMICI CURIAE* | 2 |
| INTRODUCTION | 4 |
| ARGUMENT | 6 |
| I. Plaintiffs' Official-Capacity Claim Against President Trump Must Be Dismissed | 6 |
| II. Because the MDC Parcel Is and Remains the Property of the Donald J. Trump Presidential Library Foundation, Inc., Which Is a Private Entity with Independent Legal Personality, Plaintiffs' Claim Against President Trump Must Be Dismissed | 9 |
| III. Plaintiffs' Claim Against President Trump Fails Because They Are Seeking to Enforce Constitutional Provisions Offensively Absent Any Federal Statutory Authorization | 11 |
| IV. Plaintiffs' Claim Against President Trump Fails Because the MDC Parcel Is Not a Constitutionally Proscribed Emolument | 14 |
| CONCLUSION | 19 |

## TABLE OF AUTHORITIES

**Page**

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 6, cl. 2 .......... 17

U.S. Const. art. I, § 9, cl. 8 .......... 6, 14

U.S. Const. art. II, § 1, cl. 7 .......... 6, 7, 14

**CASES**

*Anderson v. Griswold*, 543 P.3d 283 (Colo. 2023) .......... 11

*Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch 515 .......... 9

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) .......... 13

*Bowsher v. Synar*, 478 U.S. 714 (1986) .......... 15

*Case of Jefferson Davis*, 7 F. Cas. 63 (C.C.D. Va. 1868) (No. 3621a) .......... 11

*Clinton v. Jones*, 520 U.S. 681 (1997) .......... 12

*Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) .......... 9

*Collins v. Yellen*, 594 U.S. 220 (2021) .......... 9

*DeVillier v. Texas*, 601 U.S. 285 (2024) .......... 5, 11-12, 13

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) .......... 9

*Ex parte Young*, 209 U.S. 123 (1908) .......... 12, 13

*Feitshans v. Kahn*, Civ. A. No. 06-cv-2125-SAS, 2006 WL 2714706 (S.D.N.Y. Sept. 21, 2006) .......... 9, 10

*Griffin's Case*, 11 F. Cas. 7 (C.C.D. Va. 1869) (No. 5815) .......... 11

*Hafer v. Melo*, 502 U.S. 21 (1991) .......... 4, 6, 7-8

*Hoyt v. United States*, 51 U.S. 109 (1850) .......... 14, 15

*Kentucky v. Graham*, 473 U.S. 159 (1985) .......... 4, 6, 8

*Knick v. Twp. of Scott*, 588 U.S. 180 (2019) .......... 13

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2023) .......... 3

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) .......... 3

**TABLE OF AUTHORITIES – Continued**

**Page**

**CASES – Continued**

*Lujan v. Defenders of Wildlife* 504 U.S. 555 (1992) .......... 8

*Marbury v. Madison*, 5 U.S. 174 (1803) .......... 14

*Mich. Corr. Org. v. Mich. Dep't. of Corr.*, 774 F.3d 895 (6th Cir. 2014) .......... 13

*Moore v. United States*, 602 U.S. 572 (2024) .......... 3

*Royal Brunei Airlines Sdn Bhd v Tan Kok Ming* [1995] 2 AC 378 (P.C.) .......... 9

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) .......... 4

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) .......... 4

*Swift v. Tyson*, 41 U.S. 1 (1842) .......... 13

*TransUnion, LLC v. Ramirez*, 594 U.S. 421 (2021) .......... 8

*Trump v. Anderson*, 601 U.S. 100 (2024) .......... 3

*Trump v. Cook*, No. 25A312, 2026 WL1855613, 146 S. Ct. 2234 (June 29, 2025) .......... 13

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 3

*Young v. Barquin*, Case No. 24-cv-24260-RAR, 2024 WL 4652094 (S.D. Fla. Oct. 31, 2024) .......... 11

**FOREIGN STATUTES**

Income and Corporation Taxes Act, 1988, pt. V, ch. IV, c. 1 § 192(1) (U.K.) .......... 15

**RULES**

Fed. R. Civ. P. 8(a)(2) .......... 11

**EXECUTIVE BRANCH AUTHORITIES**

Memorandum from Samuel A. Alito, Jr., Dep'y Asst. Att'y Gen., Off. of Legal Couns., for H. Gerald Staub, Off. of the Chief Couns., Nat'l Aeronautics & Space Admin., Re: Emoluments Clause Questions Raised by NASA Scientist's Proposed Consulting Arrangement with the Univ. of New South Wales, 1986 WL 1239553 (1986) .......... 15

Memorandum from Milton J. Socolar, on behalf of the Comptroller Gen. of the U.S., to Sen. George J. Mitchell, B 207467, 1983 WL 27823 (1983) .......... 15

**AMICUS BRIEFS**

Brief of Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* Supporting Appellee and Affirmance, Citizens for Responsibility and Ethics in Washington v. Donald J. Trump, in his official capacity as President of the United States of America, 939 F.3d 131 (2d Cir. Sept. 13, 2019) (revised Mar. 3, 2020), 2018 WL 2722468 .......... 2

**TABLE OF AUTHORITIES – Continued**

**Page**

Brief Submitted for Professor Seth Barrett Tillman as *Amicus Curiae* in Support of Petitioner [Donald J. Trump], Trump v. Anderson, 601 U.S. 100 (2024), 2024 WL 184282 ..................... 2

**OTHER AUTHORITIES: BOOKS, TREATISES, DICTIONARIES, ARTICLES**

Charles L. Black, Jr., Structure and Relationship in Constitutional Law (1969).......................... 17

9 Fletcher Cyc. Corp. § 4246 (2025) ........................................................................ 9, 10

Frederico Moreno, Philippine Law Dictionary (2007) ................................................ 15

Josh Blackman, Emoluments Clauses Litigation, GOOGLE DRIVE (May 23, 2020) (listing co-authored Blackman-Tillman materials), https://bit.ly/2LUUTiY [https://perma.cc/G9C3-VTZY] ........................................................................................................ 2

Josh Blackman & Seth Barrett Tillman, Essay No. 100, *Domestic Emoluments Clause*, *in* The Heritage Guide to the Constitution 365–70 (Josh Blackman & John Malcolm eds., 3d ed 2025) ........................................................................................................ 2

Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President into Section 3*, 28 Tex. Rev. L. & Pol. 350 (2024)........................................................................... 2

Josh Blackman & Seth Barrett Tillman, *The Unresolved Threshold Issues in the Emoluments Clauses Litigation: The President Has Three Bodies and There Is No Cause of Action for Ultra Vires Conduct*, 20 Geo. J.L. & Pub. Pol'y 163 (2022)............................................................. 2

Letter from Seth Barrett Tillman to the Honorable Clarence Thomas on Suggested Sources for a Future Citation (May 31, 2024), https://ssrn.com/abstract=4833465 ........................................ 2

Richard Krever, *Taming Complexity in Australian Income Tax*, 25 Sydney L. Rev. 467 (2003)...15

John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89 (1995) ................................................................. 17

Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759 (2017) ........................................................................ 15, 16

Seth Barrett Tillman, *The Emoluments Clauses Lawsuits's Weak Link: The Official Capacity Issue*, Yale J. on Reg.: Notice & Comment (Aug. 15, 2017) ................................................ 2

## CORPORATE DISCLOSURE STATEMENT

Landmark Legal Foundation is a nonpartisan, 501(c)(3) not-for-profit public interest legal organization headquartered in Kansas City, Missouri with an office in Leesburg, Virginia. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

## INTEREST OF *AMICI CURIAE*[1]

Professor Seth Barrett Tillman, an American national, is a member of the regular full-time faculty in the Maynooth University School of Law and Criminology, Ireland/Scoil an Dlí agus na Coireolaíochta Ollscoil Mhá Nuad. Professor Tillman is one of the few academics who has written extensively, in academic publications and in amicus briefs, [i] on the Constitution's three Emoluments Clauses;[2] [ii] on the recently announced *DeVillier* Doctrine, which mandates legislation from Congress before private-party plaintiffs can institute suit offensively against the government, state or federal, particularly when seeking positive relief;[3] and, [iii] on the scope of "official capacity" claims.[4] Tillman also practiced corporate and commercial entities law in Delaware, as well as clerking for a federal judge in Delaware.

Landmark Legal Foundation is a national public interest legal organization dedicated to preserving the principles of limited government, separation of powers, federalism, advancing an originalist approach to the Constitution, and defending individual rights. Landmark has filed numerous briefs advocating for the separation of powers in courts at all levels. These cases include

[1] No counsel for a party authored this brief in whole or in part; and no person or entity, other than *Amici* and their counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

[2] *See, e.g.*, Brief of Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* Supporting Appellee and Affirmance at 4–7, 10, 26, Citizens for Responsibility and Ethics in Washington v. Donald J. Trump, in his official capacity as President of the United States of America, 939 F.3d 131 (2d Cir. Sept. 13, 2019) (revised Mar. 3, 2020), 2018 WL 2722468; Josh Blackman & Seth Barrett Tillman, Essay No. 100, *Domestic Emoluments Clause*, *in* The Heritage Guide to the Constitution 365–70 (Josh Blackman & John Malcolm eds., 3d ed 2025). *See generally* Josh Blackman, Emoluments Clauses Litigation, GOOGLE DRIVE (May 23, 2020) (listing co-authored Blackman-Tillman materials), https://bit.ly/2LUUTiY [https://perma.cc/G9C3-VTZY].

[3] *See, e.g.*, Brief Submitted for Professor Seth Barrett Tillman as *Amicus Curiae* in Support of Petitioner [Donald J. Trump] at 4–6, 8–9, Trump v. Anderson, 601 U.S. 100 (2024), 2024 WL 184282; Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President into Section 3*, 28 Tex. Rev. L. & Pol. 350, 362, 369–72, 393, 404, 491–95, 508–09 (2024).

[4] *See, e.g.*, Josh Blackman & Seth Barrett Tillman, *The Unresolved Threshold Issues in the Emoluments Clauses Litigation: The President Has Three Bodies and There Is No Cause of Action for Ultra Vires Conduct*, 20 Geo. J.L. & Pub. Pol'y 163, 188–207 (2022); Seth Barrett Tillman, *The Emoluments Clauses Lawsuits's Weak Link: The Official Capacity Issue*, Yale J. on Reg.: Notice & Comment (Aug. 15, 2017), http://tinyurl.com/y9g2v6xf; Letter from Seth Barrett Tillman to the Honorable Clarence Thomas on Suggested Sources for a Future Citation (May 31, 2024), https://ssrn.com/abstract=4833465.

*Loper Bright Enterprises v. Raimondo* , 603 U.S. 369 (2023); *Trump v. Anderson*, 601 U.S. 100 (2024); *Moore v. United States*, 602 U.S. 572 (2024); *West Virginia v. EPA*, 597 U.S. 697 (2022); and *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022).

## INTRODUCTION

Customarily, before adjudicating a case or controversy, a federal court will first examine whether it has subject matter jurisdiction, and if it does not, then the court will dismiss the lawsuit at the threshold—that is, before examining contested facts and evidence. However, under *Ruhrgas AG v. Marathon Oil Co.* and *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, the Supreme Court has recognized that certain other "threshold question[s]" may also warrant "dismissal short of reaching the merits," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, 433 (2007) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)), that is, prior to examining contested facts and evidence. In the instant lawsuit, there are, at the very least, four such threshold issues warranting dismissal. This Court may dismiss this action on any of these bases, even without first adjudicating jurisdiction.

***First***, this lawsuit is captioned as an official-capacity lawsuit. But it is plainly not an official-capacity suit; it is better characterized as an individual-capacity lawsuit or, and perhaps more likely, as a constitutional tort committed by Donald J. Trump as a private party. An official capacity claim is a claim against the government, that is, against President Trump, *qua* President, not against Donald J. Trump, the individual. However, the *sine qua non* of an official-capacity lawsuit is that "the entity's [that is, the government-defendant's] 'policy or custom' *must* have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S 159, 166 (1985)) (emphasis added). Here, no such policy or custom is alleged vis-à-vis President Trump, and thus the official-capacity claim against him, based on the Domestic Emoluments Clause, must fail. Every other claim in this lawsuit against every other Defendant is derivative from the Plaintiffs' claim against Trump. Therefore, if the official-capacity claim against President Trump fails, then the coordinate claims against the State of Florida Defendants ("State Defendants") and the Private-Party Defendants must also fail.

***Second***, the Donald J. Trump Presidential Library Foundation, Inc. ("Library Foundation"), the grantee of the Miami Dade College ("MDC") Parcel, is a "Florida nonprofit corporation incorporated on May 23, 2025." Compl. ¶ 16. Corporations have independent legal personality. Corporate property belongs to the entity, not to the members of its governing board and not to its stockholders (in those entities with stockholders). Here the grantor, the State Defendants, conveyed the MDC Parcel to the Library Foundation, not to President Donald J. Trump ("Defendant Trump"). Indeed, the Complaint does not allege that the MDC Parcel has been

(re)transferred to Defendant Trump, and it does not squarely allege that it will be (re)transferred to Defendant Trump. Rather, the Complaint hints that the MDC Parcel is or will be "constructively" owned by Trump via "family members," "legal representative[s]" and "corporate entities" that he "controls formally or informally." Compl. ¶ 46. There is no well-pled allegation that Trump, as of today, received the MDC Parcel, owns the MDC Parcel, much less that he is the record owner under Florida state law. In these circumstances, where Defendant Trump has not "received" the MDC Parcel, the Domestic Emoluments Clause and its "receive"-language are not implicated. And thus all of Plaintiffs' claims, all based on the Domestic Emoluments Clause, against President Trump and all other Defendants, must fail.

***Third***, Plaintiffs' Complaint puts forward no judicially cognizable cause of action. Like all structural provisions in the U.S. Constitution, the Domestic Emoluments Clause binds the government. This clause is enforceable by Congress through impeachment proceedings against Presidents who fail to comply. Although structural constitutional provisions may be raised *defensively* by private parties who are being sued or prosecuted by the government, as a general matter, such structural constitutional provisions are *not* enforceable *offensively* by private parties as a cause of action or theory of liability. Rather, private-party enforcement requires authorization provided for by congressional statute. In *DeVillier v. Texas*, the Supreme Court explained:

> Constitutional rights do not typically come with a built in cause of action to allow for private enforcement in courts. See *Egbert v. Boule*, 596 U. S. 482, 490–491 (2022). Instead, constitutional rights are generally invoked **defensively** in cases arising under other sources of law, or asserted **offensively** pursuant to an independent cause of action designed for that purpose, see, *e.g.*, 42 U. S. C. §1983.

*DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (Thomas, J., for a unanimous Court) (bold added).

Here, private parties are not being sued or prosecuted by the government. Instead, in the instant litigation, the Plaintiffs are private parties—these Plaintiffs are asserting constitutional claims *offensively* against the President and others. This they cannot do absent federal legislation authorizing such a suit. And absent such authorizing legislation, this lawsuit must be dismissed.

***Fourth, and finally***, the State Defendants' transfer of the MDC Parcel (purportedly) to Defendant Trump and Trump-affiliated entities might be characterized as a gift or present. But it is not an "emolument." An "emolument" is the authorized compensation for the performance of the duties of an office. It is not any "benefit" that accrues to an officeholder from whatever source and for whatever reason. If it were, then the President could not hold, receive interest on, and

receive payment during his term for *his* own U.S. and state bonds—even those bonds purchased prior to starting his four-year term. That's an absurd result. The MDC Parcel, transferred absent consideration, might be characterized as a gift or "present," U.S. Const. art. I, § 9, cl. 8, but it is in no sense an "emolument," U.S. Const. art. II, § 1, cl. 7. And thus any claim, against Trump or any other Defendant, based on the Domestic Emoluments Clause and its "emoluments"-language must fail.

## ARGUMENT

### I. Plaintiffs' Official-Capacity Claim Against President Trump Must Be Dismissed.

Generally, government officials may violate the Constitution in two capacities. On the one hand, a government official violates the Constitution in his *official capacity* if, and only if "the entity's [that is, the government-defendant's] 'policy or custom' *must* have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Kentucky v. Graham*, 473 U. S. 159, 166 (1985)) (emphasis added). With an official-capacity case, the named defendant is a nominal placeholder. Such a suit, in fact, lies against the government-defendant entity that adopted the policy or custom. On the other hand, a government official violates the Constitution in his *individual capacity* if the official was acting under the color of law, but was not acting pursuant to a government policy or custom. *Id.*

In the instant litigation, the Plaintiffs' Complaint (the "Complaint") does not allege that, at this juncture, Donald J. Trump actually owns the MDC Parcel or that he will acquire ownership imminently. All that is alleged is that the parcel has been conveyed to a charitable foundation bearing his name, and that the foundation is governed by trustees who are family relations or business associates. Plaintiffs try to elide over this difficulty. In their Complaint, Plaintiffs state:

> Instead, the State Defendants gifted the MDC Parcel to the *President* "free from any waiver, encumbrance, or restriction except for the requirement that the subject parcel contains components of a Presidential library, museum, and/or center within five years of conveyance or that construction has commenced for a Presidential library, museum, and/or center."[2]

Compl. ¶ 4 (emphasis added) (footnote in the original).

However, the only support for this allegation, in footnote 2 of the Complaint, is to an Agenda document from the Florida Board of Trustees of the Internal Improvement Trust Fund. That document repeatedly states that the Donald J. Trump Presidential Library Foundation, Inc., not

President Trump, is the grantee of the MDC Parcel. *See* Agenda, at 1 (Sept. 30, 2025), https://perma.cc/CA3X-LFNW.[5]

The text of the Domestic Emoluments Clause requires that the purportedly forbidden "emoluments" be "received" by the President, and not merely by some private entity affiliated with the President's family and business associates. U.S. Const. art. II, § 1, cl. 7. For that reason alone, the Complaint fails to state a cognizable claim under the Domestic Emoluments Clause. But even assuming, contra the Complaint and contra any future amendments to the Complaint, that the MDC Parcel were Trump's private property today or would become so sometime during his four-year term,[6] Plaintiffs' claim against Trump, in his official capacity, which is the only claim made against Trump, must fail. Why? Because there is no allegation in the Complaint, that President Trump, in receiving the MDC Parcel, acted pursuant to anyfederal government policy or custom.[7] Furthermore, every other claim in this lawsuit against every otherDefendant is derivative from the official-capacity claim against President Trump. Therefore, if the official-capacity claim against President Trump, based on the Domestic Emoluments Clause, fails, then the coordinate claims against the State Defendants and the Private-Party Defendants must also fail.

We expect that Plaintiffs' attorneys in the instant litigation will argue that as the Domestic Emoluments Clause applies to the President, his obedience to it is an official duty, requiring that his official acts comply with the clause, and his disobedience to the clause should be resisted by official-capacity claims. This position conflicts with the Supreme Court's decision in *Hafer v. Melo*. *Hafer* established that the relevant test is not whether the Constitution imposes some duty on the officeholder. Rather, the Supreme Court has stated that a government officer violates the

---

[5] We do not suggest that Plaintiffs engaged in deceit, only that they have failed to fully engage and to understand their own sources.

[6] If Plaintiffs' position is that the MDC Parcel will be conveyed to Trump, individually, after his term ends, then there is no cognizable claim under the Domestic Emoluments Clause. If Plaintiffs' position is that the MDC Parcel will be conveyed to Trump, individually, during the remainder of his constitutional term, then Plaintiffs' claim against Trump is not yet ripe. Plaintiffs do not even allege that any such transfer is imminent.

[7] It might be argued that the State Defendants acted pursuant to the policy adopted by the Florida Internal Improvement Trust Fund. Whether or not that is correct, Defendant Trump did not act pursuant to that policy. Plaintiffs have only alleged that he controls the Foundation which passively received the MDC Parcel. The only policies or customs at issue here, as to Trump's potential liability under the Domestic Emoluments Clause, are the policies and customs of the federal government or the Executive Branch. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Constitution in his official capacity if—and only if—the defendant-government "entity's 'policy or custom' ... must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

If Plaintiffs sue only Trump, as an *official-capacity defendant*, as they do in this case, then they are suing the Government or the presidency. By contrast, if Plaintiffs were to sue Trump, as an *individual-capacity defendant*, or to sue Trump personally, then they are suing Donald Trump, the natural person. These are different defendants, who, in the normal course of litigation, would have different attorneys, i.e., the Department of Justice for an official-capacity claim against the President; and private attorneys against Trump, the natural person. Where the incorrect party-defendant is served, counsel for the "wrong" defendant would appear. As a result, the intended defendant would lack notice, an opportunity to be heard, and the attorney of his choice. In *Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985), the Supreme Court explained:

> A victory in a [individual]-capacity action is a victory against the individual defendant, rather than against the [government] entity that employs him. Indeed, unless a distinct cause of action is asserted against the entity itself, the entity is not even a party to a [individual]-capacity lawsuit and has no opportunity to present a defense. That a plaintiff has prevailed against one party does not entitle him to fees from another party, let alone from a nonparty.

In short, suing the wrong defendant in the wrong capacity amounts to a denial of all the indicia of fair-play and due process.

Moreover, the capacity issue is closely linked to Article III jurisdiction. To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). As a result, plaintiffs who sue the defendant in the wrong capacity lack standing. For example, if a defendant is sued only in his official capacity, but he committed the tort in his individual capacity, then the injury could not be traced to any official-capacity defendant conduct. Moreover, in this example, the injury could not be redressed by an injunction awarding prospective relief against the official-capacity defendant. Although the official-capacity defendant and the individual-capacity defendant are nominally the same flesh-and-blood person, they are juridically distinct for purposes of Article III. Conversely, if a defendant is sued only in his individual capacity, but he committed the tort in his official capacity, the injury could not be traced to any individual-capacity conduct,

and the injury could not be redressed by awarding retrospective damages against the individual-capacity defendant. Retrospective damages do not obviate the continuing harm of an illegal and ongoing government policy or custom —only an injunction can obviate that harm. Again, the official-capacity defendant is distinct from the individual-capacity defendant for purposes of Article III. In this regard, "standing and [capacity] are joined at the hip." *See Collins v. Yellen*, 594 U.S. 220, 277 n.1 (2021) (Gorsuch, J., concurring) (quoting *Collins v. Mnuchin*, 938 F.3d 553, 609 (5th Cir. 2019) (Oldham, J., concurring in part and dissenting in part)).

## II. Because the MDC Parcel Is and Remains the Property of the Donald J. Trump Presidential Library Foundation, Inc., Which Is a Private Entity with Independent Legal Personality, Plaintiffs' Claim Against President Trump Must Be Dismissed.

Corporations, including private charitable non-profit entities organized as corporations, have "separate and independent legal personality" —that is, separate and independent from the fiduciaries composing its governing board, and separate and independent from the corporation's stockholders (where the entity has stockholders). *Feitshans v. Kahn*, Civ. A. No. 06-cv-2125-SAS, 2006 WL 2714706, at *3 (S.D.N.Y. Sept. 21, 2006). Corporations may sue and be sued. 9 Fletcher Cyc. Corp. § 4246 (2025). As a general rule, when a corporation is sued, it is the assets of the corporation, and not its stockholders and governing fiduciaries, which are at risk. *Id.* § 4328. Thus, limited liability is a consequence of the entity's separate and independent legal personality. In certain circumstances, members of a commercial or other entity's governing board can be sued for their individual violations of fiduciary duty in regard to *particular* transactions. *Emerald Partners v. Berlin*, 787 A.2d 85, 93 (Del. 2001) (explaining "that injury or damages becomes a proper focus only *after* a transaction is determined *not* to be entirely fair"); *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch 515, 538 (explaining transactional basis of liability for breach of fiduciary duty). Third parties who knowingly assist wrongdoing by such fiduciaries are derivatively liable and subject to joint and several liability with the fiduciaries. *Royal Brunei Airlines Sdn Bhd v Tan Kok Ming* [1995] 2 AC 378 (P.C.). Such third parties are sometimes characterized as alter-egos for the corporation under the theory that they have wrongfully dominated directors or members of the corporation's governing board.

The Plaintiffs have alleged that Trump dominates or "exercises control" over the Foundation's trustees. Compl. ¶¶ 16 & 124. Each such allegation comes without well-pled support;

each such allegation is pled merely by "information and belief." The problem with Plaintiffs' Trump-Dominates-the-Trustees theory is that alter-ego liability and third-party domination claims are examined transactionally. There is no recognized tort or fiduciary violation against a third party based on merely alleging that a third party dominates an entity's board; rather, any such claim is examined vis-à-vis individualized transactions and harm, injury, or damages to that entity. *See Feitshans v. Kahn*, Civ. A. No. 06-cv-2125-SAS, 2006 WL 2714706, at *3 (S.D.N.Y. Sept. 21, 2006); 9 Fletcher Cyc. Corp. § 4246 (2025); *id.* § 4328. Here the Foundation's board accepted the transfer of the MDC Parcel to the Foundation. Even assuming that Trump dominated the board into accepting that property—the board's having done so (even if dominated by Trump) caused no harm to the corporation. Obviously, the decision of the Foundation's board to accept the transfer enriched (as opposed to harmed) the Foundation.

If the Foundation's trustees had (re)transferred or conveyed the MDC Parcel to Trump, then that specific transaction might be fairly characterized as a harm to the Foundation. In those circumstances, one could examine if the board's members were dominated and if that individualized transaction was fair to the Foundation. But no such transaction has occurred, and the Complaint, at best, only hints at some such transaction at some unknown time in the future. Compl. § Prayer for Relief (a)(2) (seeking to preclude Trump from "receiving gifts through a corporate entity or immediate family members").

If Plaintiffs' position is that Trump is, in effect, the owner of the MDC Parcel *now* because he (allegedly) controls the Foundation's board, then one only need note that the Domestic Emoluments Clause speaks to "receiv[ing]" proscribed "emoluments," not to controlling "emoluments" received or owned by others. Because the MDC Parcel was "receiv[ed]" by the Foundation (and not by Trump), and because, as a matter of state law, the Foundation is (apparently) the record owner of the parcel (and not Trump), and because the Foundation has a independent and separate legal personality (that is, separate from Trump), Plaintiffs' claim against President Trump must fail. Furthermore, every other claim in this lawsuit against every other Defendant is derivative from the claim against President Trump. Therefore, if the Plaintiffs' claim based on the Domestic Emoluments Clause against President Trump fails, then the coordinate claims against the State Defendants and the Private-Party Defendants must also fail.

### III. Plaintiffs' Claim Against President Trump Fails Because They Are Seeking to Enforce Constitutional Provisions Offensively Absent Any Federal Statutory Authorization.

The Domestic Emoluments Clause is enforceable by Congress through impeachment proceedings against Presidents who fail to comply. This structural constitutional provision is not a judicially cognizable cause of action, see, e.g., Fed. R. Civ. P. 8(a)(2); *Young v. Barquin*, Case No. 24-cv-24260-RAR, 2024 WL 4652094, at *1 (S.D. Fla. Oct. 31, 2024) (Ruiz, J.) (citing Rule 8 in the context of discussing the requirements for a sufficiently pled theory of liability and cause of action).

In our American constitutional tradition, constitutional provisions may be asserted in two fashions: first, as a *shield*—or *a defense*—and second, as a *sword*—or *a theory of liability* or *cause of action*. The former is customarily asserted as a defense in a civil or criminal action brought by the government (or, in certain limited circumstances, by others); the latter is asserted offensively by an applicant. For example, when the government sues or prosecutes a person, the defendant can argue that the Constitution provides an affirmative defense or otherwise prohibits the government's action. In other words, the Constitution is raised *defensively*. In this first sense, the Constitution is self-executing—it does not require any further legislation or action by Congress. In the second sense, the Constitution is used *offensively*—as *a theory of liability* or *a cause of action*. For example, a person goes to court and sues the government, or its officers, for damages in relation to a breach of contract or in response to a constitutional tort committed by government actors. As a general matter, to sue the federal government or its officers, a private individual litigant must invoke a federal statutory cause of action. It is not enough for Plaintiffs merely to allege some unconstitutional state action in the abstract. *See, e.g.*, *Anderson v. Griswold*, 543 P.3d 283, 346, 351 & n.7, 356 (Colo. 2023) (Samour, J., dissenting). *Compare Case of Jefferson Davis*, 7 F. Cas. 63 (C.C.D. Va. 1868) (No. 3621a) (Chase, C.J.) (allowing defendant to assert Amendment XIV, Section 3 as a defense), *with Griffin's Case*, 11 F. Cas. 7 (C.C.D. Va. 1869) (No. 5815) (Chase, C.J.) (precluding defendant from asserting Section 3 offensively). In this second sense, the Constitution is not self-executing. The key issue is whether the private-party plaintiffs are acting as plaintiffs or defendants.

In *DeVillier v. Texas*, the Supreme Court explained:

> Constitutional rights do not typically come with a built in cause of action to allow for private enforcement in courts. See *Egbert v. Boule*, 596 U. S. 482, 490–491

> (2022). Instead, constitutional rights are generally invoked **defensively** in cases arising under other sources of law, or asserted **offensively** pursuant to an independent cause of action designed for that purpose, see, *e.g.*, 42 U. S. C. §1983.

*DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (Thomas, J., for a unanimous Court) (bold added).

In the instant litigation, the Plaintiffs are private parties, and they are not being sued or prosecuted by the government. Instead, these Plaintiffs are asserting constitutional claims *offensively* against private and public Defendants. This Plaintiffs cannot do absent federal legislation authorizing such a suit. Again, the key issue is whether the private-party Plaintiffs are acting as plaintiffs or defendants. To be clear, *DeVillier* Doctrine makes no distinction based on whether the form of relief sought by plaintiffs is positive or negative relief—including positive or negative injunctive relief or declaratory relief. However, where a plaintiff seeks positive relief in asserting a constitutional right offensively, the form of relief sought further accentuates all the policy concerns animating *DeVillier* Doctrine. In the instant litigation, notwithstanding artful pleading, the Plaintiffs are seeking positive relief. They are seeking a judicial order conveying or ordering others to convey the property now held by the Foundation back to the Florida Internal Improvement Trust Fund. This will require any number of private and public actors to take positive action to effectuate that transfer.

The *DeVillier* Doctrine flows from the most basic understanding of separation of powers. The Executive Branch enforces the law, but it does not create the law it enforces —that is left to Congress. The federal courts adjudicate cases or controversies, but the content of that law is, likewise, left to Congress. This is especially true here, as the courts have no guidance as to the standard of review. In the instant litigation, the standard of review is a particularly important and difficult question because all such cases connected to the Domestic Emoluments Clause will impinge on the President's time, *Clinton v. Jones*, 520 U.S. 681, 697–698 (1997), and where, as here, the President is sued in an official capacity, all such cases will impinge on the resources of the U.S. Department of Justice, which represents the President (in his official capacity).

Undoubtedly, there are exceptions to *DeVillier* Doctrine. One exception is *Ex parte Young*, in which the Supreme Court held that the federal courts could issue injunctive relief to prevent state officers from prospectively violating the Due Process Clause of the Fourteenth Amendment. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). Suits under *Ex parte Young* preempt a future, feared civil suit or prosecution brought by the government. As Judge Sutton explained:

> Private parties who act in compliance with federal law may use *Ex parte Young* as a **shield** against the enforcement of contrary (and thus preempted) state laws. . . . But matters differ when litigants wield *Ex parte Young* as a cause-of action-creating **sword**. In that setting … [w]hat is required is that Congress create [] a cause of action for injunctive relief in the statute or otherwise made § 1983 available.

*Mich. Corr. Org. v. Mich. Dep't. of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (bold added).

To put it another way, in an *Ex parte Young* action, the plaintiff is seeking an early adjudication of his *defenses*, including constitutional defenses. Substantively, *Young* and *DeVillier* are, in fact, closely aligned. We do not doubt that there are other established and potential exceptions to *DeVillier* Doctrine. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), is one exception; Takings Clause cases, *see, e.g.*, *Knick v. Twp. of Scott*, 588 U.S. 180, 192 (2019), and inverse condemnation proceedings, may be another. Contracts Clause cases, which also turn on government abridgment of a form of private property, may yet be another.[8] We suspect other exceptions may exist where concrete private property rights are in dispute under Article III's equity prong,[9] as opposed to Article III's law prong. There may be other exceptions too. But they are all, individually and collectively, exceptions —often of recent judicial creation. Still none of these exceptions would seem to apply to the instant litigation. It is *DeVillier* which restated and clarified the general and long-standing litigation-related rule which applies here.

Application of *DeVillier* shows that Plaintiffs' claim against President Trump must fail. Furthermore, every other claim in this lawsuit against every other Defendant is derivative from the claim against President Trump. Therefore, if the Plaintiffs' claim based on the Domestic

---

[8] Our view is that in the nineteenth century, many (if not most) such Contracts Clause cases were brought in federal court under diversity jurisdiction with a state cause of action. Many such contracts disputes did not arise under the Constitution's Contracts Clause or the latter only operated as a defense. If a federal common law of contracts was the rule of decision, then such cases were the product of *Swift v. Tyson*, 41 U.S. 1 (1842).

[9] *Trump v. Cook*, No. 25A312, 2026 WL1855613, 146 S. Ct. 2234 (June 29, 2025) is not contrary authority. In *Cook*, plaintiffs asserted a statutory cause of action, slip op. at *7& *10, and the Supreme Court explained that plaintiffs' claim had an equitable basis, as the plaintiffs were asserting *personal* property rights incident to holding office, slip op. at *15. The instant litigation is distinguishable—here, Plaintiffs are not asserting that any property right they hold was invaded by government action; rather, they are seeking to vindicate a structural provision of the Constitution. Here, the Plaintiffs' claim amounts to little more than an attempt to seek a special judicially crafted indulgence to act as private attorneys-general.

Emoluments Clause against President Trump fails, then the coordinate claims against the State Defendants and the Private-Party Defendants must also fail.

## IV. Plaintiffs' Claim Against President Trump Fails Because the MDC Parcel Is Not a Constitutionally Proscribed Emolument.

The MDC Parcel is not a constitutionally proscribed emolument. This view is supported by the text of the Constitution, Supreme Court precedent, the practices of President George Washington and his appointees, and arguments arising from constitutional structure.

The Constitution's Text. *First*, consider how the Foreign Emoluments Clause and Domestic Emoluments Clause use distinct language. The Foreign Emoluments Clause provides: "[N]o Person holding any Office of Profit or Trust under the [] [United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. By contrast, the Domestic Emoluments Clause provides: "[The President] shall not receive within th[e] Period [for which he was elected] any other Emoluments from the United States, or any of the[] [States]." U.S. Const. art. II, § 1, cl. 7. Plaintiffs have argued that "emoluments" in the Constitution should be understood broadly as encompassing any "profit," "benefit," or "advantage," and extends to "gifts" and "payments." Compl. ¶¶ 40–42. Plaintiffs' interpretation of "emoluments" would render "present," "Office," and "Title" in the Foreign Emoluments Clause as surplusage, and there is a long-standing canon against interpreting the words of the Constitution as surplusage. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) (Marshall, C.J.). That is a good reason to reject Plaintiffs' broad or expansive meaning for "emoluments" as used in the original Constitution of 1788.

Supreme Court Precedent. *Second*, the Supreme Court has had occasion to interpret the meaning of "emoluments"—albeit in a statutory context. In *Hoyt v. United States*, the Supreme Court explained:

> These terms ["fees" and "commissions"] denote a compensation for a particular kind of service to be performed by the officer, and are distinguishable from each other . . . they are also distinguishable from the term emoluments, that [term] being more comprehensive, and embracing every species of compensation or pecuniary profit derived from a discharge of the duties of the office.

*Hoyt v. United States*, 51 U.S. (10 How.) 109, 135 (1850) (Nelson, J., for a unanimous Court).

Indeed, the *Hoyt* Court's restricted definition of "emoluments" has been cited approvingly by the Executive Branch, e.g., Memorandum from Samuel A. Alito, Jr., Dep'y Asst. Att'y Gen., Off. of Legal Couns., for H. Gerald Staub, Off. of the Chief Couns., Nat'l Aeronautics & Space Admin., Re: Emoluments Clause Questions Raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales, 1986 WL 1239553, at *1 n.4 (1986), and the Legislative Branch,[10] e.g., Memorandum from Milton J. Socolar, on behalf of the Comptroller Gen. of the U.S., to Sen. George J. Mitchell, B 207467, 1983 WL 27823, at *2 (1983), and the *Hoyt* Court's definition is consistent with authorities from around the English-speaking world. *See, e.g.*, Frederico Moreno, Philippine Law Dictionary 311 (2007) (defining "emolument" as "[f]ees, fixed salary, and compensation which the incumbent of an office is by law entitled to receive because he holds such office"); Richard Krever, Taming Complexity in Australian Income Tax, 25 Sydney L. Rev. 467, 474 (2003) ( "[A]n English court [may] f[ind] that a particular type of *payment* was not an emolument from office as required by UK income tax law . . . ." (emphasis added)); *cf., e.g*., Income and Corporation Taxes Act, 1988, pt. V, ch. IV, c. 1 , § 192(1) (U.K.), https://perma.cc/J7C8 6FMR (defining "foreign emoluments" as extending to emoluments associated with foreign "offices" and "employments"). The MDC Parcel is plainly a gif t or present—as the transfer was not based on consideration. It follows that t he *Hoyt* Court's interpretation of "emolument" is a strong reason to reject the Plaintiffs' position.

<u>Practices of George Washington and His Appointees</u>. *Third*, Plaintiffs' position—that "emoluments" extends to any "benefit" or "profit" or "advantage" or "payment" —squarely conflicts with the precedent set by George Washington: he personally bought land in a public federal auction in the nation's new capital while he was President.

Among other achievements, President George Washington presided over the Philadelphia Convention. During his presidency, he did business with the Federal Government on more than one occasion. He purchased several lots of land in the new federal capital at public auction. One such set of purchases took place on or about September 18, 1793. Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem* , 40 Harv. J.L. & Pub. Pol'y 759 , 761–62 (2017) (collecting sources).

[10] The Supreme Court has identified the Comptroller General with the Legislative Branch. *See Bowsher v. Synar*, 478 U.S. 714, 727–34 (1986).

The public auction was run by three federal commissioners: David Stuart, Daniel Carroll, and Thomas Johnson—each appointed by Washington. Who were they? Among other achievements, David Stuart was a member of the Virginia convention that ratified the Federal Constitution, and Stuart was also a federal elector in the first federal election for President and Vice President of the United States.

Among other achievements, Daniel Carroll was a member of the Federal Convention that drafted the Constitution, and later, he was a member of the First Congress.

Among other achievements, Thomas Johnson was the first Governor of Maryland following independence, a member of the Maryland convention that ratified the Federal Constitution, and afterwards, he served as a Justice of the Supreme Court of the United States. *Id.*

Among the four participants (Washington and the three commissioners) were: three members of the Continental Congress; three members of pre independence colonial legislatures or post independence state legislatures; two members of state conventions that ratified the Constitution; two members of the Federal Convention (including the Convention's president); a member of the First Congress; a Justice of the Supreme Court of the United States; a governor; a federal elector for President and Vice President; and, our first President. Collectively these four are, undoubtedly, an accomplished group. *Id.*

These land purchases plainly benefited Washington—that is why he purchased the land. Are we really to believe that not only did all three appointed officers willingly, openly, and notoriously participate in a conspiracy to aid and abet the President in violating the Constitution's Domestic Emoluments Clause, but that they also left—for themselves and their posterity—a complete and signed documentary trail of their wrongdoing? And if all this was a plain violation of the Domestic Emoluments Clause, as it must be if Plaintiffs' position is correct, why was there no outcry against Washington by contemporaneous anti-administration members of Congress and other state and federal officials, in the press, in private correspondence, or by subsequent academics, in law, history, and other fields? The reason is simple. Plaintiffs' all-too-expansive meaning for "emoluments" is plainly ahistorical. Or, to put it another way: It is because the Plaintiffs are wrong and President Washington was correct.

<u>Constitutional Structure</u>. *Finally*, Plaintiffs' position is that "emoluments," as used in the Domestic Emoluments Clause, extends to any "benefit," "advantage," or "profit" If so, Presidents would be barred, in effect, from holding bonds issued from the federal or any state government—

even if purchased on the same terms and conditions as any other buyer, and even if purchased prior to the start of the President's term. As an intuitive matter, that is an absurd result.

Here, we make an argument, not based on intuition, but based on constitutional structure. *See generally* Charles L. Black, Jr., Structure and Relationship in Constitutional Law (1969). Plaintiffs' position is that a State (such as Florida) by conveying property to the President has granted an "emolument." That's entirely wrong. The only body which can grant an emolument to a position is the institution which created the position or the institution which is charged with fixing the position's compensation. As for the Presidency—the only body which can fix its compensation (or grant "emoluments") is Congress.

Consider the untoward consequences of Plaintiffs' contrary position. The Constitution's Ineligibility Clause also speaks to "emoluments." That clause states: "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the *Emoluments* whereof shall have been increased during such time." U.S. Const. art. I, § 6, cl. 2 (emphasis added). Now let's say there was a Democratic President and a Democratic Congress, and the President sought to appoint a sitting senator to a cabinet post, whose federal compensation had not been increased for more than six years. Under Plaintiffs' position, where an "emolument" is any benefit, then any single Republican state legislature could grant that cabinet position further "compensation" or further "emoluments," say $10 annually, and voilà, the Ineligibility Clause would bar the senator's appointment to a federal position. Not only would the senator be barred, under Plaintiffs' position, but the federal Congress could not roll back the state legislature's salary increase—so, no Saxbe Fix[11] would be possible either. What this shows is that although a State can give a gift or "present" to a federal official, that is, a benefit absent consideration, a State cannot increase the federal official's compensation or "emoluments" attached to any particular federal position, including the presidency. It follows that Florida's conveying the MDC Parcel

[11] Where the compensation or emoluments of a federal statutory position is increased during a senator's term, the President may still seek to appoint a senator who is not otherwise eligible to hold that position under the Ineligibility Clause. In such circumstances, as once applied to Senator Saxbe, Congress may choose to roll back the compensation of the federal statutory position to what it had been prior to its emoluments having been increased. This is the so-called "Saxbe Fix." At that point, the practice has been to permit the President to make the appointment. Still the practice is a contested one. *See generally* John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89, 122–56 (1995).

amounts to granting a gift or present, but not an "emolument." This structural consideration is some reason to reject Plaintiffs' position as to the scope of the Domestic Emoluments Clause's "emoluments"-language.

The better way to think about the Domestic Emoluments Clause is that it works a limited restriction on state-federal dual office-holding. The U.S. Constitution does not expressly bar federal officials from concurrently holding state positions. The Domestic Emoluments Clause does not bar the President from holding any state position; rather, it bars a President who also concurrently holds a state position from receiving the emoluments of the *state* position. In other words, the President must receive his regular compensation exclusively as determined by Congress. For example, in the event that the federal electors elect a sitting governor to be President, it may happen that the governor's State might be in disarray (e.g., an insurrection). The Domestic Emoluments Clause would allow the governor to hold both positions concurrently, leaving to his discretion to withdraw from the state position only once the emergency in his home State has ended, and without forcing him to delay his becoming President. Fortunately, such disarray, at the state level has been rare, and has not impinged on presidents or presidents-elect. Thus, we have few sources focusing on the original public meaning of this constitutional provision. Between 2017 and 2021, several inferior courts discussed the meaning(s) of "emoluments" in connection with lawsuits allegedly arising under the Foreign and Domestic Emoluments Clauses. All those decisions were reversed or otherwise vacated by the U.S. Supreme Court under *Munsingwear* Doctrine. None of those cases were from the Southern District of Florida or the Eleventh Circuit.

Because the MDC Parcel cannot be characterized as a constitutionally proscribed "emolument," Plaintiffs' claim against President Trump based on the Domestic Emoluments Clause and its "emoluments"-language must fail. And because the Plaintiffs' claim against President Trump fails, then the coordinate claims against the State Defendants and the Private-Party Defendants must also fail.

## CONCLUSION

For all the reasons discussed above, Plaintiffs' claims based on the Domestic Emoluments Clause against President Trump must be dismissed, as well as all the derivative claims against all the other Defendants.

Respectfully submitted,

/s/Michael A. Sasso
Michael A. Sasso (Florida Bar No.: 93814)
masasso@sasso-law.com
Sasso & Sasso, P.A.
630 South Maitland Avenue
Maitland, FL 32751
(407) 644-7161
*Counsel of Record*

Robert W. Ray*
*Counsel for Amicus Curiae Professor Seth Barrett Tillman*
55 McDermott Way
Englewood Cliffs, NJ 07632
(732) 687-1380
rayrobwil@verizon.net

Michael J. O'Neill*
*Counsel for Amicus Curiae Landmark Legal Foundation*
19415 Deerfield Ave.
Suite 312
Leesburg, VA 20176
(703) 554-6100
mike@landmarklegal.org

**pro hac vice motion forthcoming*

August 13, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of August 2026, I caused a true and correct copy of the foregoing to be served via ECF on all parties and counsel of record in this matter.

____