**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-cv-23365-RUIZ/LOUIS**

SISTRUNK SEEDS INC. d/b/a
DUNN'S OVERTOWN FARM, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.
_______________________________________/

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 6

I. Plaintiffs Have Standing. ..... 6

A. Each Plaintiff Has Alleged an Injury-in-Fact. ..... 7

1. Kristen Browde and Gregory van den Dries ..... 7

2. Dunn's Farm ..... 11

3. Carmen Salcedo ..... 15

B. Plaintiffs' Injuries Are Fairly Traceable to Defendants' Conduct. ..... 17

1. Plaintiffs' Injuries All Stem from the Transfer of the MDC Parcel to the Trump Defendants Through a Predictable and Closely Connected Chain of Events. ..... 17

2. Plaintiffs Are Not Required to Allege that Their Injuries Are Traceable to the President's Performance of His Official Job Duties. ..... 20

C. Injunctive and Declaratory Relief Will Redress Plaintiffs' Injuries and Prevent Further Injuries from Defendants' Ongoing Violation of the Domestic Emoluments Clause. ..... 23

II. Plaintiffs Have Stated a Claim for Violation of the Domestic Emoluments Clause. ..... 24

A. Transfer of the MDC Parcel from the State Defendants to the Trump Defendants for Construction of a High-Rise Hotel Constitutes an "Emolument" Prohibited by the Clause. ..... 25

1. The Founding-Era Meaning of "Emolument" ..... 25

2. Constitutional Text and Structure ..... 29

3. Constitutional History ..... 31

B. Defendants Cannot Escape the Strictures of the Clause by Transferring the MDC Parcel to the Trump Library Foundation Rather than Putting It in the Name of the President. ..... 35

C. The MDC Board and Its Trustees Are Properly Joined as Defendants. ..... 37

**TABLE OF CONTENTS – cont'd**


III. Defendants' Other Efforts to Evade Judicial Review Are Meritless.................... 38

A. Because Plaintiffs Assert an Equitable Constitutional Claim, No Statutory Cause of Action Is Required, and No Zone-of-Interests Test Applies. ........ 38

B. The State Defendants Are Not Entitled to Eleventh Amendment Immunity Because the *Ex parte Young* Doctrine Applies. .......................... 40

C. This Is Not a Political Question. ................................................................ 43

D. Because Plaintiffs Do Not Seek to Enjoin the President from Performing His Official Duties, *Mississippi v. Johnson* Does Not Bar Relief............... 44

CONCLUSION ............................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ........ 11

*Aaron Priv. Clinic Mgmt. LLC v. Berry*,
912 F.3d 1330 (11th Cir. 2019) ........ 14

*ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........ 10

*Aerojet-Gen. Corp. v. Askew*,
453 F.2d 819 (5th Cir. 1971) ........ 40

*Aktepe v. United States*,
105 F.3d 1400 (11th Cir. 1997) ........ 43

*Ameritech Corp. v. McCann*,
297 F.3d 582 (7th Cir. 2002) ........ 20

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........ 38, 39

*Attwood v. Clemons*,
818 F. App'x 863 (11th Cir. 2020) ........ 43

*Baker v. Carr*,
369 U.S. 186 (1962) ........ 43

*Barahona v. LaSalle Mgmt. Co.*,
2024 WL 6954433 (M.D. Ga. Sep. 30, 2024) ........ 41

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) ........ 15

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ........ 8

*Blumenthal v. Trump*,
373 F. Supp. 3d 191 (D.D.C. 2019) ........ 22

*Blumenthal v. Trump*,
949 F.3d 14 (D.C. Cir. 2020) ........ 22

*Bond v. United States*,
564 U.S. 211 (2011) ........ 39

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) .......... 13

*Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*,
2008 WL 1848389 (S.D. Fla. Apr. 22, 2008) .......... 9

*Busby v. City of Orlando*,
931 F.2d 764 (11th Cir. 1991).......... 38

*California v. Texas*,
593 U.S. 659 (2021) .......... 18

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 13

*Charles River Bridge v. Warren Bridge*,
36 U.S. (11 Pet.) 420 (1837).......... 30

*Citizens for Resp. & Ethics in Wash. v. Trump*,
939 F.3d 131 (2d Cir. 2019).......... 43

*City of South Miami v. Governor*,
65 F.4th 631 (11th Cir. 2023) .......... 12

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019).......... 17

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) .......... 39

*Cotto v. Campbell*,
126 F.4th 761 (1st Cir. 2025).......... 41

*Cross v. Ala., State Dep't of Mental Health & Mental Retardation*,
49 F.3d 1490 (11th Cir. 1995).......... 38

*Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*,
100 F.4th 1349 (11th Cir. 2024) .......... 4, 8

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 18

*Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*,
604 U.S. 321 (2025) .......... 37

*District of Columbia v. Trump*,
291 F. Supp. 3d 725 (D. Md. 2018).......... 43

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*District of Columbia v. Trump*,
315 F. Supp. 3d 875 (D. Md. 2018) .......... 21, 29, 34

*District of Columbia v. Trump*,
838 F. App'x 789 (4th Cir. 2021) .......... 22

*Edelman v. Jordan*,
415 U.S. 651 (1974) .......... 20

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 8, 18, 19, 23

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) .......... 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 39

*Gagliardi v. City of Boca Raton*,
2017 WL 5239570 (S.D. Fla. Mar. 28, 2017) .......... 9

*Gardner v. Mutz*,
962 F.3d 132 (11th Cir. 2020) .......... 9

*Gratz v. Bollinger*,
539 U.S. 244 (2003) .......... 13

*Griffin v. United States*,
935 F. Supp. 1 (D.D.C. 1995) .......... 21, 32

*Hafer v. Melo*,
502 U.S. 21 (1991) .......... 20

*Hawaii v. Trump*,
871 F.3d 646 (9th Cir. 2017) .......... 13

*Himely v. Rose*,
9 U.S. (5 Cranch) 313 (1809) .......... 26

*Hollywood Mobile Ests. Ltd. v. Cypress*,
415 F. App'x 207 (11th Cir. 2011) .......... 42

*Hollywood Mobile Ests. Ltd. v. Cypress*,
2009 WL 10670031 (S.D. Fla. Dec. 6, 2009) .......... 42

*Houston v. Marod Supermarkets, Inc.*,
733 F.3d 1323 (11th Cir. 2013) .......... 10

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Hoyt v. United States*,
51 U.S. (10 How.) 109 (1850) .......... 30

*In re Trump*,
958 F.3d 274 (4th Cir. 2020) .......... 34

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .......... 15

*Johnson v. Mayor*,
178 F.4th 1240 (11th Cir. 2026) .......... 8, 9

*Lavina v. Fla. Prepaid Coll. Bd.*,
174 F.4th 49 (11th Cir. 2026) .......... 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 40

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 6, 8, 11

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 6

*Maron v. Chief Fin. Officer of Fla.*,
136 F.4th 1322 (11th Cir. 2025) .......... 18

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*,
501 F.3d 1244 (11th Cir. 2007) .......... 6

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .......... 5, 44

*Mobile Baykeeper, Inc. v. Ala. Power Co.*,
175 F.4th 1316 (11th Cir. 2026) .......... 8

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312 (11th Cir. 2019) .......... 11

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) .......... 13, 14

*Otto Candies, LLC v. Citigroup Inc.*,
137 F.4th 1158 (11th Cir. 2025) .......... 11

*Papasan v. Allain*,
478 U.S. 265 (1986) .......... 40

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**


*Pennsylvania v. West Virginia*,
262 U.S. 553 (1923) .......... 10

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) .......... 29

*Sierra Club v. Morton*,
405 U.S. 727 (1972) .......... 8

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 7, 9, 16

*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*,
524 F.3d 1229 (11th Cir. 2008) .......... 6

*State Emps. Bargaining Agent Coal. v. Rowland*,
494 F.3d 71 (2d Cir. 2007) .......... 42

*Summit Med. Assocs., P.C. v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) .......... 41

*T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Supervisors*,
748 F.3d 185 (4th Cir. 2014) .......... 13

*Town of East Hartford v. Hartford Bridge Co.*,
51 U.S. (10 How.) 511 (1850) .......... 30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6, 12

*Trump v. Cook*,
146 S. Ct. 2234 (2026) .......... 38, 44

*Trump v. District of Columbia*,
592 U.S. 1233 (2021) .......... 22

*Ulaleo v. Paty*,
902 F.2d 1395 (9th Cir. 1990) .......... 41

*United States v. Hill*,
123 U.S. 681 (1887) .......... 30

*United States v. Stanley*,
483 U.S. 669 (1987) .......... 39

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) .......... 42

**TABLE OF AUTHORITIES – cont'd**


**Page(s)**

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .................... 12, 13, 15

*Walters v. Fast AC, LLC*,
60 F.4th 642 (11th Cir. 2023) .................... 5, 17, 19

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019) .................... 5, 19

*Yeldell v. Cooper Green Hosp., Inc.*,
956 F.2d 1056 (11th Cir. 1992) .................... 20

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) .................... 43

STATUTES AND CONSTITUTIONAL PROVISIONS

§ 617.1430(1)(a), Fla. Stat. .................... 36

Pa. Const. of 1776, Decl. of Rights art. V .................... 25

U.S. Const. art. II, § 1, cl. 7 .................... 1, 3, 21, 24, 29, 31

U.S. Const. art. II, § 4 .................... 3

BOOKS, ARTICLES, AND OTHER AUTHORITIES

*Applicability of Emoluments Clause to Proposed Serv. of Gov't Emp. on Comm'n of Int'l Historians*,
11 Op. O.L.C. 89 (1987) .................... 21

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) .................... 27

Clark D. Cunningham & Jesse Egbert, *Using Empirical Data to Investigate the Original Meaning of "Emolument" in the Constitution*,
36 Ga. St. L. Rev. 465 (2020) .................... 26, 28

2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) .................... 1, 31

1 *A Dictionary of the English Language* (1755) .................... 25

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Donald Trump's Troubled Charity Foundation to Shut Down*, BBC (Dec. 18, 2018), https://perma.cc/6YPP-ALJR .......... 36

*The Federalist No. 68* (Clinton Rossiter ed., 1961) .......... 25

*The Federalist No. 73* (Clinton Rossiter ed., 1961) .......... 2, 24, 31, 34, 37

Hon. George J. Mitchell, B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) .......... 32

Letter from James Madison to Thomas Jefferson (Aug. 12, 1786), *reprinted by Nat'l Archives: Founders Online*, https://perma.cc/L2NZ-RC55 .......... 26

John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://perma.cc/53Y9-RP5K .......... 27

John Mikhail, *Emoluments and President Trump*, 53 Val. U. L. Rev. 631 (2019) .......... 26

John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806* (July 12, 2017), https://perma.cc/79C4-V2TS .......... 25, 27, 28

5 *Oxford English Dictionary* (2d ed. 1989) .......... 25

James Cleith Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 S. Tex. L. Rev. 181 (2018) .......... 28

*President Reagan's Ability to Receive Ret. Benefits from the State of Cal.*, 5 Op. O.L.C. 187 (1981) .......... 2, 24, 32, 34

1 *The Records of the Federal Convention* (Max Farrand ed., 1911) .......... 34, 35

2 *The Records of the Federal Convention* (Max Farrand ed., 1911) .......... 32

Jonathan Swift, *The Tale of a Tub and Other Works* (Henry Morley ed., 1889) (1704) .......... 25

Zephyr Teachout, *Corruption in America* (2014) .......... 33

Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341 (2009) .......... 25

U.S. Continental Congress, A Declaration by the Representatives of the United Colonies of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and Necessity of Their Taking Up Arms (July 6, 1775) .......... 26

Virginia Nonimportation Resolutions (June 22, 1770), *reprinted by Nat'l Archives: Founders Online*, https://perma.cc/66DV-4XUY .......... 26

Plaintiffs Sistrunk Seeds Inc. d/b/a Dunn's Overtown Farm ("Dunn's Farm"), Carmen Salcedo, Kristen Browde, and Gregory van den Dries (collectively, "Plaintiffs") file this consolidated response in opposition to the Motion to Dismiss filed by Defendant Donald J. Trump, Dkt. No. 37, and the Motion to Dismiss filed by the State Defendants[1] and The Donald J. Trump Presidential Library Foundation, Inc. ("Trump Library Foundation"), Dkt. No. 38.

## INTRODUCTION

The Framers wrote the Domestic Emoluments Clause to ensure that the President "may be justly styled *the man of the people*," "not particularly interested for any one of them," but "watch[ing] over the whole with paternal care and affection." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 448 (Jonathan Elliot ed., 1836) [hereinafter *Elliot's Debates*] (James Wilson). A critical safeguard against corruption, the Clause provides that the President shall "receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period *any other Emolument from the United States, or any of them*." U.S. Const. art. II, § 1, cl. 7 (emphasis added).

Defendants have flouted this prohibition. The State Defendants have given, and President Trump has received, a prime piece of Miami real estate (the "MDC Parcel") that would easily fetch hundreds of millions of dollars on the open market. Worse still, although the State Defendants

[1] As used herein, and throughout this litigation, the term "State Defendants" collectively refers to Defendants Ron DeSantis, James Uthmeier, Blaise Ingoglia, Wilton Simpson, the Florida Board of Trustees of the Internal Improvement Trust Fund ("Florida Board"), Michael Bileca, Roberto Alonso, Marcell Felipe, Ismare Monreal, Juan Segovia, Jose Felix Diaz, David J. Smith, the District Board of Trustees of Miami Dade College ("MDC Board"), and Miami Dade College ("MDC").

claim they gifted the President this land for development into a presidential library, President Trump, in his own words, "do[es] not believe in building libraries or museums." Compl. ¶ 5.

And the State Defendants have known that from the start. Indeed, they went to great lengths to ensure that President Trump would have "maximum flexibility" to monetize the land, *id.* ¶ 62, including by enacting a law that preempts municipal regulation of the Parcel, *id.* ¶¶ 64–65, and by conveying the Parcel "free from any waiver, encumbrance, or restriction except for the requirement that the subject parcel contains *components* of a Presidential library, museum, and/or center within five years of conveyance," *id.* ¶ 4 (emphasis added). It was thus no surprise when, in March 2026, President Trump announced plans to build on the MDC Parcel "a hotel with a beautiful building underneath and a 747 Air Force One in the lobby," *id.* ¶ 5, something Defendants have never disputed in their Motions to Dismiss or anywhere else.

This scenario—in which the President receives from a single state a "pecuniary inducement to renounce or desert the independence intended for him by the Constitution," *The Federalist No. 73*, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961)—is precisely what the Framers wrote the Domestic Emoluments Clause to guard against. Courts, the Department of Justice's Office of Legal Counsel, and previous presidents have all understood the Clause to prohibit "payments which have a *potential* of influencing or corrupting the integrity of the recipient." *President Reagan's Ability to Receive Ret. Benefits from the State of Cal.*, 5 Op. O.L.C. 187, 188 (1981) (emphasis added).

Defendants offer a different view—one that would effectively write the Domestic Emoluments Clause out of the Constitution and that has never been endorsed by any legal authority. They claim that the Clause merely prohibits states from giving benefits to the President "as renumeration [sic] for an act he performed as President." Trump Mot. at 18; *see* State Defs.

Mot. at 21. Thus, according to Defendants, the Domestic Emoluments Clause does nothing more than prohibit bribery, an impeachable offense, U.S. Const. art. II, § 4. Rather than serve as a prophylactic safeguard against the possibility of corruption, Defendants claim the Clause targets only quid pro quo arrangements in which a state gets caught paying off the President with the clear intent of rewarding him for a specific official act. This means that Florida can effectively write a nine-figure check to the President without consequence because Plaintiffs—at least at this stage of the litigation—do not allege that he performed any discrete act for the State in exchange.

The text, structure, and history of the Domestic Emoluments Clause say otherwise. For one thing, the text plainly prohibits the receipt of "any" emolument during a President's term, not just emoluments received "for his Services," U.S. Const. art. II, § 1, cl. 7, much less emoluments received in exchange for a specific, identifiable act. For another thing, the word "emolument" was used at the Founding to mean financial benefits and advantages of all sorts, not just official remuneration. *See* Compl. ¶¶ 40–42. And even if this Court were to adopt Defendants' made-up definition of "emolument" ("the receipt of value for one's services rendered in an official position or in an employment relationship," Trump Mot. at 14), or their tortured reading of the Clause's syntax (in which "for his Services" limits the coverage of "Emolument[s]"), Plaintiffs would still state a claim. After all, the State Defendants gave President Trump something of value because he is rendering "services" in his "official position" as the President of the United States. Their generous gift was not for just anyone—it was carefully crafted to benefit the most powerful man in the country.

Failing on the merits, Defendants trot out a parade of horribles that they claim will result if this action is allowed to proceed. But the nation will not "need more federal judges," State Defs. Mot. at 9, just because this Court concludes that Plaintiffs' allegations—taken as true and viewed

in the light most favorable to them—amount to concrete, personal harms arising from the construction of President Trump's high-rise hotel on the MDC Parcel. Indeed, the Eleventh Circuit has long held that even interested observers—with far less of a personal stake than Plaintiffs have here—can suffer a cognizable injury from the construction of a structure on land they seek to view or use for an alternative purpose. *See, e.g.*, *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355–56 (11th Cir. 2024).

If this Court ultimately puts a stop to Defendants' unlawful behavior, Plaintiffs' harms will be ameliorated. Resident Plaintiffs Kristen Browde and Gregory van den Dries will face no impending risk of obstruction of their views, disruption of their daily lives, and diminution of their property values. Compl. ¶¶ 154–66, 171–83. Plaintiff Dunn's Farm will be able to continue pursuing its efforts to establish an urban farm on the MDC Parcel, and the resources it already expended to that end will no longer be wasted expenditures. *Id.* ¶¶ 188–200. And Plaintiff Carmen Salcedo will be able to study in peace and pursue other opportunities at MDC, as the Complaint details. *Id.* ¶¶ 214–20, 222–26.

Defendants primarily respond by claiming that Plaintiffs may not ultimately suffer these harms if, for some reason, President Trump does not build the towering hotel that he says he is going to build. But especially on a motion to dismiss, this Court should assume that Defendants are going to do exactly what they have said they will do. Notably, every action they have taken up to this point is consistent with that notion. The State Defendants have gone to great lengths, including by enacting a law prohibiting local regulation of the MDC Parcel, to ensure that President Trump will be able to build a hotel or commercial property on the MDC Parcel. *Id.* ¶¶ 59–65. The

Trump Defendants[2] have already hired an architecture firm, *id.* ¶ 114, announced their plans for the site, *id.* ¶¶ 112–13, 116–21, released a video rendering, *id.* ¶¶ 114–15, and started soliciting donations based on that rendering, *id.* ¶ 116. To be sure, it will take significant manpower to execute the President's vision—and Defendants will not be driving the bulldozers themselves—but a "defendant's challenged conduct need not be 'the very last step in the chain of causation' for it to be fairly traceable to the plaintiff's injury." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (quoting *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2019)). And Defendants supply no reason to believe that the third parties involved in building the newest Trump Hotel will act in unpredictable ways and disrupt the President's plans.

Defendants' other threshold arguments fare no better. Because Plaintiffs bring an equitable constitutional claim, they require no statutory cause of action, and the zone-of-interests test does not apply. And under the classic *Ex parte Young* doctrine, Plaintiffs' claims for prospective injunctive relief from unlawful acts by state officials are not subject to Eleventh Amendment immunity. The idea that this case presents a political question is utterly implausible and has been rejected repeatedly in cases brought under the Domestic and Foreign Emoluments Clauses. And because Plaintiffs do not seek to enjoin the President in the performance of his official duties, *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), does not bar the requested relief.

Ultimately, when it comes to their arguments for dismissal, Defendants' quantity-over-quality approach gets them nowhere. And at this stage of the litigation, this Court need not decide the ultimate fate of the MDC Parcel, or even conclusively construe the scope of the Domestic Emoluments Clause. The only question is whether Plaintiffs have pleaded a judicially cognizable

[2] As used herein, and throughout the course of this litigation, the term "Trump Defendants" refers to Defendants Donald J. Trump and the Trump Library Foundation.

claim that Defendants violated the Domestic Emoluments Clause by giving President Trump a multimillion-dollar gift for his personal enrichment. The answer is yes.

## ARGUMENT

### I. Plaintiffs Have Standing.

To establish Article III standing, a plaintiff must show "that he suffered an injury in fact" that "was likely caused by the defendant" and that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" because the court must "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). And where, as here, Defendants launch a "facial attack on the complaint," a court's job is simple: "look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction" when "the allegations in his complaint are taken as true." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)).

Plaintiffs have met that burden. As two residents of Miami who own property overlooking the planned building site, a local nonprofit organization that has for years sought to use the MDC Parcel for an urban farm, and a current student at MDC, each has alleged concrete and particularized injuries that will result from President Trump's receipt of a multimillion-dollar gift of land for development into a high-rise hotel. The requested injunctive and declaratory relief will redress these injuries by putting a stop to Defendants' ongoing violation of the Domestic Emoluments Clause and preventing this violation from recurring.

### A. Each Plaintiff Has Alleged an Injury-in-Fact.

For an injury to be judicially cognizable, it must be (1) "concrete," meaning it is "real, and not abstract," (2) "particularized," meaning it "must affect the plaintiff in a personal and individual way," and (3) imminent, meaning the injury may not be "conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (quotation marks omitted). Each Plaintiff satisfies all three criteria.

#### 1. Kristen Browde and Gregory van den Dries

Kristen Browde and Gregory van den Dries own homes within four blocks of the MDC Parcel, and they both intend to reside in those homes for the foreseeable future. Compl. ¶¶ 151–52, 168–69. Ms. Browde can see the MDC Parcel from nearly every window in her home, and both she and Mr. van den Dries can see the Parcel from their balconies. *Id.* ¶¶ 153, 170. They allege that the State Defendants' gift of the MDC Parcel without any encumbrances will cause them concrete injuries by disrupting their sightlines from their homes, as well as by causing heavy traffic, congestion, and security activity around their dwellings, making it more difficult for them to access their buildings, reducing their property values, and interfering with their enjoyment of their properties. *Id.* ¶¶ 154–66, 171–83. Courts have long deemed these sorts of injuries legally cognizable.

Defendants do not challenge the concreteness of the Resident Plaintiffs' injuries.[3] And for good reason: anyone who has ever gazed out the window of their home could understand the harm that would result if their current view were replaced with a soaring concrete tower. Indeed, the

[3] President Trump's brief uses the word "concrete" once in its discussion of the Resident Plaintiffs, *see* Trump Mot. at 8 ("the Residential Plaintiffs fail to clearly allege concrete and imminent harm"), but it follows up with argument only about the imminence requirement. The State Defendants say nothing about the concreteness of the Resident Plaintiffs' injuries—only that President Trump's "preliminary building plans are not 'concrete.'" State Defs. Mot. at 6.

Eleventh Circuit has made clear that plaintiffs who, unlike Ms. Browde and Mr. van den Dries, do not even *own* property overlooking a challenged development still may suffer a cognizable "aesthetic injury from viewing the [land], which is a concrete interest." *Ctr. for a Sustainable Coast*, 100 F.4th at 1355–56; *see, e.g.*, *Mobile Baykeeper, Inc. v. Ala. Power Co.*, 175 F.4th 1316, 1322 (11th Cir. 2026) ("no surprise" under Eleventh Circuit case law that harm to a person's "'aesthetic or recreational interests'" in the "'area affected by the alleged violations'" constitutes an "'injury-in-fact'" (quoting *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015))).

The Resident Plaintiffs' injuries are particularized because they have "a direct stake in the outcome" of this case. *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972). Ms. Browde and Mr. van den Dries do not come before this Court as individuals who might have some "general legal, moral, ideological, or policy objection" to the MDC Parcel's conveyance for President Trump's hotel project, as Defendants suggest. State Defs. Mot. at 11 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). Rather, the Resident Plaintiffs are property owners who can literally see the MDC Parcel from their homes, Compl. ¶¶ 151–53, 168–70, and whose sightlines and daily lives will be disrupted by the planned skyscraper, *id.* ¶¶ 154–66, 171–83. The impending construction of a massive hotel shadowing their homes will thus "affect [them] in a personal and individual way," and the relief they seek will "more directly and tangibly benefit[] [them] than it does the public at large." *Lujan*, 504 U.S. at 560 n.1, 573–74.

These facts distinguish Ms. Browde and Mr. van den Dries from the plaintiff in *Johnson v. Mayor*, 178 F.4th 1240 (11th Cir. 2026), which the State Defendants cite for the proposition that the Resident Plaintiffs allege "an insufficiently personal, generalized grievance." State Defs. Mot. at 7 (quoting *Johnson*, 178 F.4th at 1248). Johnson was a Florida resident challenging the use of

taxpayer dollars to support *any* public place in the state with a Confederate name. *Johnson*, 178 F.4th at 1244. He alleged "'repulsion' and 'intimidation'" from Confederate symbolism but "pleaded nothing distinguishing him 'from other interested observers,'" and it was not even clear that Johnson would ever encounter all the places with names he sought to change. *See id.* at 1244, 1247–48 (quoting *Gardner v. Mutz*, 962 F.3d 1329, 1343 (11th Cir. 2020)). In contrast, here, the Resident Plaintiffs live literally down the street from the MDC Parcel. They allege ways in which the planned hotel will cause them harm that no mere passerby would suffer.

To be sure, there are likely other property owners near the MDC Parcel who will also suffer injuries similar to those of Ms. Browde and Mr. van den Dries. But the Supreme Court has been clear: "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339 n.7. "The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Id.*[4]

Defendants' efforts to cast doubt on the imminence of the Resident Plaintiffs' injuries are even further afield. Without denying President Trump's intentions to build a hotel on the MDC Parcel, Defendants assert that the Resident Plaintiffs' injuries are unripe and conjectural because the Trump Library Foundation "may still choose to revise or modify its plans for the Library."

---

[4] For that reason, the district court decisions that State Defendants cite are unavailing. *See* State Defs. Mot. at 6–7 (first citing *Gagliardi v. City of Boca Raton*, 2017 WL 5239570 (S.D. Fla. Mar. 28, 2017), and then citing *Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*, 2008 WL 1848389 (S.D. Fla. Apr. 22, 2008)). Relying on district court cases that *predated* the Supreme Court's decision in *Spokeo*, the court in *Gagliardi* concluded that plaintiffs who lived near a planned building site did not allege particularized injuries because their injuries also "impact[ed] vast swaths of the surrounding population." 2017 WL 5239570, at *6. That reasoning does not survive *Spokeo*. *Buena Vista* suffers from similar defects, not to mention the fact that its standing holding turned on the lack of "evidence" of particularized harm presented at the *summary judgment* stage. 2008 WL 1848389, at *5.

State Defs. Mot. at 6–7 (quotation marks omitted). But plaintiffs "do[] not have to await the consummation of threatened injury to obtain preventive relief," *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923), thereby opening themselves up to irreparable injuries.

In any event, Ms. Browde and Mr. van den Dries filed suit only *after* President Trump shared a nearly-two-minute video rendering of his plans for the site, created by an architecture firm that his Foundation retained, as part of a concrete proposal to donors. *See* Compl. ¶¶ 114–16. It is difficult to imagine an injury that is more "certainly impending" than one premised on actual plans portrayed in a video that was released by the President of the United States. *Pennsylvania*, 262 U.S. at 593.

Defendants also assert that the Resident Plaintiffs' injuries are not imminent because they do not allege a "fixed period of time in the future" when those injuries will occur. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1339 (11th Cir. 2013) (quoting *ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1193 (11th Cir. 2009)). That is simply wrong. Ms. Browde and Mr. van den Dries allege that their injuries will commence at a specific time in the future: when the towering hotel planned for the MDC Parcel is constructed. Compl. ¶¶ 154–56, 162–66, 171–73, 179–83. Under the conveyance's terms, construction of President Trump's skyscraper on the MDC Parcel must begin within "five years" of September 30, 2025. *Id.* ¶ 108. That is more than sufficient under Eleventh Circuit precedent: "[i]mmediacy requires only that the anticipated injury occur with[in] some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008); *see also, e.g.*, *ACLU of Fla.*, 557 F.3d at 1193–94 ("Immediacy, in this context, means reasonably fixed and specific in time and not too far off.").

In the absence of discovery, it is of course impossible for Plaintiffs to say precisely when construction will start on the MDC Parcel, beyond the requirement that it begin before September 30, 2030. Compl. ¶ 108; *cf. Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1206 (11th Cir. 2025) (faulting the district court for fixating on a complaint's omission of facts that were exclusively in the defendants' possession, "particularly before discovery"), *cert. denied*, 146 S. Ct. 1524 (2026). Nonetheless, Plaintiffs' allegations that Defendants have contracted with an architecture firm, Compl. ¶ 114, publicly described their plans for the site, *id.* ¶¶ 112–13, 116–21, released a video rendering, *id.* ¶¶ 114–15, and started soliciting donations based on that video rendering, *id.* ¶ 116, make it sufficiently plausible that construction of the towering hotel and the injuries it will inflict are imminent enough "that there is little likelihood the district court will be deciding a case 'in which no injury would have occurred at all.'" *31 Foster Child. v. Bush*, 329 F.3d 1255, 1267 (11th Cir. 2003) (quoting *Lujan*, 504 U.S. at 564 n.2). Accordingly, the Resident Plaintiffs have met their burden.

**2. Dunn's Farm**

Dunn's Farm is a Florida nonprofit that has been working for years to develop an urban farm on the MDC Parcel in partnership with MDC's Miami Culinary Institute. Compl. ¶¶ 188–203. When the State Defendants gifted the MDC Parcel to President Trump, they harmed Dunn's Farm in two distinct ways: (1) by rendering its expenditures of time and money toward that end worthless, and (2) by depriving Dunn's Farm of an opportunity that it was able and ready to seize had it been permitted to meaningfully compete with President Trump for the MDC Parcel.

By endeavoring to develop an urban farm on the MDC Parcel, Dunn's Farm incurred costs that were ultimately rendered worthless—a classic pocketbook injury that courts routinely deem legally cognizable and that the Eleventh Circuit has called "the epitome of 'concrete.'" *MSPA*

*Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019); *see also TransUnion LLC*, 594 U.S. at 414 ("monetary harms readily qualify as concrete injuries under Article III"). Indeed, the Supreme Court explicitly endorsed this form of economic injury in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Court held that a nonprofit's expenditure of "thousands of dollars" on "plans" for its desired housing project and "studies" to support a petition for rezoning was a cognizable economic injury because these expenditures became "worthless" upon the petition's denial. *Id.* at 262.

The State Defendants, for their part, assert that the resources that Dunn's Farm expended prior to Defendants' violation of the Domestic Emoluments Clause are insufficient because a plaintiff must allege "that it has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." State Defs. Mot. at 11 (quoting *City of South Miami v. Governor*, 65 F.4th 631, 638–39 (11th Cir. 2023)). This argument misunderstands the nature of Dunn's Farm's economic injury. Dunn's Farm's expenditures do not reflect a diversion-of-resources theory in response to government action, as in *City of South Miami* or *Alliance for Hippocratic Medicine*. Dunn's Farm did not "spend its way into standing based on speculative fears of future harm," *City of South Miami*, 65 F.4th at 639 (quotation marks omitted); rather, it spent the money and time advocating for an urban farm at MDC *before* Defendants' unlawful actions even began—just like the plaintiff in *Arlington Heights*.

President Trump asserts that Dunn's Farm's past expenditures to advocate for an urban farm on the MDC Parcel do not suffice because Dunn's Farm seeks only "forward-looking relief." Trump Mot. at 7. True, the relief that Plaintiffs request is prospective in nature, but an injury in the form of resources rendered worthless can be remedied by prospective relief that restores their

value. In fact, that is precisely what the Supreme Court said in *Arlington Heights*, where the only relief requested was an injunction granting the previously denied rezoning petition on which the plaintiff had spent thousands of dollars. 429 U.S. at 262.

And *Arlington Heights* is no outlier. In many other cases, courts have held that a plaintiff had standing to seek injunctive relief because the plaintiff invested time, money, or resources in a project that was rendered of little value because of the defendant's action. *See, e.g.*, *T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Supervisors*, 748 F.3d 185, 197 (4th Cir. 2014) (company "expended substantial time and money in pursuing [a permitting] application," which gave it "standing to challenge in court the Board's denial of its application" and seek injunctive relief); *Hawaii v. Trump*, 871 F.3d 646, 661, 664 (9th Cir. 2017) (per curiam) (refugee resettlement agency had standing to seek an injunction of an Executive Order barring admission of refugees where it would "lose the money and resources it ha[d] already expended in preparing for arrival" of those refugees).

As for Dunn's Farm's injury stemming from its lost opportunity to compete for the MDC Parcel, the Supreme Court has long held that a plaintiff can challenge allegedly unlawful government processes when he can demonstrate that he is "able and ready" to be considered for a benefit or position. *See Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Candidates or applicants for consideration "have an interest in a fair process," and infringement of that interest is a cognizable injury. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026). The Court has applied this doctrine in a variety of contexts. *See, e.g.*, *Jacksonville*, 508 U.S. at 658–59 (bidding for city contracts); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (public university admissions); *Carney v. Adams*, 592 U.S. 53, 60 (2020) (appointment to a judicial vacancy).

Here, Dunn's Farm has alleged sufficient facts to demonstrate that it was "able and ready" to compete for the MDC Parcel, but was ultimately excluded from that opportunity because a competitor with significantly more leverage—the President of the United States—was given preferential treatment by the State of Florida. When the State Defendants transferred the MDC Parcel to President Trump, Dr. Marvin Dunn (Dunn's Farm's co-founder) had already been engaged in discussions with high-level college officials about building an urban farm on the MDC Parcel and had been authorized to establish a smaller vegetable garden on MDC's Wolfson Campus while college leadership identified staff to support a larger urban farm. Compl. ¶¶ 192–97. Moreover, Dunn's Farm had long been in the business of urban farming—it was already operating another urban farm in Miami—and thus had the expertise and resources necessary to convert the MDC Parcel to that use, as well as the funding to do so. *Id.* ¶¶ 185–86, 199. Those facts show more than a generalized interest in placing an urban farm on the MDC Parcel; they establish that Dunn's Farm had a "concrete plan in place for bringing its [farm] into operation." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337 (11th Cir. 2019).

Defendants protest that these allegations are too speculative to support standing because Dunn's Farm never took certain *additional* steps toward establishing an urban farm on the MDC Parcel like filing a zoning variance application, and because it was never certain that the State would have approved Dunn's Farm's plans for a farm on the MDC Parcel. *See, e.g.*, State Defs. Mot. at 9. It is true that the processes involved in obtaining state-owned land can move slowly for people other than the President. But because the injury under an "able and ready" theory originates in the "inability to compete on an equal footing," and "not the ultimate inability to obtain the benefit," the plaintiff need not show that he necessarily would have secured the benefit had he been fairly considered. *Jacksonville*, 508 U.S. at 666. Indeed, "[u]nder well-established caselaw,"

a plaintiff need not even "apply for" the benefit "to suffer a justiciable injury in fact." *Baughcum v. Jackson*, 92 F.4th 1024, 1035, 1037 (11th Cir. 2024); *cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977) (even if the plaintiff "has not actually applied"—because "a formal application" would be no more than "a futile gesture"—the denial of the opportunity for equal consideration suffices for standing).

Again, *Arlington Heights* is instructive. There, the Court held that the plaintiff had standing to seek an injunction granting a rezoning petition, even though such an "injunction would not, of course, guarantee" that the housing complex that the plaintiff sought to build would ultimately be built. 429 U.S. at 261–62. The plaintiff "would still have to secure financing, qualify for federal subsidies, and carry through with construction." *Id.* at 261. Nonetheless, because the requested injunction would "remove[]" a significant "barrier" to the plaintiff's goal, the plaintiff had the "requisite personal stake in the controversy." *Id.* at 261–62.

Thus, the point is not that Dunn's Farm *definitely* would have secured the MDC Parcel for an urban farm. The point is that it expended significant resources over the course of years working toward that goal and demonstrated that it was able and ready to compete for the Parcel. That progress was wiped out by the unlawful transfer of the Parcel and, thus, Dunn's Farm has sufficiently alleged an injury-in-fact.[5]

**3. Carmen Salcedo**

Carmen Salcedo is a current student at MDC and takes classes on the Wolfson Campus, where the MDC Parcel is located. Compl. ¶¶ 211–12. Like the Resident Plaintiffs, she alleges

[5] In a footnote, State Defendants also challenge the plausibility of Dunn's Farm's allegation that there "is no land on the MDC Wolfson Campus or in Downtown Miami other than the MDC Parcel that would be appropriate for an urban farm." State Defs. Mot. at 8 n.6 (quoting Compl. ¶ 203). To support that assertion, Defendants link to a map of the area surrounding the MDC Parcel without elaboration. That map tells us nothing.

harms arising out of the construction of President Trump's planned hotel, such as congestion that will lengthen her hour-long commute to school and noise that will disrupt her studies. *Id.* ¶¶ 225–26. She also alleges injuries in the form of lost opportunities for educational experiences and monetary benefits. *Id.* ¶¶ 214–24. Specifically, because the State Defendants chose to give away the MDC Parcel rather than turn it into an on-campus urban farm, or sell it and reinvest the proceeds in MDC, she has missed out on the opportunity to work on an urban farm affiliated with MDC for school credit, *id.* ¶¶ 214–21, or potential benefits for MDC students like financial aid, on-campus childcare, or better facilities and academic programs, *id.* ¶¶ 221–24.

Defendants largely rehash their arguments about the Resident Plaintiffs to challenge Ms. Salcedo's injuries. With respect to particularity, they make the same generic argument that "[m]any of" Ms. Salcedo's injuries are "generalized grievances." State Defs. Mot. at 7. This Court should reject that assertion as to Ms. Salcedo for the same reasons discussed above. *See supra* part I.A.1. To be sure, Defendants' construction of a towering hotel on the MDC campus will create harms that are "widely shared" by MDC students, but that does not matter—what matters is that the alleged harms are "particularized" to Ms. Salcedo because she will *personally* suffer from Defendants' conduct. *Spokeo*, 578 U.S. at 339 n.7; *see* Compl. ¶¶ 214–24.

As for imminence, Ms. Salcedo's impending injuries stemming from the construction of a towering hotel on her college campus, including noise, traffic, and congestion, are hardly conjectural. As described above, the plans for the site documented by an architecture firm in a video rendering combined with repeated statements about the site from President Trump and his associates make it more than plausible that the MDC Parcel will be used in precisely the way President Trump says it will be. *See* Compl. ¶¶ 112–21.

Defendants also claim Ms. Salcedo has not pleaded sufficient facts to make it plausible that any of her lost opportunities as a student at MDC were truly forthcoming. Yet it is hardly a stretch to infer that Ms. Salcedo, as a student, would benefit from her school literally doubling its endowment overnight by selling the MDC Parcel rather than giving it away. *Id.* ¶ 95. And as to her lost opportunity to work on an urban farm on campus, Plaintiffs have alleged, as described above, sufficient facts to make it plausible that Dunn's Farm was able and ready to compete for the MDC Parcel, with a substantial probability of obtaining it, had the State Defendants not given it away to President Trump. *See supra* part I.A.2.

**B. Plaintiffs' Injuries Are Fairly Traceable to Defendants' Conduct.**

**1. Plaintiffs' Injuries All Stem from the Transfer of the MDC Parcel to the Trump Defendants Through a Predictable and Closely Connected Chain of Events.**

All of Plaintiffs' injuries stem from the transfer of the MDC Parcel from the State Defendants to the Trump Defendants. Particularly when read in the light most favorable to Plaintiffs, there is simply no plausible reading of the Complaint pursuant to which Plaintiffs "'would have been injured in precisely the same way' without [Defendants'] alleged misconduct." *Walters*, 60 F.4th at 650 (quoting *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019)). But for the challenged transfer of the MDC Parcel, the Resident Plaintiffs would face no impending risk of obstruction of their views, disruption of their daily lives, and diminution of their property values. Compl. ¶¶ 154–66, 171–83. Dunn's Farm would still be pursuing its efforts to establish an urban farm on the MDC Parcel, and the resources it already expended to that end would not be wasted. *Id.* ¶¶ 188–200. Ms. Salcedo would be able to study in peace and pursue other opportunities at MDC, including potentially working at an on-campus urban farm for school credit. *Id.* ¶¶ 214–20, 222–26. These allegations establish that Plaintiffs' injuries "likely [were]

caused or likely will be caused by [Defendants'] conduct," *Alliance*, 602 U.S. at 382, and they suffice to establish the modest burden of "*de facto* causality" required for standing, *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (quotation marks omitted).

Defendants' chief rebuttal is that Plaintiffs' injuries are not traceable to the challenged land transfer because they rely on the actions of "unnamed" third parties not before the Court, such as "architects" and "engineers." State Defs. Mot. at 12. But "standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331 (11th Cir. 2025) (alteration and quotation marks omitted). Defendants offer no reason to doubt that these "'third parties will likely react in predictable ways' that in turn will likely injure [Plaintiffs]." *Alliance*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

Perhaps that is because the only plausible inference is that these individuals will do precisely what the President himself has said they will do: build a towering "hotel with a beautiful building underneath and a 747 Air Force One in the lobby." Compl. ¶ 117; *see also id.* ¶¶ 114–15 (description of video rendering). After all, any architects and engineers involved will be *employed* and *paid* by the Trump Defendants. And to the extent the hotel plans require review from the Federal Aviation Administration or state building code officials, *see* State Defs. Mot. at 7 n.5, those individuals are plainly aligned with Defendants. Given that the State Defendants went so far as to enact a law (SB 118) prohibiting local regulation of the MDC Parcel so that, in the bill sponsor's words, President Trump will have "maximum flexibility" to construct his "historic landmark" in Florida, Compl. ¶¶ 59–65, the idea that state officials would suddenly change course and impose *restrictions* on this effort strains credulity. *See also id.* ¶ 4 (conveying the MDC Parcel to the Trump Library Foundation "free from any waiver, encumbrance, or restriction except for the

requirement that the subject parcel contains components of a Presidential library, museum, and/or center within five years of conveyance or that construction has commenced [within five years]").

Defendants also assert that even if the chain of events stemming from the transfer of the MDC Parcel were predictable, the transfer is "too 'far removed from its distant (even if predictable) ripple effects' to establish standing." State Defs. Mot. at 12 (quoting *Alliance*, 602 U.S. at 383). Far from a distant "ripple effect," enabling President Trump to build whatever he wants on the MDC Parcel was the entire point of the transfer.

In any event, Defendants offer no new argument on this point. Instead, they merely rehash their assertions that Plaintiffs' injuries are too speculative. For instance, they reassert that Dunn's Farm has failed to plausibly allege that it was engaged in a process to secure the MDC Parcel for an urban farm, and they question the plausibility of Ms. Salcedo's allegation that the transfer of the MDC Parcel to President Trump deprived her of various opportunities. *See, e.g.*, Trump Mot. at 11–12. These arguments should be rejected on their own terms for the reasons stated above, *supra* part I.A, and they are irrelevant to the question of whether the transfer of the MDC Parcel is the *cause* of Plaintiffs' injuries.

The bottom line is that a defendant's "challenged conduct need not be 'the very last step in the chain of causation' for it to be fairly traceable to the plaintiff's injury." *Walters*, 60 F.4th at 650 (quoting *Wilding*, 941 F.3d at 1126). In other words, a challenged action is not too distant from a harm just because the action is not the most immediate cause of the plaintiff's injury. Here, there is just a single step between the transfer of the MDC Parcel and Plaintiffs' harms: construction of the high-rise hotel that President Trump says he will build on the site. And under the terms of the MDC Parcel's conveyance, that step must be taken within five years of September

30, 2025. Compl. ¶ 108. The chain of events from the transfer of the MDC Parcel to Plaintiffs' harms is therefore neither attenuated in terms of links nor indeterminate in terms of time.

### 2. Plaintiffs Are Not Required to Allege that Their Injuries Are Traceable to the President's Performance of His Official Job Duties.

Finally, the President's assertion that Plaintiffs fail to show causation between their injuries and "President Trump's conduct in his official capacity," Trump Mot. at 10, fundamentally misunderstands the nature of official-capacity suits. Bringing an official-capacity claim does not require Plaintiffs to allege that President Trump's constitutional violation arises out of his performance of his affirmative duties as President. And therefore, Plaintiffs are not required to allege that their injuries are *traceable* to any such "official" conduct.

Whether a suit is an official- or personal-capacity suit turns on the nature of the relief sought, not on the nature of the government officer's conduct. Lawsuits requesting injunctive or declaratory relief—that is, seeking to make the current occupant of an office "conform his future conduct of that office" to constitutional requirements, *Edelman v. Jordan*, 415 U.S. 651, 664 (1974)—are always brought against that officer in his or her "official" capacity, rather than in his or her personal capacity. By contrast, "individual (or personal) capacity suits do not seek to conform the State's conduct to federal law; rather, such suits seek recovery from the defendant personally" in the form of monetary damages. *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002); *see Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992) ("[A] plaintiff in an action against a government official in his personal capacity can recover only against the official's personal assets."). As the Supreme Court has explained, "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26 (1991).

While it is true that suits against a government officer for injunctive relief usually center around the performance of that officer's job duties (as do suits for damages), that need not be so when the constitutional provision being violated is one that restricts an officer's private behavior. The Domestic Emoluments Clause is such a provision. It imposes on the President a *negative* duty ("he shall not receive within that Period any other Emolument," U.S. Const. art. II, § 1, cl. 7) quite apart from the President's *positive* duties—executing the laws, conducting foreign relations, and the like. But the Clause does not impose this *negative* duty on the President only when he happens to be engaged in one of his separate *positive* duties. To the contrary, it declares categorically that during "that Period" (the entire time the President is in office) he may not accept "any other Emolument from the United States, or any of them." *Id.*

That makes perfect sense given the purpose of the Clause: to prevent Congress or the states from exploiting the President's self-interest through gifts or benefits that could give rise to corruption. Compl. ¶¶ 34–39; *see also Applicability of Emoluments Clause to Proposed Serv. of Gov't Emp. on Comm'n of Int'l Historians*, 11 Op. O.L.C. 89, 90 (1987) (the Foreign Emoluments Clause "is plainly applicable where an official is offered the gift, title or office in his private capacity"); *Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995) (the Framers wrote the Domestic Emoluments Clause "because they feared the consequences of allowing a President to convert his or her office into a vehicle for *personal* profit" (emphasis added)). Indeed, the only court to ever squarely address this issue rejected the argument that the Domestic Emoluments Clause applies only to "a payment made as compensation for official services." *See District of*

*Columbia v. Trump*, 315 F. Supp. 3d 875, 886–904 (D. Md. 2018); *see also Blumenthal v. Trump*, 373 F. Supp. 3d 191, 196–208 (D.D.C. 2019) (same for Foreign Emoluments Clause).[6]

Thus, this lawsuit is brought against President Trump in his official capacity because it seeks to enjoin him from engaging in a continuing violation of the Constitution rather than to hold him personally liable for damages to compensate for his past violations of the Constitution. The fact that Plaintiffs bring an official-capacity claim does not require them to plead that the President violated the Constitution through the performance of his official job duties—and they do not. Rather, Plaintiffs allege that President Trump's private conduct is violating the Domestic Emoluments Clause.[7]

With respect to traceability, then, Plaintiffs must show only that their injuries are traceable to that private conduct. The President all but concedes this point: he admits that "[a]ll of Plaintiffs' injuries stem from the transfer of the MDC Parcel to the Foundation," and neglects to quarrel with Plaintiffs' allegation that "President Trump himself exercises control over the Trump Library Foundation." Trump Mot. at 10 (quoting Compl. ¶ 124); *see also infra* part II.B (describing the ways in which the Trump Library Foundation and the President are inextricably intertwined). Thus, Plaintiffs' injuries are fairly traceable to President Trump's violation of the Domestic Emoluments Clause.

---

[6] Both these decisions were ultimately vacated on other grounds: the former because it became moot while review was pending due to the end of President Trump's first term, *see Trump v. District of Columbia*, 592 U.S. 1233 (2021); *District of Columbia v. Trump*, 838 F. App'x 789, 790 (4th Cir. 2021), and the latter because it became moot due to the reviewing court's jurisdictional ruling, *see Blumenthal v. Trump*, 949 F.3d 14, 21 (D.C. Cir. 2020).

[7] To be sure, although Plaintiffs do not allege that President Trump received the gift of the MDC Parcel *in the course of performing* his affirmative duties as President, they do allege that he received the gift *because of* his official role as the President. Put another way, Plaintiffs allege that the State Defendants gave President Trump a prohibited emolument because of who he is and what he does: serve as the President of the United States. *See infra* part II.A.

### C. Injunctive and Declaratory Relief Will Redress Plaintiffs' Injuries and Prevent Further Injuries from Defendants' Ongoing Violation of the Domestic Emoluments Clause.

Plaintiffs request injunctive and declaratory relief to redress their impending injuries stemming from Defendants' ongoing violation of the Domestic Emoluments Clause. In addition to a declaration of the parties' rights and the meaning of the Domestic Emoluments Clause, Compl. ¶¶ 230–35, Prayer for Relief ¶ (a), Plaintiffs ask for two specific forms of injunctive relief. First, Plaintiffs ask this Court to declare null and void the land transaction complained of and enjoin Defendants from treating the conveyance of the MDC Parcel as valid. *Id.* ¶¶ 236–41, Prayer for Relief ¶ (b)(2)–(3). Because all of Plaintiffs' injuries arise from this unconstitutional land transaction, nullification of the transaction will remedy their injuries. Second, Plaintiffs request that this Court enjoin Defendants from further violation of the Domestic Emoluments Clause with respect to the MDC Parcel. *Id.* ¶¶ 236–41, Prayer for Relief ¶ (b)(1). Such an injunction will not only remedy the injuries described above, but also prevent future violations of the Domestic Emoluments Clause with respect to the MDC Parcel that would injure Plaintiffs—*i.e.*, by preventing Defendants from redoing the challenged transaction if it were voided for any reason (including by this Court).

Defendants do not advance any substantive arguments against the redressability of Plaintiffs' injuries, resting instead on the proposition "that causation and redressability 'are often flip sides of the same coin.'" Trump Mot. at 10 (quoting *Alliance*, 602 U.S. at 380). Thus, this Court should hold that Plaintiffs' claims are redressable for the same reasons that it should hold that Plaintiffs' injuries are traceable to Defendants' conduct. *See supra* part I.B.

## II. Plaintiffs Have Stated a Claim for Violation of the Domestic Emoluments Clause.

The Domestic Emoluments Clause prohibits the President from receiving "any . . . Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. It was enshrined in our national charter to ensure that the President would "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist No. 73*, *supra*, at 442. Thus, it has long been understood by the Executive Branch that the Domestic Emoluments Clause prohibits states "from attempting to influence the President through financial awards," including "gifts," which could potentially "influenc[e] or corrupt[] the integrity of the recipient." 5 Op. O.L.C. at 188–91.

Against the grain of this historical consensus, Defendants offer a truly implausible interpretation of the Domestic Emoluments Clause—one that is unmoored from the constitutional text, the Framers' reasons for adopting the Clause, and the manner in which the Clause has been interpreted since it was written more than two centuries ago. According to Defendants, the Domestic Emoluments Clause merely prohibits states and the federal government from giving benefits to the President "as renumeration [sic] for an act he performed as President." Trump Mot. at 18; *see* State Defs. Mot. at 23 (same). In other words, the Domestic Emoluments Clause is nothing more than a bribery prohibition. Rather than serve as a prophylaxis against efforts by states to "tempt [the President] by largesses," *The Federalist No. 73*, *supra*, at 441, it targets only full-blown quid pro quo arrangements—and only when states are foolish enough to write the President's own name, rather than that of his business, or his son, or his son-in-law, on the line of the check.

This Court should reject that argument for three main reasons. *First*, it has no basis in Founding-era usage or dictionaries. *Second*, it rests on a contortion of the Domestic Emoluments

Clause's text. And *third*, it is at odds with the Clause's history, inviting the very "cabal, intrigue, and corruption," *The Federalist No. 68*, at 412 (Alexander Hamilton) (Clinton Rossiter ed., 1961), that the Framers were "obsessed" with preventing, Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 348 (2009).

### A. Transfer of the MDC Parcel from the State Defendants to the Trump Defendants for Construction of a High-Rise Hotel Constitutes an "Emolument" Prohibited by the Clause.

#### 1. The Founding-Era Meaning of "Emolument"

At the Founding, "emolument" was a commonly used term that referred to profit or gain in general, not just profit or gain provided as compensation for the performance of an official service. *See* 5 *Oxford English Dictionary* 182 (2d ed. 1989) (citing eighteenth-century texts for a contemporary definition meaning "[a]dvantage, benefit, comfort"). Samuel Johnson's preeminent 1755 dictionary, quoting illustrative examples, defined "emolument" simply as "Profit; advantage." 1 *A Dictionary of the English Language* (1755). Indeed, "*every* known English language dictionary" published in the seventeenth and eighteenth centuries defined "emolument" in this broad fashion—as "profit," "advantage," "gain," or "benefit." John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806*, at 8 (July 12, 2017), https://perma.cc/79C4-V2TS.

Those expansive definitions reflect how the word was used during this era, in sources ranging from general-purpose writings, *see, e.g.*, Jonathan Swift, *The Tale of a Tub and Other Works* 91 (Henry Morley ed., 1889) (1704) (discussing "how much emolument this whole globe of earth is like to reap by my labours"), to official government documents. American state constitutions, for instance, used "emolument" in this broad sense. *See* Pa. Const. of 1776, Decl. of Rights art. V ("government is . . . instituted . . . not for the particular emolument or advantage

of any single man"). So, too, did early legal decisions. *See, e.g.*, *Himely v. Rose*, 9 U.S. (5 Cranch) 313, 319 (1809) (owner of property who was deprived of its possession "lost those emoluments and mercantile advantages which might have resulted from the use of it"). A formal declaration issued by the colonies protesting British policy used the term in the same way. *See* U.S. Continental Congress, A Declaration by the Representatives of the United Colonies of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and Necessity of Their Taking Up Arms (July 6, 1775) (accusing Britain of judging the colonies "to be in such a State, as to present Victories without Bloodshed, and all the easy Emoluments of statuteable Plunder").

Significantly, as at least the State Defendants seem to acknowledge, *see* State Defs. Mot. at 21, "emolument" was frequently used, including by the Framers of our Constitution, to mean the profits accruing from private financial transactions, including "revenue from ownership interest in a business." Clark D. Cunningham & Jesse Egbert, *Using Empirical Data to Investigate the Original Meaning of "Emolument" in the Constitution*, 36 Ga. St. L. Rev. 465, 486 & n.72 (2020). For instance, George Washington, Thomas Jefferson, and others criticized merchants who "preferred their own private emolument" by violating a boycott of British goods. Virginia Nonimportation Resolutions (June 22, 1770), *reprinted by Nat'l Archives: Founders Online*, https://perma.cc/66DV-4XUY. James Madison asked Jefferson to join him and James Monroe in a land purchase "for our triple emolument." Letter from James Madison to Thomas Jefferson (Aug. 12, 1786), *reprinted by Nat'l Archives: Founders Online*, https://perma.cc/L2NZ-RC55. An Articles of Confederation signer advertised a sale of land, along with all its "buildings, ways, paths, profits, commodities, advantages, emoluments and hereditaments." John Mikhail, *Emoluments and President Trump*, 53 Val. U. L. Rev. 631, 650–51 (2019) (quotation marks omitted). These are but a few examples of the Founders using the word to refer to "the consequences of [private]

business dealings." John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://perma.cc/53Y9-RP5K. The same usage is found in Blackstone and other legal treatises well known to the Founders. *See* Mikhail, *The Definition of "Emolument," supra*, at 10.

Defendants do not deny that this was the predominant definition of "emolument" at the Founding. Nor do they dispute that the Framers and their contemporaries frequently used the word to describe profits and benefits arising out of private commercial transactions. Instead, they argue that the Framers invoked a "narrower" definition in the Domestic Emoluments Clause, meaning "the receipt of value for one's services rendered in an official position or in an employment relationship." Trump Mot. at 14; *see* State Defs. Mot. at 21.

This assertion is unfounded. To support it, Defendants cite a single Founding-era dictionary that defined "emolument" as "profit arising from an office or employ" and as "gain, or advantage." *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774). Defendants ignore the inconvenient latter definition. And the fact that the former definition appears at all makes *Barclay's* highly unusual: only 8% of English dictionaries in the seventeenth and eighteenth centuries included a definition of "emolument" that was qualified by reference to "office or employ." Mikhail, *The Definition of "Emolument," supra*, at 8. Each of those dictionaries also included the broader, unqualified definition of profit or gain in general (as does this one). *Id.*

Defendants' other sources get them no further. The President cites a work by John Trusler, Trump Mot. at 15 n.1, that "is not a standard dictionary at all, but rather a thesaurus" that "has long been viewed skeptically by scholars," in part because its text was "copied directly from a French thesaurus." Mikhail, *The Definition of "Emolument," supra*, at 8–9. The State Defendants, for

their part, cite an 1828 dictionary, published over forty years after the Constitution was written. State Defs. Mot. at 20. The first edition of that same dictionary published in 1806—much closer to the Founding—defined "emolument" in the standard fashion as profit, gain, or advantage. Mikhail, *The Definition of "Emolument," supra*, at 26–27.[8]

Even putting this aside, Defendants' narrower definition remarkably does not help them, because while it includes "remuneration" and "salary," it also includes more—profits or benefits "arising from station [or] office," Trump Mot. at 15, or resulting from "one's services rendered in an official position," *id.* at 14. The situation here fits that bill. The State Defendants gave President Trump a benefit (the gift of a multimillion-dollar parcel of land to develop into a lucrative hotel with no restrictions) because he is rendering "services" as the President of the United States. Put another way, President Trump's "official position"—his "office"—is the but-for cause of the State Defendants' lucrative gift to him. They didn't give the MDC Parcel to just anyone, *see* Compl. ¶ 94 (describing how the State Defendants previously rejected offers from deep-pocketed developers to *purchase* the land); they gave it to President Trump precisely because he is the President, with "authority over the executive branch" and a critical "role in the legislative process." *Id.* ¶ 139.

Perhaps recognizing this shortcoming, Defendants ask this Court to read their own made-up definition even more narrowly: as referring only to those benefits given as remuneration for a

[8] The President also cites a corpus linguistics study to support his definition. *See* Trump Mot. at 15 (citing James Cleith Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 S. Tex. L. Rev. 181 (2018)). This study's methodology was flawed, as a subsequent corpus linguistics analysis has explained. *See* Cunningham & Egbert, *supra*, at 476–77 & n.46. Moreover, its empirical findings do not necessarily support its conclusions. For instance, its analysis of word clusters reveals that the word "emolument" "almost always appears at the end of a recurring word group," supporting a "broad, inclusive meaning for *emolument* rather than many distinct senses of the kind that Phillips and White try to classify." *Id.* at 486–87 & nn.73 & 75.

*discrete* act rather than those benefits given because of the recipient's services in an official role. *See* Trump Mot. at 1, 18; State Defs. Mot. at 23. Defendants offer zero justification for that further narrowing. It is drawn from thin air.

**2. Constitutional Text and Structure**

Even if there were a definition of "emolument" at the Founding as narrow as Defendants claim, the Domestic Emoluments Clause does not use the word in that narrow sense. To start, the Framers specifically directed us not to read the Clause in that way. The Clause reads in full:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const. art. II, § 1, cl. 7. This syntax, consisting of a single sentence with two independent clauses, tells us two important things about the meaning of the Clause.

*First*, the presence of "any" before "other Emolument" means that if there are multiple types of emoluments, *every* type should be included. "Any," of course, is an "expansive modifier[]." *District of Columbia*, 315 F. Supp. 3d at 887–88 (discussing the word "any" in the context of the Domestic Emoluments Clause). As the Supreme Court has explained, it refers to "*every* member of the class or group," without "distinction or limitation." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 363 (2018) (quotation marks omitted).

*Second*, the presence of the adverbial phrase "for his Services" modifying the receipt of "Compensation" but *not* the receipt of "any other Emolument" tells us that the Framers chose not to narrow the meaning of "any other Emolument" to refer only to profits received for services—even though they knew exactly how to do so. This point is underscored by the fact that the Framers *did* repeat the reference to "the Period for which he shall have been elected" in the second independent clause of the sentence. Again, this demonstrates that the Framers knew how to repeat

a modifier in two clauses of the same sentence to emphasize that both clauses should share the same attribute. They simply did not do that for the phrase "for his Services."[9]

Preposterously, Defendants assert that the structure of the Clause actually helps them, arguing that whatever the definition of the term "Emolument," the language "for his Services" in the *first* clause applies to the word "Emolument" in the *second* clause, thereby limiting the Clause's reach to emoluments received for discrete services. Their only support for that claim is that the Clause's usage of "other" before "Emolument" means that "'Compensation' and 'Emolument' are intended to be read in parallel." Trump Mot. at 14; *see* State Defs. Mot. at 20. This makes no sense. The only thing that "other" tells us is that "Compensation" is one type of "Emolument," which nobody disputes. Consider the phrase: "the veterinarian shall treat cats and dogs, and she shall not treat any other animal." All the word "other" tells us there is that cats and dogs are animals. It in no way suggests that the word "animal" is limited to creatures with attributes similar to cats and dogs.

Read naturally then, and according to its plain text, the Domestic Emoluments Clause prohibits the receipt of "any other Emolument," not the receipt "*for his Services* of any other Emolument." But even if Defendants were right that the syntax of the Clause required that

---

[9] In light of this, the "early" cases Defendants cite (from nearly a century after the Founding) are inapposite—all addressed the meaning of "emolument" in statutes containing *restrictive* modifiers that do not appear in the Domestic Emoluments Clause. *See Hoyt v. United States*, 51 U.S. (10 How.) 109, 135 (1850) ("emoluments of office"); *United States v. Hill*, 123 U.S. 681, 685–86 (1887) ("emoluments of his office"). Other Supreme Court cases from the same period confirm that, in the absence of a restrictive modifier like "of his office," the term "emolument" was used to mean "profit" or "advantage" not associated with compensation for an official service. *See, e.g.*, *Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420, 586 (1837) ("The proprietors have, under these grants, ever since continued to possess and enjoy the emoluments arising from the tolls taken for travel over the bridge; and it has proved a very profitable concern."); *Town of East Hartford v. Hartford Bridge Co.*, 51 U.S. (10 How.) 511, 516 (1850) ("[T]he . . . town of Hartford has not made any use of said ferry as a franchise, or derived any benefit or emolument therefrom, since the year 1814.").

emoluments be linked to the President's "services" as President, Plaintiffs still satisfy that requirement, as described above: the State Defendants gave President Trump a lucrative benefit because of his "services" as the President of the United States. In other words, he received special treatment due to his official role.

And again, Defendants offer no justification for reading the phrase "for his Services" to mean "in exchange for a discrete service as part of a quid pro quo." There is none. Indeed, everyone agrees that the phrase "for his Services" refers to the President's fixed "Compensation" under the Clause, which (of course) is tied to his services as President as a whole rather than to any discrete act that he performs as President. U.S. Const. art. II, § 1, cl. 7.

**3. Constitutional History**

Lacking any textual support, Defendants turn to history, but the historical record only undermines their arguments. After all, from the moment it was introduced in Philadelphia, the Domestic Emoluments Clause was recognized as a prophylactic safeguard against the *possibility* of corruption. Allowing President Trump to receive the gift at issue in this case is completely at odds with that purpose. It would nullify the Framers' effort to ensure that the President would "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution," *The Federalist No. 73*, *supra*, at 442—that "he may be justly styled *the man of the people*," "not particularly interested for any one of them," but "watch[ing] over the whole with paternal care and affection," 2 *Elliot's Debates* 448 (James Wilson).

To be sure, as the State Defendants emphasize, this concern was animated in part by the Framers' experience under British and colonial governments in which government leaders often were not paid fixed salaries and instead received payments from their constituents, opening up the risk of "regulatory capture." *See* State Defs. Mot. at 20–21. But the Framers did not stop at the

requirement that the President receive a fixed salary. They supplemented the presidential salary provision by adding the phrase, "and he (the President) shall not receive . . . any other emolument from the U.S. or any of them." 2 *The Records of the Federal Convention* 626 (Max Farrand ed., 1911) [hereinafter *Farrand's Records*]; Compl. ¶ 36. That provision was approved without noted debate. 2 *Farrand's Records* 626.

In the absence of support from the Convention or ratification debates, Defendants fall back on "the dog that didn't bark" historical arguments, relying on a smattering of examples of conduct by past presidents that they say would run afoul of Plaintiffs' interpretation of the Domestic Emoluments Clause. Those examples are nothing like the gift that Plaintiffs challenge here. For instance, when George Washington purchased land from the federal government, he was the one who *paid* the federal government for the land, and Defendants point to no evidence that he received a special deal.

Most of Defendants' other examples are even more irrelevant. As for President Reagan, the Office of Legal Counsel ("OLC") and the Comptroller General determined that he did not violate the Domestic Emoluments Clause when he accepted pension benefits from California from his time as governor because the benefits were "vested rights"—which vested *before* Reagan became President—rather than "gratuities which the [s]tate is free to withdraw." 5 Op. O.L.C. at 187–88; *see also* Hon. George J. Mitchell, B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983). So, too, for President Nixon: a federal district court held that the Domestic Emoluments Clause did not prevent Nixon's estate from seeking just compensation for the taking of his presidential papers because the right to just compensation vested "subsequent to the expiration of [Nixon's] term of office," meaning "the plain language of the Emoluments Clause" did not apply. *Griffin*, 935 F. Supp. at 6.

In any event, even if there are instances of conduct by past presidents that raise difficult line-drawing questions with respect to the scope of the Domestic Emoluments Clause, none of them must be resolved here. For Plaintiffs to state a claim, all this Court must decide is whether it plausibly violates the Clause for a state to *give away* to a President, for free, a piece of land worth hundreds of millions of dollars after paving the way for him to monetize that land by removing restrictions and encumbrances and preempting any attempts by municipalities to regulate it. Compl. ¶¶ 58–67, 77–111. As President Trump boasted to reporters, "the state worked with us" to get "the best block in Miami." *Id.* ¶ 148. This was a sweetheart deal awarded to President Trump because he is the President of the United States—a far cry from Virginia giving Thomas Jefferson and James Madison negotiable "tobacco notes" in exchange for delivering their product to a warehouse just like *every other tobacco grower* in the state. In truth, there are simply no close historical analogues to the transaction that took place here, and that is because, up until President Trump took office, the Clause had served its fundamental role as a defense against even the *prospect* of corruption.

Notably, Defendants' interpretation of the Domestic Emoluments Clause would undermine its ability to play that role entirely. If, as Defendants would have it, the Clause operates merely to bar bribery (an impeachable offense) by preventing states from paying the President in exchange for discrete acts, it would leave a gaping hole in the Clause's coverage. A state could, as here, give the President a massive gift while he was in office so long as it ostensibly was not given in exchange for a specific official act.

The Framers hardly trusted that such gifts lacked the potential for corruption. To the contrary, they demonstrated an unwavering commitment "to treating gifts as political threats," even "when the gifts were not accompanied by an explicit deal." Zephyr Teachout, *Corruption in*

*America* 18 (2014). This stemmed, in part, from the Framers' desire to avoid attracting people to the presidency who sought personal gain—to satisfy "the love of power, and the love of money," as Benjamin Franklin put it—rather than to perform public service. 1 *Farrand's Records* 82; *see also* Compl. ¶ 37. By eliminating *opportunities* for leverage over the President rather than simply providing post-hoc remedies for bribes, the Framers ensured that states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." *The Federalist No. 73*, *supra*, at 442.

Precisely for this reason, the only court to ever address the scope of the Domestic Emoluments Clause on the merits and the only OLC opinion to address the Clause have both interpreted the Domestic Emoluments Clause to apply to *gifts with corrupting potential*, including those given without any consideration. In a case challenging President Trump's receipt of profits and favors from domestic governments through his private businesses during his first term, the District of Maryland rejected the same narrow reading of the Domestic Emoluments Clause that Defendants advance here, reasoning that it "would reduce the Clause[] to little more than a prohibition of bribery which, in addition to already being addressed elsewhere in the Constitution, is . . . a very difficult crime to prove." *District of Columbia*, 315 F. Supp. 3d at 897–98.[10] And in the OLC opinion addressing President Reagan's California pension, the OLC concluded that Reagan's receipt of the pension did not violate the Domestic Emoluments Clause because it was a *sui generis* legal entitlement under California law, and therefore "neither a *gift* nor a part of the retiree's compensation" prohibited by the Clause. 5 Op. O.L.C. at 187, 191 (emphasis added).

[10] The Fourth Circuit, sitting en banc, declined to grant mandamus relief to the President on his argument that the district court's interpretation of the scope of the Domestic Emoluments Clause was too broad. *In re Trump*, 958 F.3d 274, 286–87 (4th Cir. 2020). The State Defendants cite the *dissent* from that en banc decision. *See* State Defs. Mot. at 14, 23.

In sum, the Domestic Emoluments Clause's original meaning, text, history, and purpose all demonstrate that it prohibits states from giving, and the President from receiving, lavish gifts. Defendants' argument that the State of Florida can, effectively, write a nine-figure check to President Trump without consequence under that Clause would astound the Framers, who knew all too well that if they did not "provide against" such "corruption," their "government [would] soon be at an end." 1 *Farrand's Records* 392 (George Mason).

**B. Defendants Cannot Escape the Strictures of the Clause by Transferring the MDC Parcel to the Trump Library Foundation Rather than Putting It in the Name of the President.**

Remarkably, although the President does not dispute that he "exercises control over the Trump Library Foundation through [three] trustees," Trump Mot. at 10 (alteration in original), he and the State Defendants challenge the plausibility of Plaintiffs' allegations that the gift of the MDC Parcel will inure to the benefit of the President himself. That is ludicrous. The idea that President Trump will not derive profits and benefits from a high-rise luxury development that literally bears his name, *see* Compl. ¶¶ 114–15, is difficult to imagine. What is more, Plaintiffs have alleged a multitude of facts demonstrating that President Trump and the Trump Library Foundation are inextricably intertwined. Among other things, the Foundation's three trustees are the President's son (Eric Trump), son-in-law (Michael Boulos), and personal attorney (James D. Kiley). *Id.* ¶ 16. And in March 2026, Eric Trump publicly announced that staff at The Trump Organization—the business conglomerate owned *solely* by President Trump and consisting of his for-profit business ventures in hospitality, golf, and real estate—have poured their "heart[s] and soul[s] into [the MDC Parcel] project." *Id.* ¶¶ 74, 121. Even the President has made statements indicating his control over the future of the site, including that it will contain "a hotel with a

beautiful building underneath," *id.* ¶ 117, and he has posted a video rendering of that high-rise hotel, bearing The Trump Organization's logo, *id.* ¶ 115.

Defendants offer three rebuttals to these allegations. First, they attempt to disavow their own client's statements, asserting that President Trump will not actually do what he has said he is going to do with the MDC Parcel because of a restriction in the Trump Library Foundation's Articles of Incorporation that prohibits it from "engag[ing] in any transactions resulting in private benefit or private inurement." Trump Mot. at 19 (alteration in original). Even if such a disavowal were plausible, Defendants themselves make clear that the Trump Library Foundation could change its charter at any time, acknowledging that any earnings will benefit only the Foundation "*[a]s long as this provision of the Articles of Incorporation governs*." *Id.* (emphasis added). Moreover, the entity charged with enforcing a violation of a corporate charter in Florida is the Office of the State Attorney General, *see* § 617.1430(1)(a), Fla. Stat., the head of which is a Defendant in this very action. *See* Compl. ¶ 147 (social media post from Eric Trump thanking Attorney General Uthmeier for being "an incredible partner[] in this endeavor"); *id.* ¶ 148 (statement from President Trump expressing gratitude to the State Defendants for working with him to procure land on "the best block in Miami"). It is no wonder that the President does not view himself as bound by that provision.[11]

[11] As the Complaint alleges, this would not be the first time that President Trump and his family played fast and loose with funds purportedly collected for non-profit purposes. For instance, the predecessor entity to the Trump Library Foundation was mysteriously dissolved in 2025, resulting in a congressional investigation into what happened to the $63 million in funds that had been earmarked for the dissolved entity. Compl. ¶¶ 53–57. Further, in 2018, President Trump agreed to shut down his charitable foundation at the behest of the Attorney General of New York, following accusations that the foundation's funds were being used to benefit the President personally. *Donald Trump's Troubled Charity Foundation to Shut Down*, BBC (Dec. 18, 2018), https://perma.cc/6YPP-ALJR.

Second, Defendants fall back on the uncontested principle of corporate law that "separately incorporated organizations are separate legal units with distinct legal rights and obligations." State Defs. Mot. at 24 (quoting *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 327 (2025)). But that tells us *nothing* about whether President Trump will profit immensely and personally from a hotel built on the MDC Parcel, even if the Trump Library Foundation technically owns the land. Again, Defendants offer no reason to credit their insinuation that President Trump lacks a financial connection to the Foundation and planned hotel bearing his name and his company's logo over the President's own words. Regardless, at this stage, the allegations in the Complaint must be construed in the light most favorable to Plaintiffs.

Third, and finally, the State Defendants point out that the Domestic Emoluments Clause focuses on the President and not the family members and close allies of the President who are the trustees of the Trump Library Foundation. *See* State Defs. Mot. at 24. But the Clause prohibits the President from receiving emoluments, whether that receipt is direct or through an intermediary such as his immediate family members or a closely held business. If gifts to the President could simply be routed to those with whom the President necessarily shares interests, the Clause could easily be circumvented, eviscerating its strong anti-corruption purpose and principal goal of ensuring that the President would have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist No. 73*, *supra*, at 442.

### C. The MDC Board and Its Trustees Are Properly Joined as Defendants.

Finally, the MDC Board and its Trustees sued in their official capacities are all properly joined as Defendants in this case.[12] Plaintiffs do not merely allege that these Defendants

[12] Plaintiffs acknowledge that the MDC Board is the appropriate legal entity with the capacity to sue or be sued for MDC's conduct and, therefore, agree to the dismissal of Defendant MDC.

transferred the MDC Parcel to the Florida Board—they allege that the transfer was made "*for further conveyance for a Presidential Library for Donald J. Trump*," as expressly provided in the MDC Board's public notice for its November 25, 2025 special board meeting. Compl. ¶ 105. The MDC Board and its Trustees thus played an indispensable role in conveying the MDC Parcel to the Trump Defendants for President Trump's profit, leading to Plaintiffs' injuries and the Domestic Emoluments Clause violation. *See id.* ¶¶ 2, 209 (describing the "coordinated multipart transaction"). To the extent that the MDC Board and its Trustees claim they acted under duress when they conveyed the MDC Parcel to the Florida Board or otherwise seek to assert that the other State Defendants are solely responsible for the alleged scheme, they are free to file a cross-claim.[13]

## III. Defendants' Other Efforts to Evade Judicial Review Are Meritless.

### A. Because Plaintiffs Assert an Equitable Constitutional Claim, No Statutory Cause of Action Is Required, and No Zone-of-Interests Test Applies.

The Supreme Court has "often held" that when a plaintiff asserts an equitable claim for a constitutional violation, he may sue "without a congressionally-provided cause of action." *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026). That is the precise scenario here: Plaintiffs seek the "equitable relief that is traditionally available to enforce federal law" as redress for Defendants' ongoing violation of the Domestic Emoluments Clause. *Armstrong v. Exceptional Child Ctr., Inc.*,

[13] Defendants also assert in a footnote that Plaintiffs' claims against the MDC Board's named Trustees should be dismissed because they are "redundant and duplicative" of their claims against the MDC Board. State Defs. Mot. at 3 n.3. For this proposition, Defendants cite a line of cases that apply only to *municipal* defendants. *See, e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a *municipal* officer sued in his official capacity and direct suits against *municipalities* are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly." (emphasis added)). No authority applies that proposition to state defendants, and courts regularly entertain suits against both state officials and state entities. *See, e.g.*, *Cross v. Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490 (11th Cir. 1995) (claims adjudicated against both the Alabama State Department of Mental Health and Mental Retardation and various state officials in their official capacities).

575 U.S. 320, 329 (2015). Such requests for injunctive relief have "long been recognized as the proper means for preventing [defendants] from acting unconstitutionally," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001), and they are part of "a long history of judicial review of illegal executive action, tracing back to England," *Armstrong*, 575 U.S. at 327.

Defendants acknowledge this precedent and history, but argue that this is not "an appropriate case" in which to apply it. Trump Mot. at 12. They cite no authority, however, for the proposition that equitable relief from constitutional violations is available only as a defense to an enforcement action (there is none), nor do they provide any reason to treat the Domestic Emoluments Clause "differently than every other constitutional claim," for which parties have an equitable "right to relief as a general matter." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). And Defendants' dubious assertion that the Domestic Emoluments Clause is a purely structural provision is beside the point because the Supreme Court has held that equitable relief is available to remedy violations of structural protections like "separation-of-powers limitations" and "constitutional principle[s] that allocate[] power within government," including by constraining the President's conduct. *Bond v. United States*, 564 U.S. 211, 222 (2011). Thus, Plaintiffs certainly do "not ask the Court to imply a new kind of cause of action," *United States v. Stanley*, 483 U.S. 669, 683 (1987) (quotation marks omitted), much less award a "type of relief that has never been available before," Trump Mot. at 12 (quotation marks omitted).

Relatedly, the zone-of-interests test is no barrier to Plaintiffs' claims because it applies only to statutory claims, not constitutional ones like Plaintiffs assert here. Although the test was "previously classified as an aspect of 'prudential standing,'" the Supreme Court has since "found that label inapt" because the inquiry is at bottom one of congressional intent; it requires courts to apply the "traditional tools of statutory interpretation" to determine "whether a *legislatively*

*conferred* cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 & n.3 (2014) (emphasis added). Where a plaintiff asserts an equitable cause of action directly under the Constitution, these questions plainly do not apply. Tellingly, Defendants invoke only pre-*Lexmark* decisions and cite no case in which a constitutional claim was dismissed pursuant to a zone-of-interests inquiry.

### B. The State Defendants Are Not Entitled to Eleventh Amendment Immunity Because the *Ex parte Young* Doctrine Applies.

Sovereign immunity does not bar Plaintiffs' claims against the State Defendants. To begin, the pre-split Fifth Circuit held that an action against Defendant Florida Board "does not constitute an action against the State of Florida and is, therefore, not barred by the Eleventh Amendment." *Aerojet-Gen. Corp. v. Askew*, 453 F.2d 819, 830 (5th Cir. 1971). Defendants concede, as they must, that this longstanding precedent binds this Court. State Defs. Mot. at 17 n.13.

The remaining State Defendants are also not entitled to sovereign immunity. As Defendants acknowledge, the *Ex parte Young* doctrine provides an "exception" to states' sovereign immunity that permits "plaintiffs to seek prospective relief." State Defs. Mot. at 16. Here, the remedy Plaintiffs seek is "prospective relief to cure an ongoing injury." *Lavina v. Fla. Prepaid Coll. Bd.*, 174 F.4th 49, 53 (11th Cir. 2026). Specifically, Plaintiffs allege that their injuries are impending from President Trump's construction of a towering hotel on the MDC Parcel, and the relief they seek is prospective in nature because it will prevent those future injuries from occurring rather than remedy a past injury. *See* Compl. ¶¶ 236–41, Prayer for Relief ¶ (b)(2)–(3). Not only that, but Plaintiffs also request that this Court enjoin Defendants from any further violations of the Domestic Emoluments Clause with respect to the MDC Parcel. *Id.* ¶¶ 236–41, Prayer for Relief ¶ (b)(1). Such an injunction would ensure "compliance *in the future*" with the Clause's mandate. *Papasan v. Allain*, 478 U.S. 265, 282 (1986) (quotation marks omitted); *see supra* part I.C.

Defendants protest that the Domestic Emoluments Clause violation alleged in the Complaint really happened at a single moment in the past, or at least began with the transfer of the MDC Parcel, and that, therefore, the relief that Plaintiffs seek is necessarily retrospective in nature. State Defs. Mot. at 17.[14] That is wrong on both the facts and the law.

On the facts, Plaintiffs do not merely allege that the *transfer* of land from the State Defendants to President Trump violated the Domestic Emoluments Clause. Rather, central to Plaintiffs' claims is President Trump's ability to profit personally from the transfer by monetizing the land, as he avowedly plans to do. Compl. ¶ 122. In other words, the heart of the alleged Domestic Emoluments Clause violation is the fact that President Trump *will profit immensely* from the State Defendants' gift by turning this piece of unencumbered bay-view real estate into a luxury hotel. *See id.* ¶¶ 122, 125. That is why Plaintiffs seek prospective relief—to prevent the violation from coming to fruition and rendering Plaintiffs' injuries irreparable.[15]

As a legal matter, Defendants are also wrong that the fact that the challenged conduct *began* in the past necessarily means that the relief that Plaintiffs seek is retrospective in nature. As the Eleventh Circuit has explained, the "ongoing and continuous requirement" under *Ex parte Young* simply aims to ensure that the relief sought is "designed to prevent injury that will occur in the future." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999).

---

[14] Similarly, the State Defendants try to recast Plaintiffs' constitutional claims as "effectively" an action to quiet title. State Defs. Mot. at 18. But the Complaint is what it says: an equitable action seeking prospective declaratory and injunctive relief. *See* Compl. ¶¶ 235, 241. "It is not the Defendants' prerogative to recharacterize Plaintiffs' claims." *Barahona v. LaSalle Mgmt. Co.*, 2024 WL 6954433, at *7 (M.D. Ga. Sep. 30, 2024).

[15] That distinguishes this case from those that Defendants cite, in which litigants sought relief only from *completed* past harms. *See* State Defs. Mot. at 18 (first citing *Cotto v. Campbell*, 126 F.4th 761 (1st Cir. 2025), and then citing *Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990)).

To illustrate this principle, *Hollywood Mobile Estates Ltd. v. Cypress*, 415 F. App'x 207 (11th Cir. 2011) (per curiam), is instructive. There, the plaintiff corporation brought suit against various tribal officials who had ejected it from a leasehold, seeking an injunction compelling the tribal officials to restore possession of the property. *See Hollywood Mobile Ests. Ltd. v. Cypress*, 2009 WL 10670031, at *1 (S.D. Fla. Dec. 6, 2009). Although the ejection indisputably happened in the past, the panel held that the defendants were currently "depriving [the plaintiff] of its *present* right to occupy the property under the terms of the lease, in violation of federal law." *Hollywood Mobile Ests. Ltd.*, 415 F. App'x at 209. Thus, the court concluded that the plaintiff's "request for an injunction directing the tribal defendants to restore it to the property" was "prospective relief that will cure [an] ongoing violation," fitting within the *Ex parte Young* exception. *Id.* In reaching that conclusion, the court analogized to unlawful termination claims seeking reinstatement to previous employment, which "[e]very Circuit to have considered the issue" has held "satisfy the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity bar." *Id.* (alteration in original) (quoting *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 96 (2d Cir. 2007)).

Much like *Hollywood Mobile* and the reinstatement cases it cited, Plaintiffs ask this Court for a prospective injunction restoring the status quo to prevent an ongoing violation of federal law and stave off imminent injuries. By voiding the transfer of the MDC Parcel from the State of Florida to the Trump Defendants and enjoining Defendants from treating it as valid, this Court will put an end to President Trump's development of a for-profit hotel on the Parcel that would injure Plaintiffs and violate the Domestic Emoluments Clause.[16]

[16] Declaratory relief is also appropriate under *Ex parte Young* because, "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002); *see also*

### C. This Is Not a Political Question.

This case does not implicate the political-question doctrine, a "narrow" exception to the judiciary's "responsibility to decide cases properly before it, even those it would gladly avoid" because of "political implications." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–96 (2012) (quotation marks omitted). In cases involving both Emoluments Clauses, courts have previously refused to apply that doctrine. *See, e.g.*, *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 756–57 (D. Md. 2018) (Domestic and Foreign Emoluments Clauses); *Citizens for Resp. & Ethics in Wash. v. Trump*, 939 F.3d 131, 158 (2d Cir. 2019) (Foreign Emoluments Clause).

Here, Plaintiffs' allegations "sound in familiar principles of constitutional interpretation" and call for "careful examination of the textual, structural, and historical evidence," which is exactly "what courts do." *Zivotofsky*, 566 U.S. at 201. The Domestic Emoluments Clause lacks any "textually demonstrable constitutional commitment of the issue to a coordinate political department," and the State Defendants' half-hearted references to Congress's impeachment power offer no reasoned argument that judicial review would convey a "lack of respect" for, or generate conflicting "pronouncements" with, other coordinate branches. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Judicial resolution of Plaintiffs' claims is thus wholly "consonant with the separation of powers principles embodied in the Constitution." *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997). Perhaps that is why the President himself has not pressed a political-question argument in this case.

---

*Attwood v. Clemons*, 818 F. App'x 863, 868 (11th Cir. 2020) ("An injunction is necessarily prospective, and the Supreme Court has held that declaratory relief is treated the same when it exposes the defendant to no more liability than an injunction.").

### D. Because Plaintiffs Do Not Seek to Enjoin the President from Performing His Official Duties, *Mississippi v. Johnson* Does Not Bar Relief.

Despite properly asserting an official-capacity claim for prospective injunctive relief, *see supra* part I.B.2, Plaintiffs do not seek to enjoin the President in the performance of his official duties, and so *Mississippi v. Johnson* does not bar the relief requested. "The single point" that *Mississippi v. Johnson* decided was whether the President could "be restrained by injunction from carrying into effect an act of Congress." 71 U.S. (4 Wall.) at 498. To be sure, the Court also stated that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 501. But that assertion—whatever its merits[17]—has no bearing here, where Plaintiffs seek to enjoin the President's *private* conduct with respect to developing a for-profit hotel on the MDC Parcel. As discussed above, the Domestic Emoluments Clause applies to the President's private affairs and official job responsibilities alike, and the President must conform his private conduct to the Clause's mandate. *See supra* part I.B.2.

If that were not enough, *Mississippi v. Johnson* is distinguishable for another reason: it concerned the President's discretionary powers, but affirmatively blessed injunctive relief in other cases where a "simple, definite duty" is "imposed by law." 71 U.S. (4 Wall.) at 498. This case falls in that latter "ministerial" camp: the Domestic Emoluments Clause is mandatory on the President, where "nothing is left to discretion" in his compliance. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss.

[17] There are reasons to doubt its merits. In the 160 years since, the Supreme Court has indeed upheld orders enjoining the President in his performance of official duties. *See, e.g.*, *Cook*, 146 S. Ct. at 2242, 2256.

Dated: September 15, 2026

Respectfully submitted,

*/s/ Gerald E. Greenberg*
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
DANIEL S. GELBER
Florida Bar No. 512877
dan@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com

ELIZABETH B. WYDRA *
elizabeth@theusconstitution.org
BRIANNE J. GOROD *
brianne@theusconstitution.org
BRIAN R. FRAZELLE *
brian@theusconstitution.org
MIRIAM BECKER-COHEN *
miriam@theusconstitution.org
SMITA GHOSH *
smita@theusconstitution.org
JOSHUA D. BLECHER-COHEN *
josh@theusconstitution.org
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Avenue NW, Suite 1200
Washington, D.C. 20036
Telephone: (202) 296-6889

* Admitted *pro hac vice*

*Counsel for Plaintiffs*