**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

SISTRUNK SEEDS, INC. D/B/A DUNN'S OVERTOWN FARM, et al.

*Plaintiffs*,

v.

DONALD J. TRUMP, et al.,

*Defendants*.

Case No. 1:26-CV-23365-RAR

**REPLY IN SUPPORT OF THE PRESIDENT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1
ARGUMENT ............................................................................................................................. 1
I. PLAINTIFFS LACK STANDING TO SUE THE PRESIDENT........................... 1
A. Injury-in-Fact. ........................................................................................ 1
B. Traceability and Redressability. ............................................................ 4
II. PLAINTIFFS LACK A CAUSE OF ACTION. ..................................................... 6
III. PLAINTIFFS FAIL TO STATE A CLAIM........................................................... 7
A. The Domestic Emoluments Clause Does Not Cover the Land Transfer. ..................................................................................................... 8
B. Plaintiffs Have Not Alleged the President's Receipt of an Emolument. ........................................................................................... 12
IV. PLAINTIFFS CANNOT OBTAIN RELIEF AGAINST THE PRESIDENT....... 12
CONCLUSION ........................................................................................................................ 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 11

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) ... 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 11

*Bond v. United States*,
564 U.S. 211 (2011) ... 6

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) ... 4

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ... 3

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 2

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ... 7

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) ... 13

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ... 8

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ... 4

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010) ... 6

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) ... 9

*Haaland v. Brackeen*,
599 U.S. 255 (2023)........................................................................................... 5, 10

*Hafer v. Melo*,
502 U.S. 21 (1991)........................................................................................... 5

*Hoyt v. United States*,
51 U.S. 109 (1850)...........................................................................................11

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)........................................................................................... 7

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................... 5

*Mississippi v. Johnson*,
71 U.S. 475 (1866)........................................................................................... 12, 13

*Mistretta v. United States*,
488 U.S. 361 (1989)........................................................................................... 10

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312 (11th Cir. 2019)........................................................................................... 2

*Murthy v. Missouri*,
603 U.S. 43 (2024)........................................................................................... 5

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)........................................................................................... 10

*Ne. Fla. Ch. of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993)........................................................................................... 3

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989)........................................................................................... 7

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996)........................................................................................... 13

*T-Mobile Northeast, LLC v. Loudoun County Board of Supervisors*,
748 F.3d 185 (4th Cir. 2014)........................................................................................... 4

*Trump v. Cook*,
609 U.S. 528 (2026)........................................................................................... 6, 13

*Trump v. Mazars USA, LLP*,
940 F.3d 710 (D.C. Cir. 2019)........................................................................................ 13

*United States v. Wiltberger*,
18 U.S. 76 (1820).............................................................................................................. 8

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
454 U.S. 464 (1982).......................................................................................................... 7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977).......................................................................................................... 3

**Constitional Provisions**

U.S. Const. art. II, § 1, cl. 7 .............................................................................................. 9

**Other Authorities**

5 O.L.C. Op. 187 (1981) ......................................................................................................11

John Mikhail, The Definition of “Emolument” in English Language and Legal Dictionaries, 1523-1806 (July 13, 2017),
https://perma.cc/79C4-V2TS ..................................................................................... 8, 9

*The Honorable George J. Mitchell U.S. Senate*,
B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ..........................................................11

## INTRODUCTION

This lawsuit is an academic and political exercise masquerading as an Article III case or controversy. Plaintiffs allege that the President has violated the Domestic Emoluments Clause and they expend numerous pages articulating an erroneous and ahistorical reading of the Clause that runs contrary to text, context, history, and tradition. But the Court need not reach that merits-related defect in the Complaint because Plaintiffs have failed to make the threshold showings required to pursue any claim. Plaintiffs' Complaint alleges a wide array of standing theories in the hopes that one will stick and support this Court's jurisdiction. None does. Collectively, Plaintiffs allege speculative and contingent theories of injury, none of which is caused by the President. Plaintiffs' opposition brief, ECF No. 68 ("Opp'n"), argues otherwise but in doing so, it doubles down on speculative assertions about what may or may not occur in the future and relies on inapposite lines of authority that do not support the Complaint. Moreover, Plaintiffs cannot state any claim under the Domestic Emoluments Clause because they lack any cause of action in equity to sue the President here, where the Clause confers no individual rights and where Plaintiffs' alleged injuries are far removed from the zone of interests to which the Clause is directed. Finally, Plaintiffs cannot obtain equitable relief against the President in his official capacity. Plaintiffs' Complaint should be dismissed.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO SUE THE PRESIDENT.

Plaintiffs' Complaint fails first and foremost because it does not adequately allege any of the three elements of Article III standing to sue. President's Mot. to Dismiss at 5–12 ("MTD"), ECF No. 37.

**A. Injury-in-Fact**. Plaintiffs Browde, van den Dries, and Salcedo each allege injuries that depend on the ultimate construction of a particular kind of building on the MDC Parcel. But

Plaintiffs can only speculate that a structure of the type they fear will be built, what its impacts will be, and when any of this would happen. MTD at 7–9. Plaintiffs protest that their alleged injury is sufficiently imminent because a rendering of a possible structure to be built on the land was circulated on social media and because any construction on the land must begin by September, 2030, according to the terms of the conveyance. Opp'n at 9–10. That is far from sufficient. The Supreme Court has instructed that Article III injuries premised on future events must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). But Plaintiffs allege no specific architectural plans or construction date. The most they can muster is the possibility that construction consistent with a social media post may commence as late as *four years from now*. Plaintiffs argue that injury is sufficiently imminent where it will occur within "some fixed period of time in the future." Opp'n at 10. But Plaintiffs have not shown anything like that—their claims are based on the impacts of an as-yet unbuilt structure, which may or may not be built at any particular time in the next four years. [1]

Plaintiff Dunn's Farm separately alleges that it has been injured because it expended resources in pursuit of the MDC Parcel and it has been deprived of the opportunity to compete for that land. This theory fails, however, because its allegations rest on mere speculation that any opportunity to obtain the MDC Parcel existed or that Plaintiff had any imminent plans or capacity to create such a farm. MTD at 6–7. Plaintiffs respond by arguing that their past expenses in seeking the MDC Parcel suffice to obtain the relief they seek. Opp'n at 11–12. But this is not a damages action, unlike the precedent that Plaintiffs cite for this point. *See MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (finding a concrete injury in a case where

---

[1] Salcedo also alleges other injuries, such as the loss of potential academic benefits if the State Defendants had sold the property or given it to Dunn's Farm. *See, e.g.*, Compl. ¶¶ 216–24. These alleged injuries are far too conjectural to suffice for standing purposes, *see* MTD at 8.

plaintiff sought "interest (and double damages)" for past "economic injury"). Plaintiffs must allege a *prospective* injury to support the equitable remedies pled in the Complaint. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Plaintiffs also cite *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Unlike here, however, the "challenged action" in *Arlington Heights* stood "as an absolute barrier to constructing the housing [that the plaintiff] had contracted" to build. *See id.* at 261–62. And that contractual right was key to the Supreme Court's conclusion "that the plaintiff has the requisite personal stake in the controversy." *Id.* at 262. Plaintiffs here have nothing approaching a current contractual right to the MDC Parcel, let alone any showing that the President has rendered such a contractual right worthless.

Plaintiffs next argue that their alleged injury is cognizable because the Court could restore their opportunity to compete for the MDC Parcel. Opp'n at 12–15. Plaintiffs here invoke an inapposite line of authority providing that injury may be shown where the Government is currently violating a plaintiff's individual legal or constitutional rights. *See, e.g.*, *Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024) (challenge to Georgia law that prevented plaintiffs "from carrying weapons" in alleged contravention of Second Amendment rights); *Ne. Fla. Ch. of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (equal protection challenge to ordinance providing preferential treatment to certain minority-owned businesses in awarding city contracts). In that kind of case, the injury is not speculative because it is *already happening*—the government is alleged to be currently infringing the plaintiff's individual rights. There is nothing like that here, where the Domestic Emoluments Clause contains no rights-conferring language and where Plaintiffs' theory of injury depends on future events having nothing to do with any alleged unlawful treatment of *them right now*. Moreover, courts

sometimes accept standing based on the alleged "loss of a statutorily conferred opportunity to compete for a contract" or similar opportunity or benefit. *See CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989). But here, Plaintiffs fail to allege that MDC was under any legal obligation to consider Dunn's Farm's proposal. Dunn's Farm's desire for this land and its unilateral efforts to obtain it do not support standing. *See* MTD at 7.

**B. Traceability and Redressability.** Plaintiffs' claims also flunk the traceability and redressability tests for many of the same reasons. This Court cannot provide likely relief to Dunn's Farm because MDC is under no legal obligation to even *consider* its interest in acquiring the MDC Parcel, let alone any obligation to transfer the land to Plaintiff.[2] The same is true for Salcedo and the homeowner Plaintiffs—any relief by the Court may or may not have any bearing on whether a large structure may be constructed on this land or whether it will be used to benefit Salcedo during her time as a student. The other Defendants' briefs have addressed these matters at greater length and the Government incorporates those points by reference.

There is a separate threshold problem with traceability and redressability as to the claims against the President: Plaintiffs have failed to show how the President, in his official capacity, caused any of the alleged injuries and how relief against the United States would provide redress as to a land transaction to which neither the President nor the Federal Government is a party. MTD at 10–12; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("[P]laintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by

[2] This proposition further distinguishes cases on which Plaintiffs rely. Opp'n at 13. Plaintiffs fail to plausibly allege that the transfer of the MDC Parcel robbed Dunn's Farm's alleged expenditures of any value that they would otherwise have. Unlike *T-Mobile Northeast LLC v. Loudoun County Board of Supervisors*, for example, reversing the challenged action would not plausibly vindicate the plaintiff's decision to expend "time and money." 748 F.3d 185, 191 (4th Cir. 2014).

independent actors not before the courts." (citation omitted)).[3] And Plaintiffs cannot rely on the presence of the other Defendants as a basis to circumvent these principles. Standing "is not dispensed in gross," and thus "for every defendant, there must be at least one plaintiff with standing." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quotation omitted). Plaintiffs cannot invoke groundless traceability and redressability theories against the other Defendants as a basis to seek relief against the President.

Plaintiffs' principal response is their allegation that "President Trump himself exercises control over the Trump Library Foundation." Opp'n at 22 (citing Compl. ¶ 124). This allegation does not suffice. To begin, it is conclusory and not sufficient even at the motion to dismiss stage, particularly where Plaintiffs admit that the President is not a trustee of the Trust. *See* MTD at 19 (citing Compl. ¶ 16). It also does little to solve the redressability problem. Plaintiffs have not sued President Trump in his individual capacity. Instead, they seek relief against him in his official capacity, meaning any resulting relief would run against the United States, not President Trump, let alone against any other Defendant. Plaintiffs thus can only speculate that an order against the President in his official capacity would cause the President in another capacity, or other Defendants, to act in a manner consistent with that order. But speculation is not enough. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quotation omitted)); *see also Haaland v. Brackeen*, 599 U.S. 255, 293–94 (2023) (holding that to support Article III jurisdiction, a court must "be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power"

[3] Contrary to Plaintiffs, Opp'n at 20, *Hafer v. Melo* reaffirmed that an official-capacity claim requires the identification of a federal "policy or custom" that "played a part in the violation of federal law." 502 U.S. 21, 25 (1991) (quotation omitted).

(quotation omitted)).

## II. PLAINTIFFS LACK A CAUSE OF ACTION.

Plaintiffs also lack a cause of action to enforce the Domestic Emoluments Clause because this is an inappropriate case to infer the existence of an equitable cause of action. Plaintiffs do not assert the infringement of any individual rights under the Clause and Plaintiffs' asserted injuries are far outside the zone of interests protected by the Clause. MTD at 12–13.

Plaintiffs' response begins by arguing with a straw man, attacking an argument that federal courts cannot imply causes of action in equity. Opp'n at 38–39. But that is not the issue. Instead, whether to recognize a claim in equity is a matter of judicial discretion and that discretion should not be employed in the exceptional circumstances here—a constitutional provision that creates no individual rights, a set of alleged injuries bearing no relationship to the purposes of the provision in question, and a lawsuit against the sitting President of the United States. These circumstances are far outside the situations in which courts infer equitable causes of action, which typically involve preemptive defenses to enforcement actions or requests for relief as to alleged violations of individual rights. *See* MTD at 12–13.

Plaintiffs' reliance on *Bond v. United States*, 564 U.S. 211, 223 (2011), and *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), demonstrates the point. *See* Opp'n at 39. *Bond* involved a constitutional claim that was raised as a *defense* to a federal prosecution and *Free Enterprise Fund* was consistent with the traditional practice of invoking equity to assert a preemptive defense, as the Court allowed a suit raising separation-of-powers defects with a federal agency that had threatened a "formal investigation" of one of the plaintiffs' businesses. The same is true of *Trump v. Cook*, 609 U.S. 528 (2026), in which a Federal Reserve Governor challenged her removal from office. All of these circumstances fit far more comfortably

in the tradition of equity and the zone of interests of the applicable legal requirements.

Plaintiffs also state that the zone-of-interests test no longer applies after the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Opp'n at 39–40. But while *Lexmark* clarified that the requirement is properly characterized as addressing the scope of a "cause of action" rather than "prudential standing," *Lexmark* also reaffirmed that this limitation on causes of action is a "requirement of general application." 572 U.S. at 127, 129. The Court there focused on "statutorily created causes of action," but it did so to emphasize the importance of congressional intent, *see id.* at 129, not to suggest that courts should have broader authority to infer an equitable cause of action than to construe causes of action expressly created by Congress. And in any event, the Court did not purport to overrule its precedent holding that plaintiffs must fall within "the zone of interests to be protected . . . by the statute *or constitutional guarantee* in question." *E.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982) (citation omitted) (emphasis added); MTD at 13; *see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (explaining that lower courts must leave to the Supreme Court "the prerogative of overruling its own decisions"). Here, Plaintiffs' claims are at most "marginally related" to the Domestic Emoluments Clause's purpose. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394, 399 (1987). Accordingly, Plaintiffs are outside of the Clause's zone of interests, which counsels against this Court's exercise of its equitable power.

## III. PLAINTIFFS FAIL TO STATE A CLAIM.

Plaintiffs fail to state any claim under the Domestic Emoluments Clause for two reasons: (1) the Domestic Emoluments Clause does not encompass alleged commercial benefits having no relationship to any official act by the President and (2) Plaintiffs fail to allege that the President

has *received* any "Emolument" by virtue of the land transfer. MTD at 14–19.

### A. The Domestic Emoluments Clause Does Not Cover the Land Transfer.

To begin, the Domestic Emoluments Clause does not cover alleged benefits that do not arise from the President's service in office. MTD at 14–18. Plaintiffs respond by arguing that the Clause covers any "profit or gain in general," which they argue comports with the original public meaning of the term emolument. Opp'n at 25–27. They cite examples of usage of the term in accordance with that definition in founding-era documents, *see id.*, and rely on an article that found that the President's proposed definition appears in "only 8%" of the 40 dictionaries catalogued for the period of 1604 to 1806. *Id.* at 27 (citing John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 8 (July 13, 2017), https://perma.cc/79C4-V2TS). But mechanical counting of dictionaries is unpersuasive. It does not appear that Plaintiffs dispute that *both* of these definitions existed during the founding era (nor could they). And it is a fundamental canon of construction that a term "cannot be construed in a vacuum" and "must be read in [its] context." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Thus, the relevant question is not how many dictionaries or sources provide one of the two available definitions, but rather which of those definitions should be applied in the context of the Domestic Emoluments Clause. As the President's Motion demonstrated, *see* MTD at 14–17, the context provided by the Constitution—read in concert with the history of the Emoluments Clauses and founding-era practices—shows that Plaintiffs' reading of the term "Emolument" to encompass any profit or gain is meritless.[4]

[4] Plaintiffs also ignore that the dictionaries referenced in Mikhail's article show that the President's definition is closely related to the etymology of emolument, which is profit from labor, or more specifically, from grinding corn. *See United States v. Wiltberger*, 18 U.S. 76, 106 n.w (1820) (using "etymology" to interpret constitutional text). As confirmed by these dictionaries, the term "emolument" derives from the Latin "emolumentum," *see, e.g.* Mikhail, *supra*, at A-6–A-9, no. 4,

Plaintiffs also argue that the Clause's structure, including its use of the phrase "any other Emolument," means that it is intended to capture the broadest reach of emoluments without any relationship to "Compensation." Opp'n at 29–31. Plaintiffs' argument confounds the constitutional text. Again, the Clause provides that the President shall receive "for his Services" a fixed "Compensation" "during the Period for which he shall have been elected" and that "he shall not receive within that Period *any other Emolument* from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7 (emphasis added). The term "Emolument" in this Clause plainly relates back to "Compensation" "for his Services." *See* MTD at 14 (quoting U.S. Const. art. II, § 1, cl. 7). Thus, the reference to "any *other* Emolument" further demonstrates that "Compensation" is a type of "Emolument" and that the two terms should be read in concert. Plaintiffs also protest that the broadest definition of emolument should be used because the Clause prohibits the receipt of "any" emolument. But this simply reflects that any kind of benefit *arising from the President's services* is covered by the Clause's prohibition, not only monetary "Compensation." Plaintiffs err in reading "any" to have a "transformative" effect that alters the Clause's "clear meaning." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).

The President's interpretation of the Clause is also consistent with the practices of early Presidents, which contradicts Plaintiffs' interpretation. MTD at 17. Plaintiffs' responses are unpersuasive. First, Plaintiffs argue that President Washington's business transaction with the Federal Government was distinguishable because there was no allegation he got a "special deal"

---

which was the combination of "mola," meaning "a mill," and "emole," meaning "to grind thoroughly," *id.* nos. 15, 35. Excerpts from six of the dictionaries cited by Mikhail thus include variations of the definition of "profit gotten by labor and cost," *id.* nos. 4, 5, 7, 11, 15, 35. By focusing narrowly on dictionaries that define "emolument" as "profit arising from office or employ," Plaintiffs ignore these etymologically rooted definitions and thus significantly understate the percentage of dictionaries having a definition supporting the President's position.

from the Government. Opp'n at 32. But Plaintiffs do not explain why the absence of a "special deal" would exempt Washington's transaction from the broad scope of the Domestic Emoluments Clause as they (mis)interpret it, which would cover "any" "profit or gain in general," with *no* exceptions. Plaintiffs go on to attack the President's references to past conduct by our early Presidents only on the ground that they are "nothing like the [alleged] gift" challenged here. *Id.* Perhaps recognizing that these attacks have no textual grounding in their reading of the Domestic Emoluments Clause, Plaintiffs go on to argue that the Court should disregard the "difficult line-drawing questions" occasioned by their position. *Id.* at 33. But that is tantamount to a confession of error. *Cf. Haaland*, 599 U.S. at 279–80 (faulting petitioners for failing to "offer a theory" that coherently explained the lines between precedents). It is at the heart of the matter that Plaintiffs' position is irreconcilable with the historical record. The Supreme Court has taught that "*significant weight*" must be placed on "*historical practice*," *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014), including on "contemporaneous practice by the Founders themselves," *Mistretta v. United States*, 488 U.S. 361, 399 (1989).

Plaintiffs further argue that OLC's opinion concerning President Reagan's state retirement benefits implicitly rejects the President position. Opp'n at 32, 34. According to Plaintiffs, although received by President Reagan while he was in office, the retirement benefits did not run afoul of the Domestic Emoluments Clause because they vested before he was elected. *Id.* at 34. But there is no doubt that the retirement benefits fell within Plaintiffs' broad definition of an "Emolument." And there is no doubt that accrued benefits from Treasury bonds would also constitute an "Emolument" under Plaintiffs' proposed definition, *see* MTD at 18, but Plaintiffs do not even respond to this point. Moreover, in addition to noting that President Reagan's retirement benefits were previously earned and vested, OLC also stressed that these were benefits "for which

[the President] no longer ha[d] to perform any services." 5 O.L.C. Op. 187, 190 (1981). The Comptroller General similarly observed that "acceptance of pension benefits requires no obligation to the State for future services." *The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983). Thus, these opinions do not undercut the President's interpretation of the Domestic Emoluments Clause.

Finally, Plaintiffs argue that they have stated a plausible claim even under the President's interpretation of the Clause because the MDC Parcel was allegedly conveyed "because" of the President's office. Opp'n at 28. But Plaintiffs have made no factual allegations plausibly supporting their assertion that the land was conveyed because of the President's "authority over the executive branch and his role in the legislative process." *See id.* (citing Compl. ¶ 139); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009) (conclusory allegations of intent were not entitled to presumption of truth and did not "plausibly suggest an entitlement to relief"). And even though the Clause covers only compensation for services, Plaintiffs fail to allege any meeting of the minds, or that the President accepted the MDC Parcel in exchange for a specific exercise of his authority. *Cf. Hoyt v. United States*, 51 U.S. 109, 135 (1850) (emolument must be "derived from a discharge of the duties of the office"). It is not enough to allege that MDC previously declined to sell the land. Opp'n at 28 (citing Compl. ¶ 94). That contains no allegation at all about why the land *was* transferred now, let alone that the transfer was intended to obtain a benefit for the State via the President's official service. It is just as plausible that the transfer was intended to benefit the State's own tourism industry, or any number of other grounds unrelated to the President's service. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564–69 (2007) (allegations of parallel conduct did not plausibly allege a conspiracy under antitrust law).

### B. Plaintiffs Have Not Alleged the President's Receipt of an Emolument.

Plaintiffs fail to state a claim for the additional reason that they have not shown any *receipt* of an emolument by the President. Plaintiffs' own complaint alleges that the MDC Parcel was transferred to a trust, not the President, and public records show that the President is not a trustee of that entity. MTD at 19. Plaintiffs respond by recapitulating their speculation about what may be built on the land and how it may economically benefit the President or the Trump Organization. Opp'n at 35–36. But as discussed in the standing section above, Plaintiffs cannot say when this structure may be built, and, crucially for these purposes, whether it will occur during the President's term in office. Plaintiffs also rely on allegations indicating the President's awareness of plans for the structure, *see id.*, but these allegations do not overcome the fact that the Foundation, rather than the President, received the land transfer, nor do they show that the transfer of the MDC Parcel will be to the financial "benefit of the President during his term of office," MTD at 19. Plaintiffs finally claim that the Domestic Emoluments Clause also forbids indirect receipt. Opp'n at 37. But the Clause contains nothing to indicate that it covers transactions involving business entities in which the President does not even have a legal relationship. And Plaintiffs' proposed rule could lead to absurd consequences, for it would seem to mean, for example, that a President's child would be constitutionally prohibited from having a paid internship with a state.

## IV. PLAINTIFFS CANNOT OBTAIN RELIEF AGAINST THE PRESIDENT.

Plaintiffs' claims also fail because this Court has no jurisdiction to issue the requested relief against the President in his official capacity, under *Mississippi v. Johnson*, 71 U.S. 475 (1866), and its progeny. MTD at 20. Plaintiffs respond by arguing that *Johnson* is inapplicable because their requested relief extends only to the President's private conduct. *See* Opp'n at 44. As a threshold matter, that is incoherent, because a court cannot issue relief concerning the President's

*private* conduct when he has been sued only in his *official* capacity—again, such a suit is effectively against the United States, and the President's private conduct cannot be adjudicated in a suit when he was not sued in that capacity. In any event, it is not true that the relief extends "only" to the President's private conduct. After all, the requested relief would effectively impose a financial condition on the President's ability to serve as President and to perform the duties he is duly elected to perform, implicating core "executive and political" duties. *Johnson*, 71 U.S. at 499. That plainly implicates the separation-of-powers problems identified in *Johnson*. *Cf. Trump v. Mazars USA, LLP*, 940 F.3d 710, 733 (D.C. Cir. 2019) ("Statutes mandating divestment from financial interests or recusal from conflicted matters might impermissibly disempower Presidents from performing some of the functions prescribed by the Constitution." (quotation modified)), *vacated and remanded,* 591 U.S. 848 (2020).

Plaintiffs also argue that *Johnson* does not apply because compliance with the Domestic Emoluments Clause involves a purely ministerial duty. Opp'n at 44. But this case does not involve a "simple, definite duty" in "which nothing is left to discretion." *See Johnson*, 71 U.S. at 498. Ensuring compliance with the Domestic Emoluments Clause plainly involves the "exercise of judgment," *see id.* at 499, in assessing whether particular matters come within the Clause's scope. Moreover, even if the matters at hand could fairly be described as ministerial, this Court should still refrain from entering an injunction. The Supreme Court has never done so. The D.C. Circuit has not either. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).[5]

**CONCLUSION**

Plaintiffs' Complaint should be dismissed.

---

[5] The Court in *Trump v. Cook*, 609 U.S. 528 (2026), did not uphold an order "enjoining the President in his performance of official duties," Opp'n at 44 n.17. The injunction ran to the Federal Reserve Chairman and Board. *Cook v. Trump*, 804 F. Supp. 3d 14, 45 (D.D.C. 2025).

Dated: October 1, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 353-0543
James.R.Powers@usdoj.gov

*Counsel for the President in his Official Capacity*