**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

SISTRUNK SEEDS INC. *d/b/a* DUNN'S OVERTOWN FARM, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

No. 1:26-cv-23365-RAR

**STATE DEFENDANTS' AND**
**THE DONALD J. TRUMP PRESIDENTIAL LIBRARY FOUNDATION'S**
**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Plaintiffs lack standing. ..... 2

A. Plaintiffs lack a cognizable injury ..... 2

1. The Student and Residential Plaintiffs' injuries are speculative, not imminent, and not ripe. ..... 4

2. Dunn's Farm's injuries are speculative or otherwise insufficient. ..... 4

B. Plaintiffs' injuries are not fairly traceable to a perceived violation of the Domestic Emoluments Clause. ..... 6

II. Plaintiffs' Domestic Emoluments Clause claim presents a nonjusticiable political question. ..... 7

III. Plaintiffs lack a cause of action to enforce the Domestic Emoluments Clause. ..... 9

IV. The State Defendants are entitled to Eleventh Amendment immunity. ..... 10

V. Plaintiffs fail to state a claim under the Domestic Emoluments Clause. ..... 11

A. Plaintiffs fail to state a claim against the MDC, MDC Trustees, and the DBOT because none was involved in the transfer of land from the Trust Fund to the Foundation. ..... 11

B. A land transfer from a state entity to a private nonprofit organization is not an "emolument" for the President under the Domestic Emoluments Clause. ..... 12

CONCLUSION ..... 15

CERTIFICATE OF SERVICE ..... 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aerojet-Gen. Corp. v. Askew*,
453 F.2d 819 (5th Cir. 1971) .......... 10
*Aktepe v. USA*,
105 F.3d 1400 (11th Cir. 1997) .......... 8
*Allen v. Wright*,
468 U.S. 737 (1984) .......... 6
*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 9
*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*,
397 U.S. 150 (1970) .......... 10
*Baker v. Carr*,
369 U.S. 186 (1962) .......... 8
*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) .......... 5
*Bos. Stock Exch. v. State Tax Comm'n*,
429 U.S. 318 (1977) .......... 10
*Brandwein v. Bd. of Trs. of the Univ. of S. Fla.*,
2024 WL 326614 (M.D. Fla. Jan. 29, 2024) .......... 12
*Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*,
2008 WL 1848389 (S.D. Fla. Apr. 22, 2008) .......... 3
*California v. Texas*,
593 U.S. 659 (2021) .......... 6
*Carney v. Adams*,
592 U.S. 53 (2020) .......... 5
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 4
*Cohens v. Virginia*,
19 U.S. 375 (1821) .......... 2
*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) .......... 9
*DeVillier v. Texas*,
601 U.S. 285 (2024) .......... 9
*F.E.C. v. Akins*,
524 U.S. 11 (1998) .......... 3
*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 2, 6, 7
*Gagliardi v. City of Boca Raton*,
2017 WL 5239570 (S.D. Fla. Mar. 28, 2017) .......... 3
*Hollywood Mobile Ests. Ltd. v. Cypress*,
415 F. App'x 207 (11th Cir. 2011) .......... 11

*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261 (1997)........................................................................................... 11
*In re Trump*,
958 F.3d 274 (4th Cir. 2020) ........................................................................... 7, 8, 14
*Marbury v. Madison*,
5 U.S. 137 (1803)................................................................................................. 8
*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007)............................................................................................. 3
*MedImmune, Inc., v. Genentech, Inc.*,
549 U.S. 118 (2007)............................................................................................. 7
*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) ............................................................................. 10
*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*,
No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) ........................................ 3
*Papasan v. Allain*,
478 U.S. 265 (1986)........................................................................................... 11
*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974)........................................................................................ 2, 3
*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)............................................................................................... 10
*Summit Med. Assocs., v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) ......................................................................... 11
*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)............................................................................................. 7
*Trump v. Cook*,
609 U.S. 528 (2026)............................................................................................. 9
*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)........................................................................................... 10
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)............................................................................................. 5
*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)............................................................................................. 10
*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989)............................................................................................. 12

**Constitution**

U.S Const. art. II, § 1, cl. 7 ............................................................................... 14

**Statutes**

42 U.S.C. § 1983 ...................................................................................................... 9

**Other Authorities**

John R. Breihan, *William Pitt and the Commission on Fees, 1785-1801*,
27 Hist. J. 59 (1984)........................................................................................... 12

*The Federalist Papers* (Clinton Rossiter ed., 1961) ........................................................ 14
*Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*,
33 Op. O.L.C. 1 (2009) ........................................................................................ 8
Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*,
102 Minn. L. Rev. 639 (2017) ................................................................................ 12
Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*,
52 U. Ga. L. Rev. 1 (2017) ............................................................................... 12, 13
*President Reagan's Ability to Receive Ret. Benefits from the State of California*,
5 Op. O.L.C. 187 (1981) ...................................................................................... 8

## INTRODUCTION

Plaintiffs seek remarkable relief: enjoining the President of the United States and multiple State actors based off a novel constitutional theory for which no cause of action exists. They claim standing to do so by voicing hypothetical concerns about the Miami skyline, suspected neighborhood disruption, and the loss of hitherto nonexistent academic opportunities. These gripes belong in an op-ed, not a courtroom.

*First*, Plaintiffs lack standing. They offer scattershot standing theories, including the disruption caused by the library's construction and the loss of their preferred use of the land. But these worries are simply generalized grievances reserved to the political process—not the courts. And these worries are hopelessly speculative. No shovel has entered the dirt, nor are there any immediate plans to begin construction. Before construction commences, countless permits, clearances, agreements, and deals must be secured. There's a long way to go before Plaintiffs' imaginary harms could even materialize.

*Second*, Plaintiffs ask this Court to answer a nonjusticiable political question. That doctrine saves the judiciary from being forced to resolve political disagreements. Domestic Emoluments Clause questions belong to Congress, the court of public opinion, and the President's own constitutional obligations. Especially so under Plaintiffs' interpretation of the Domestic Emoluments Clause—namely that it covers *any* conceivable advantage to the President. Determining whether *any* perceived advantage constitutes a prohibited "emolument" is irreducibly a political judgment better left to the public and Congress.

*Third*, Plaintiffs have no cause of action. Neither Congress nor the Constitution vests private individuals with the ability to enforce the Domestic Emoluments Clause. And even if a cause of action existed, Plaintiffs fall outside the zone of interest that might unlock the door.

*Fourth*, Plaintiffs cannot overcome the State Defendants' Eleventh Amendment immunity. State Defendants are sovereigns immune from suit, barring special circumstances. Plaintiffs rely on *Ex parte Young*, but that case only operates prospectively—it emphatically does not apply to Plaintiffs' complaints about prior land transfers and Florida's interest in controlling its property.

*Finally*, even if Plaintiffs could clear all those hurdles, Plaintiffs haven't alleged a Domestic Emoluments Clause violation. The text, structure, and history demonstrate that emoluments had the narrow meaning of compensation in return for official services. Yet Plaintiffs have failed to allege that the President received anything at all. They argue that the receipt of land by a separate legal entity, whose rules prevent individual enrichment, should nevertheless be considered a prohibited emolument to the President.[1] That theory doesn't work.

The Court should dismiss Plaintiffs' Complaint.

## ARGUMENT

### I. Plaintiffs lack standing.

#### A. Plaintiffs lack a cognizable injury.

As Justice John Marshall recognized, Article III "does not extend the judicial power to every violation of the constitution which may possibly take place." *Cohens v. Virginia*, 19 U.S. 375, 405 (1821). A litigant must suffer a "particular injury" that is not "merely a general interest common to all members of the public." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–21 (1974); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("*AHM*") (a "general legal, moral, ideological, or policy objection to a particular government action," does not confer standing). Because "all citizens" have a "generalized interest" in

---

[1] Moreover, many of the State Defendants did not convey the disputed land to Defendant Presidential Library Foundation, so they do not belong in this case.

"constitutional governance," injuries premised on the violation of the Constitution, without more, do not provide a citizen "standing to sue." *Schlesinger*, 418 U.S. at 217. Plaintiffs' claim that Defendants have violated the Domestic Emoluments Clause falls squarely in this category of "generalized complaint." *See id*.

Plaintiffs attempt to avoid these problems by emphasizing the *personal* nature of the aesthetic, stigmatic, and other disruptions. *See* Opp. 7–11. But courts have consistently held that "loss of property value," "noise from future parties," "aesthetic intrusion,"[2] and "increased traffic congestion," are not particularized injuries because they are no "different in kind from those suffered by the community as a whole." *Buena Vista E. Historic Neighborhood Ass'n v. City of Miami*, 2008 WL 1848389, at *5 (S.D. Fla. Apr. 22, 2008); *Gagliardi v. City of Boca Raton*, 2017 WL 5239570, at *6 (S.D. Fla. Mar. 28, 2017), *aff'd sub nom. Gagliardi v. TJCV Land Tr.*, 889 F.3d 728 (11th Cir. 2018) ("increased traffic," and "change in character of the area," from proposed construction "impact[] vast swaths of the surrounding population" such that they are "generalized grievances," not "particularized and concrete injuries necessary to confer standing").[3]

---

[2] Plaintiffs cite environmental cases where individuals have standing because they "use," or would use more frequently, an area affected by the alleged violations and their aesthetic or recreational interests in the area have been harmed. Opp. 8. But aesthetic disagreements don't convey standing. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*, No. 26A203, 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026) (claim that a building is "distasteful" does not establish standing).

[3] Plaintiffs attempt to cast doubt on *Buena Vista* and *Gagliardi* because they came before *Spokeo*. Opp. 9 n.4. That is irrelevant. Plaintiffs incorrectly suggest that *Spokeo* created a new rule, but that case merely confirmed existing doctrine that "standing is not to be denied simply because many people suffer the same injury." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.24 (2007); *cf.* Opp. 9 n.4. At any rate, the Plaintiffs lack standing because their injuries are "abstract and indefinite," which "deprives the case of the concrete specificity" necessary for standing. *F.E.C. v. Akins*, 524 U.S. 11, 23–24 (1998).

**1. The Student and Residential Plaintiffs' injuries are speculative, not imminent, and not ripe.**

Resident and Student Plaintiffs[4] do not have standing because their alleged injuries are too speculative and not imminent. The imminence requirement, "ensure[s] that the alleged injury is not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). Because the myriad complaints about the negative effects of the library's construction have yet to occur, they must be imminent for these Plaintiffs to have standing. They are not.

Plaintiffs' counterarguments fail. They claim that the sharing of a "two-minute video rendering" of the library makes their supposed injuries "certainly impending." Opp. 10. But as explained in the Motion to Dismiss, a blueprint would need to be made, requisite approvals granted, construction would need to start, and that construction would need to occur in a certain way before Plaintiffs experience their alleged harms. Plaintiffs offer no argument in response to these many, contingent prerequisites. And such "highly speculative fear," relies on a "highly attenuated chain of possibilities," which "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.[5]

**2. Dunn's Farm's injuries are speculative or otherwise insufficient.**

Dunn's Farm alleges that but for Defendant Donald J. Trump Presidential Library Foundation Inc.'s (the "Foundation") receipt of the MDC Parcel, Dunn's Farm might have received the MDC Parcel. But that is also speculative. At most Dunn's Farm points to some MDC staff expressing vague "verbal interest" in a partnership with Dunn's Farm and the *former* MDC President

---

[4] Resident Plaintiffs are Kristen Browde and Gregory van den Dries. Student Plaintiff is Carmen Salcedo.

[5] For the same reasons, construction may not occur within five years of conveyance, contrary to Plaintiffs' claim. *See* Opp. 10.

delivering a diplomatic message more than half a decade ago that he would identify certain potentially helpful staff members. Compl. ¶¶ 194–96. Contrary to Plaintiffs' characterization, State and Foundation Defendants do not claim that Dunn's Farm must demonstrate it would have received the MDC Parcel for standing purposes. Opp. 14–15. Instead, Dunn's Farm's lack of any application or bid for the putative lost opportunity shows it was not "able and ready" to take advantage of the opportunity. *Carney v. Adams*, 592 U.S. 53, 60, 64–66 (2020). Nor has it demonstrated that such an effort would have been a "futile gesture." *Id.*; Opp. 14–15 (citing *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024)).[6]

Dunn's Farm attempts to analogize the loss it alleged to have experienced to the economic "pocketbook" injury in *Arlington Heights*. Opp. 11–12. The situation here is not even close. In *Arlington Heights*, a development corporation suffered an economic injury because it expended "thousands of dollars" on "plans" and "studies," which the purportedly unlawful act would render "worthless." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977). But here, one searches the Complaint in vain for any allegation of money that Dunn's Farm expended and would lose if it does not receive the MDC Parcel. *See* Compl. ¶¶ 185–210. Dr. Dunn established a "small vegetable garden on the Wolfson Campus," Compl. ¶ 193, but that garden is not rendered worthless just because Dunn's Farm did not get to build a larger garden on the MDC Parcel. Dunn's Farm comes closer to showing standing when it alleges that Dr. Dunn informed MDC that he wished to create "a larger urban farm" on the MDC Parcel. Compl. ¶ 194. But a few conversations do not equal expending large amounts of money on bespoke plans and studies.

[6] Dunn's Farm claims that "outreach efforts will be more challenging than they would have been if there was an urban farm right on the MDC campus." Compl. ¶ 208. That fails for the same reason. Student Plaintiff's injury based on a denial of her opportunity to work on the hypothetical farm on the MDC Parcel, Compl. ¶ 219, is definitionally even more speculative and remote.

Standing would cease to operate as a screen of mere abstract disagreement if a plaintiff could bypass it with a few phone calls or an unanswered email.[7]

### B. Plaintiffs' injuries are not fairly traceable to a perceived violation of the Domestic Emoluments Clause.

Similar to the lack of imminence, Resident and Student Plaintiffs' claims to particularized injuries also fail because the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain [Plaintiffs'] standing." *Allen v. Wright*, 468 U.S. 737, 759 (1984). The connection between the alleged Emoluments Clause violation to the aesthetic, stigmatic, and other disruptions that these Plaintiffs imagine they will experience, Compl. ¶¶ 153–84, 225–26, relies on too many "unfettered choices made by independent actors not before the courts," who are not "'likely [to] react in predictable ways.'" *AHM*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)); *see also Wright*, 468 U.S. at 759 (the involvement of "numerous third parties" renders the "chain of causation" too weak to support standing).

Plaintiffs' chief counterargument assumes too much. Plaintiffs claim that all these third parties will act in a particular way because they are in cahoots with the President. Opp. 18–19. But no evidence exists that the FAA or state building code officials would do anything but their jobs in granting approvals to any building constructed on the MDC Parcel. *See* Opp. 18. Plaintiffs also wrongly allege that the "State Defendants . . . enact[ed] a law (SB 118)." *See id.* That law was enacted by the Florida Legislature, which is not one of the State Defendants in this action.

[7] Plaintiffs previously claimed that there was a "frustration of its organizational objective to create an expanded urban farming program to benefit both MDC students and the local community." Compl. ¶ 205. Plaintiffs do not defend that as sufficient for standing. A wise choice. It is merely "a setback to the organization's abstract social interests." *AHM*, 602 U.S. at 394.

True, certain third parties like "architects and engineers" may be agents of the Foundation, *id.*, but there is no guarantee that those agents will ensure the construction proceeds in the way that Plaintiffs suggest. Surely, a good agent informs the principal of any impracticalities, hurdles, and costs that may arise, as well as alternative means of reaching a particular objective. And Plaintiffs do not mention other third parties, such as the city and local law enforcement, who may ameliorate some of the concerns regarding traffic congestion, heightened security, and other potential disruptions.[8] Plaintiffs therefore cannot justify their claim that there is "just a single step between the transfer of the MDC Parcel and Plaintiffs' harms[.]" Opp. 19. Those results are simply too "far removed from its distant (even if predictable) ripple effects." *AHM*, 602 U.S. at 383.[9]

## II. Plaintiffs' Domestic Emoluments Clause claim presents a nonjusticiable political question.

Plaintiffs' claims do not belong in this Court for another reason—claims under the Domestic Emoluments Clause present nonjusticiable political questions. Plaintiffs wrongly suggest that their claims are justiciable simply because the Domestic Emoluments Clause does not textually commit itself to a coordinate political branch. Opp. 43.[10]

*First*, questions over emoluments belong to "either the courts of Congress or the courts of public opinion." *In re Trump*, 958 F.3d 274, 305 (4th Cir. 2020) (Wilkinson, J., dissenting, joined

---

[8] And of course, to make any sense of the Student Plaintiff's alleged injury that she was denied the benefits of MDC selling the MDC parcel, Compl. ¶ 221, one must assume that MDC would have found a third-party buyer and come to an agreement resulting in a completed sale—and following each of those speculative possibilities—that MDC would have allocated the proceeds to directly benefit the Student Plaintiff.

[9] For the same reasons the case is not yet ripe. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (explaining that in some cases, standing and ripeness "boil down to the same question" (quoting *MedImmune, Inc., v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007))).

[10] Plaintiffs cited two cases where courts have previously held that the political questions doctrine does not apply to the Emoluments Clauses. Opp. 43. The Supreme Court, however, vacated and remanded both cases to be dismissed as moot.

by Niemeyer, Agee, Richardson, Quattlebaum, and Rushing), *cert. granted, judgment vacated sub nom. Trump v. District of Columbia*, 592 U.S. 1233 (2021). In other words, Congress may "impeach a President for his non-compliance with the [Emoluments] Clauses," or otherwise "enable the people to cast an informed ballot at the next election" by passing legislation that forces disclosures by the President. *Id*. at 305–06. As Judge Wilkinson observed, the Emoluments Clauses "are *especially* inapposite for freestanding judicial resolution," because "[o]nly the President must comply with both Clauses," and for constitutional structural reasons, generally suits are not permitted "against the President." *Id.* at 305. Plaintiffs object that nonjusticiability would preclude judicial enforcement of certain constitutional structures. But that's the point. For some presidential constitutional duties, he "is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*, 5 U.S. 137, 166 (1803).[11] A "court's undertaking independent resolution" of a Domestic Emoluments Clause claim is not possible "without expressing lack of the respect due coordinate branches of government," and without "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Aktepe v. USA*, 105 F.3d 1400, 1402–03 (11th Cir. 1997) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

*Second*, even if Plaintiffs' interpretation of the Emoluments Clause is correct, there is still a "lack of judicially discoverable and manageable standards for resolving" the issue, *Aktepe*, 105

[11] Presidents have operationalized this principle in the Emoluments Clauses context by seeking and following advice from the Office of Legal Counsel. *See, e.g.*, *President Reagan's Ability to Receive Ret. Benefits from the State of California*, 5 Op. O.L.C. 187 (1981) (explaining that President Reagan may continue to receive retirement benefits from his prior service as governor of California without violating the Domestic Emoluments Clause); *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (2009) (explaining that President Obama may receive the Nobel Peace Prize without Congressional approval pursuant to the Foreign Emoluments Clause).

F.3d at 1402, because it's exceedingly difficult to tell when a financial benefit originating from a state or federal government to the president is an emolument. *See infra* pp. 14–15. And surely the value of the financial benefit, the particular source, its revocability, the President's power over the source, and the President's particular financial situation all matter under Plaintiffs' theory that the Emoluments Clause is simply a broad anti-corruption provision.

**III. Plaintiffs lack a cause of action to enforce the Domestic Emoluments Clause.**

There's also no cause of action. Plaintiffs incorrectly argue that "no authority" exists for the proposition that "equitable relief from constitutional violations is available only as a defense to an enforcement action," while making the assertion that constitutional violations create causes of action on their own.[12] Opp. 38–39. Both are impossible to square with recent Supreme Court precedent. *See DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," "[i]nstead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, *see*, *e.g.*, 42 U.S.C. § 1983."). Plaintiffs also quote from *Armstrong* and *Malesko,* but miss the forest for the trees. Opp. 38–39. Both cases demonstrate that the Court is not in the business of creating implied causes of action, even for alleged constitutional violations. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (the Supremacy Clause does not create a cause of action for state violations of federal law); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (a refusal to extend a *Bivens* remedy). Plaintiffs' quoted language about injunctive relief refers to *Ex parte*

[12] Plaintiffs' citation to *Trump v. Cook*, Opp. 38, is inapposite. The Federal Reserve has a "unique historical status and role" that appears to have created an "exception" for a Federal Reserve Board member. *Trump v. Cook*, 609 U.S. 528, 530 (2026); *id.* at 535 (Thomas, J., dissenting).

*Young*. Opp. 38–39. But *Ex parte Young* is just an anti-suit injunction brought to prevent the enforcement of an unconstitutional law. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 47 (2021); *id*. at 53 (Kennedy, J., concurring in part). Even though a party can bring an *Ex parte Young* suit prior to the threatened enforcement, it still needs a cause of action. *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("*Ex parte Young* [can be used] as a *shield* against the enforcement" of unconstitutional state law; it "does not supply a right of action by itself," so it cannot be used as a "cause-of-action-creating *sword*.").

Plaintiffs also fail to fall within the necessary zone of interest. They do not dispute this fact but rather claim that the Supreme Court has recently applied the "zone of interest" tests primarily to statutory provisions, so the Court has implicitly abandoned the zone of interest test for constitutional provisions. Opp. 39–40. No support exists for that negative inference. The Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Unless and until the Supreme Court expressly holds that zone of interest tests do not apply to constitutional provisions, lower courts have no discretion to treat them as optional. *See, e.g.*, *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 321 n.3 (1977); *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982).

## IV. The State Defendants are entitled to Eleventh Amendment immunity.

Plaintiffs, in an attempt to sidestep the State Defendants' sovereign immunity,[13] claim the alleged Emoluments Clause violation is ongoing because the President has an "ability to profit

---

[13] Defendants acknowledge that the Trust Fund does not have Eleventh Amendment immunity under the erroneous precedent, *Aerojet*. Motion 17 n.13 (citing *Aerojet-Gen. Corp. v. Askew*, 453 F.2d 819, 830 (5th Cir. 1971)).

personally from the transfer." Opp. 41.[14] Despite Plaintiffs' creative characterization, they still actually seek "to adjudicate the legality of past conduct"—the conveyance of the MDC Parcel. *See Summit Med. Assocs., v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999). But this attempt to unwind a conveyance of land is "the functional equivalent of a quiet title action" against a state, which "implicates special sovereignty interests," and makes the *Ex parte Young* doctrine "inapplicable." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281, 287 (1997).

Given this hurdle, Plaintiffs declare by fiat, in a footnote, that their suit does not fall in the "special sovereignty interest" exception to *Ex parte Young* because they call their suit something other than an action to quiet title. Opp. 41 n.14. But courts "look to the substance rather than to the form of the relief sought," *Papasan v. Allain*, 478 U.S. 265, 279 (1986), and Plaintiffs' mere rewording of the claim can't sidestep sovereign immunity.

## V. Plaintiffs fail to state a claim under the Domestic Emoluments Clause.

### A. Plaintiffs fail to state a claim against the MDC, MDC Trustees, and the DBOT because none was involved in the transfer of land from the Trust Fund to the Foundation.

Plaintiffs' claim that the MDC,[15] the MDC Trustees,[16] and the DBOT should remain in the suit because they conveyed the MDC parcel to the Trust Fund for its eventual conveyance to the

---

[14] Plaintiffs also cite an unpublished *per curiam* case, *Hollywood Mobile Estates*, to support their position. Opp. 42. Not only does the case not bind this Court, but it also is not analogous. There, the panel held that where a party had a "*present* right to occupy the property," the relief it sought, to be restored to the property, was prospective, not retroactive. *Hollywood Mobile Ests. Ltd. v. Cypress*, 415 F. App'x 207, 209 (11th Cir. 2011). Here, none of the Plaintiffs has a present right to occupy the MDC Parcel. *Supra* I.A.

[15] Miami Dade College is not a legal entity that can sue or be sued; the proper party is The District Board of Trustees of Miami Dade College, Florida ("DBOT"). Motion 3 n.2. Accordingly, Plaintiffs "agree to the dismissal of Defendant MDC." Opp. 37 n.12.

[16] Plaintiffs claim that the MDC Trustees should not be dismissed from the suit even though they are being sued in their official capacities and the basis of those claims is duplicative of claims against DBOT because the duplicative-claim rule only applies to municipal defendants. Opp. 38

Foundation. Opp. 38. That is a non-sequitur. It was the Trust Fund that ultimately transferred the MDC Parcel to the Foundation. Compl. ¶¶ 92, 94, 99–100. And Plaintiffs cite no authority for why conveyances prior to the challenged conveyance to the Foundation implicate the Domestic Emoluments Clause.

**B. A land transfer from a state entity to a private nonprofit organization is not an "emolument" for the President under the Domestic Emoluments Clause.**

Text, history, and long-standing practice confirm that "emolument" originally meant a form of compensation for exercising governmental authority.

Plaintiffs claim that in Founding-Era dictionaries, literature, and letters, "emolument" commonly meant "profit or gain in general," rather than "just profit or gain provided as compensation for performance of an official service." Opp. 25–27. Fair, but that doesn't speak to the sense in which the *Constitution* uses "emoluments." Political documents, such as those created by the Continental Congress and various state records and proclamations from the 1780s, refer to emoluments as compensation by "reason of public employment." *See* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 U. Ga. L. Rev. 1, 13–16 & nn.31–55 (2017). Most "ratification-related statements . . . assume an office-related definition" of "emolument." Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 650 & n.47 (2017). The historical context also supports this interpretation. In English and early American practice, "[f]ees and other non-salary payments were familiar forms of official

n.13. But a suit against a "state official in his or her official capacity is . . . no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The rule is not limited to municipal officers. *See Brandwein v. Bd. of Trs. of the Univ. of S. Fla.*, 2024 WL 326614, at *2 (M.D. Fla. Jan. 29, 2024) (official-capacity claims against University of South Florida officials "duplicative" of claims against its Board of Trustees). The claims against the MDC Trustees thus stand or fall with the claims against DBOT.

emolument." John R. Breihan, *William Pitt and the Commission on Fees, 1785-1801*, 27 Hist. J. 59 (1984). In the 1780s, various states started to reform that system, seeking to replace emoluments with adequate salaries. Natelson, *supra*, at 25 & nn.104–05. These reform movements show that the emoluments prohibited by the states immediately prior to ratification were benefits "received by reason of public office." *Id*. at 27. These discussions never referred to emolument as any benefit or advantage or gain from business untethered to public employment. *Id.*[17] Combined with the fact that "the most frequent meaning in political discourse" of emoluments was financial benefits "solely by a reason of public civil or military position," *id*. at 13, this is strong evidence that emoluments means compensation for official service.

Plaintiffs try to have it both ways when they claim that even if emoluments mean profit or gain provided as compensation for performance of an official service, the conveyance of the MDC Parcel would still qualify. Opp. 28. But Plaintiffs point to no arrangement between State Defendants and the President, whereby in return for some official act[18] of the President, the State Defendants gave him the MDC Parcel. If, as Plaintiffs claim, the President renders services by having "authority over the executive branch" and a "critical 'role in the legislative process,'" it's hard to imagine when a sitting President is ever not rendering services. Opp. 28.

Plaintiffs' textual arguments fare no better. They claim that the "any" before "other Emolument," expansively modifies "Emolument." Opp. 29. But that ignores the immediately following word "other," which limits "any" to "other Emolument." Plaintiffs claim that because "receive for

---

[17] Plaintiffs cite Supreme Court cases to support their proposed reading, but as mid-19th century cases, Opp. 30 n.9, they come far too late to shed light on a 1788 provision.

[18] Plaintiffs complain that Defendants ask for a further narrower definition because an emolument must be for a "discrete act." Opp. 28–29. That attacks a strawman. *See* Motion 23 (Emoluments Clause violation needs compensation "for the performance of some official duty"); President's Motion 1 (Emoluments Clause violation needs exchange of compensation for "official acts").

his Service" immediately precedes "a Compensation," it only modifies "a Compensation" and not "Emolument." Opp. 29–30. But it's an equally plausible reading that "any other Emolument" is cabined by the preceding clause of "a Compensation" to be "received for [the President's] Services." U.S Const. art. II, § 1, cl. 7. In *Federalist* No. 73, Alexander Hamilton took this exact position. He explained that the Domestic Emoluments Clause would require that Congress "once for all declare what shall be compensation for his services during the time for which he shall have been elected," and that "[n]either the Union, nor any of its members, will be at liberty to give . . . any other emolument than that which may have been determined by the *first act*." *The Federalist Papers*, No. 73, at 441–42 (Clinton Rossiter ed., 1961) (emphasis added).

Plaintiffs claim that the Emoluments Clause applies to any "gifts with corrupting potential." Opp. 34. That proves far too much. Since our Founding, "prior Presidents have owned property while in office," some of which "produc[ed] income that could be attributed in part to domestic or foreign governments and officials." *In re Trump*, 958 F.3d at 309 (Niemeyer, J., dissenting, joined by Wilkinson, Agee, Quattlebaum, and Rushing); *see* Motion 22 (noting Washington's purchase of federal land and Johnson's radio and television stations receiving FCC license renewals); President's Motion 17 (describing how Jefferson and Madison received negotiable tobacco notes from Virginia). The full logical consequences of Plaintiffs' position are baffling. Under their view, the President couldn't "own municipal bonds in his investment portfolio," *In re Trump*, 958 F.3d at 309 (Niemeyer, J., dissenting), or even United States Treasury bonds.

Plaintiffs attempt to sidestep the issue, claiming that this case is different because somehow Washington's land purchases were fair but the conveyance of the MDC Parcel was "a sweetheart deal." Opp. 33. Surely if the Foundation received the MDC Parcel for less than what Plaintiffs consider a "fair" value, Plaintiffs would still be in court, claiming an Emoluments Clause violation.

Indeed, Florida did not even transfer the MDC Parcel to the President, but to the Foundation. Compl. ¶ 108. Plaintiffs claim that regardless, the President could still benefit from the conveyance, or alternatively that the Domestic Emoluments Clause extends to those "with whom the President necessarily shares interests." Opp. 37. But it's hard to imagine what transactions wouldn't be swept up under such broad definitions. Under Plaintiffs' rules, a state college could not give the sitting President an honorary degree for delivering a graduation speech, and the President's relatives likely could not even own state and federal bonds. That cannot be right.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint.

October 1, 2026

Respectfully submitted,

/s/ David M.S. Dewhirst

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

JEFFREY PAUL DESOUSA
JASON J. MUEHLHOFF
*Chief Deputies Solicitor General*
VINCENT LI
*Deputy Solicitor General*
ALEXZONDRA MATTSON
*Solicitor General Fellow*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
*david.dewhirst@myfloridalegal.com*
*jason.muehlhoff@myfloridalegal.com*

*Counsel for Governor DeSantis, Attorney General Uthmeier, Commissioner Simpson, CFO Ingoglia, and the Board of Trustees of the Internal Improvement Trust Fund*

FRANCIS A. CARBONE II
*General Counsel*
DEPARTMENT OF FINANCIAL SERVICES
400 S Monroe St. # PL11
Tallahassee, FL 32399
Phone: (850) 413-5939
*francis.carbone@myfloridacfo.com*

*Counsel for CFO Ingoglia*

JAVIER A. LEY-SOTO
*General Counsel*
MIAMI DADE COLLEGE
Office of Legal Affairs
300 NE 2nd Avenue
Room 1453
Miami, FL 33132
Phone: (305) 237-3694

JESUS M. SUAREZ
IVAN FERIS, JR.
CONTINENTAL PLLC
245 Alcazar Avenue
Coral Gables, FL 33134
Phone: (305) 677-2707

*Counsel for Miami Dade College and the Members of The District Board of Trustees of Miami Dade College*

ALEJANDRO BRITO
IAN M. CORP
BRITO PLLC
2121 Ponce de Leon Boulevard, Suite 650
Coral Gables, Florida 33131
Phone: (305) 614-4071
abrito@britopllc.com

*Counsel for the Donald J. Trump Presidential Library Foundation, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on October 1, 2026, to all counsel of record.

/s/ *David M.S. Dewhirst*
Solicitor General